1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
         – and –
6   DARREN J. ROBBINS (168593)
    DAVID C. WALTON (167268)
7   655 West Broadway, Suite 1900
    San Diego, CA  92101-8498
8   Telephone:  619/231-1058
    619/231-7423 (fax)
9   darrenr@rgrdlaw.com
    davew@rgrdlaw.com
10
    Attorneys for Plaintiff
11
    [Additional counsel appear on signature page.]
12

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15  JOSEPH CURRY, Individually and on Behalf  )  Case No.
    of All Others Similarly Situated,         )
16                                            )  CLASS ACTION
                      Plaintiff,              )
17                                            )  COMPLAINT FOR VIOLATIONS OF THE
          vs.                                 )  FEDERAL SECURITIES LAWS
18                                            )
    YELP INC., JEREMY STOPPELMAN,             )
    ROBERT J. KROLIK and GEOFFREY             )
19  DONAKER,                                  )
                                              )
20                    Defendants.             )
                                              )  DEMAND FOR JURY TRIAL
21  _____  )

22

23

24

25

26

27

28

Plaintiff makes the following allegations, except as to allegations specifically pertaining to plaintiff and plaintiff's counsel, based upon the investigation undertaken by plaintiff's counsel, including analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Yelp Inc. ("Yelp" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Yelp from October 29, 2013 through April 3, 2014, inclusive (the "Class Period"), against Yelp and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"), including Jeremy Stoppelman ("Stoppelman"), the Company's Chairman and Chief Executive Officer ("CEO"), Robert J. Krolik ("Krolik"), Yelp's Chief Financial Officer ("CFO"), and Geoffrey Donaker ("Donaker"), the Company's Chief Operating Officer ("COO").

### BACKGROUND AND OVERVIEW

2.      Yelp describes itself generally as an online networking platform that connects people with great local businesses.  The Company went public in March 2012.  The Company's shares are traded on the New York Stock Exchange ("NYSE") under ticker symbol "YELP."

3.      The Company's most recent Form 10-K states that Yelp users have contributed a total of approximately 52.8 million cumulative reviews of almost every type of local business.  According to the Company, the reviews appearing on its website are written by people using Yelp to share their everyday local business experiences, giving voice to consumers and bringing "word of mouth" online.

4.      The Company generates revenue primarily from the sale of advertising on its website and mobile app to local businesses of all sizes that seek to reach its growing audience of consumers. During the fiscal year ended December 31, 2013, the Company reported that it generated net revenue of $233.0 million, representing 69% growth over 2012, a net loss of $10.1 million and adjusted

1   EBITDA of $29.4 million.

2   5.   The Company describes the three key constituencies of its business, the communities

3   of contributors who write reviews, the consumers who read them and the local businesses, as

4   follows:

5   *Contributors*.  We foster and support vibrant communities of contributors in local markets across the United States, Canada, Europe, Singapore, Australia, New
6   Zealand and Brazil. ***These contributors provide rich, firsthand information about local businesses, such as reviews, tips, ratings and photos***.

7
8   *Consumers*.  Our platform is transforming the way people discover local businesses and is attracting a large audience of geographically and demographically diverse consumers.  Every day, millions of consumers visit our website or use our
9   mobile app to find great local businesses. . . .

10  *Local Businesses*.  Our platform provides businesses with a variety of free and paid services that help them engage with consumers at the critical moment when
11  they are deciding where to spend their money.  Businesses can register a business account for free and "claim" the Yelp business page for each of their locations,
12  allowing them to enhance the page with additional information about their businesses and respond to consumer reviews, among other features.  We refer to an individual
13  business location as a "local business."  Businesses can also pay for premium services to promote themselves through targeted search advertising, discounted offers
14  and further enhancements to their business page.

15                          *        *        *

16  *Yelp Mobile*.  We help consumers make decisions on the go through both our mobile app and versions of our website dedicated to mobile-based browsers, which
17  we refer to as our mobile website.

18  6.   During the Class Period, defendants made materially false and misleading statements

19  concerning the Company's true business and financial condition, including but not limited to the true

20  nature of the so-called "firsthand" experiences and reviews appearing on the Company's website, the

21  robustness of its processes and algorithms purportedly designed to screen unreliable reviews, and the

22  Company's forecasted financial growth prospects and the extent to which they were reliant upon

23  undisclosed business practices, including but not limited to requiring business customers to pay to

24  suppress negative reviews.

25  7.   The Class Period misrepresentations made by defendants concerning the Company's

26  current financial and business condition, including its forecasted financial and business condition

27  alleged herein, were each materially false and misleading when made and caused the Company's

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW                    - 2 -

1    stock to trade at artificially inflated prices of over $98.00 per share on March 4, 2014, because

2    defendants knew, or recklessly disregarded, the following true facts:

3                     (a)      Reviews, including anonymous reviews, appearing on the Company's website

4    were not all authentic "firsthand" reviews, but instead included fraudulent reviews by reviewers who

5    did not have first-hand experience with the business being reviewed;

6                     (b)      Algorithms purportedly designed to screen unreliable reviews did not

7    comprehensively do so, and instead, the Company allowed such unreliable reviews to remain

8    prominent while the Company tried to sell services designed to suppress negative reviews or make

9    them go away; and

10                    (c)      In light of the above facts, the representations concerning the Company's

11   current and future financial condition and prospects, and the extent to which they were reliant upon

12   undisclosed business practices, did not have a reasonable basis.

13          8.       Nevertheless, between November 11, 2013 and March 10, 2014, Company insiders,

14   including the Individual Defendants, sold 1,160,910 shares of Yelp stock at prices as high as $98.99

15   per share for insider trading proceeds of more than $81.5 million.

16          9.       As the true facts concerning the Company's business practices began to be revealed to

17   the market, the Company's stock price declined, falling from a Class Period high of over $98.00 per

18   share to $65.76 per share at the end of the Class Period.

19                                        **JURISDICTION AND VENUE**

20          10.      Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act.  The claims

21   asserted herein arise under §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and

22   Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

23          11.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Yelp is

24   headquartered in this District and many of the acts and practices complained of herein occurred in

25   substantial part in this District.

26                                                    **PARTIES**

27          12.      Plaintiff Joseph Curry purchased or acquired Yelp common stock as described in the

28   attached certification and was damaged by the conduct alleged herein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW                              - 3 -

13.     Defendant Yelp is incorporated in the state of Delaware and trades on the NYSE under the symbol "YELP."  The Company's corporate headquarters are located at 140 New Montgomery Street, San Francisco, California.

14.     Defendant Stoppelman is, and was at all relevant times, CEO of the Company. During the Class Period, defendant Stoppelman sold 132,350 shares of Yelp stock for proceeds of $8,493,479.

15.     Defendant Krolik is, and was at all relevant times, CFO of the Company.  During the Class Period, defendant Krolik sold 35,000 shares of Yelp stock for proceeds of $2,556,917.

16.     Defendant Donaker is, and was at all relevant times, COO of the Company.  During the Class Period, defendant Donaker sold 117,640 shares of Yelp stock for proceeds of $9,877,471.

17.     The defendants named in ¶¶14-16 are referred to herein as the "Individual Defendants."

## CONTROL PERSONS

18.     As officers and controlling persons of a publicly held company whose common stock was and is traded on the NYSE and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Yelp, each of the Individual Defendants had access to the adverse undisclosed information about the Company's financial

1   condition and performance as particularized herein and knew (or recklessly disregarded) that these

2   adverse facts rendered the positive representations made by or about Yelp and its business or

3   adopted by the Company materially false and misleading.

4        20.   The Individual Defendants, because of their positions of control and authority as

5   officers and/or directors of the Company, were able to and did control the content of the various SEC

6   filings, press releases and other public statements pertaining to the Company issued during the Class

7   Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be

8   misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

9   their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is

10   responsible for the accuracy of the public reports and releases detailed herein and is therefore

11   primarily liable for the representations contained therein.

12        21.   The Company and the Individual Defendants are liable as participants in a fraudulent

13   scheme and course of business that operated as a fraud or deceit on purchasers of Yelp common

14   stock by disseminating materially false and misleading statements and/or concealing material

15   adverse facts.  The scheme: (i) deceived the investing public regarding Yelp's business, operations,

16   management and the intrinsic value of Yelp common stock; (ii) allowed Yelp insiders, including the

17   Individual Defendants, to sell over 1.16 million shares of their Yelp stock at artificially inflated

18   prices for insider trading proceeds of more than $81.5 million; and (iii) caused plaintiff and other

19   members of the Class to purchase Yelp common stock at artificially inflated prices.

20   **SUBSTANTIVE ALLEGATIONS**

21        22.   On October 29, 2013, the Company issued a press release announcing its financial

22   results for the third quarter of 2013:

23   **Local Revenue Accelerates to 80% Over Third Quarter 2012**

24      . . . Yelp Inc., the company that connects consumers with great local
businesses, today announced financial results for the third quarter ended September
25   30, 2013.

26       •    Net revenue was $61.2 million in the third quarter of 2013, reflecting 68%
growth in net revenue from the third quarter of 2012

27

28       •    Cumulative reviews grew 42% year over year to more than 47.3 million

- Average monthly unique visitors grew 41% year over year to approximately 117 million

- Active local business accounts grew 61% year over year to approximately 57,200

Net loss in the third quarter of 2013 was $(2.3) million, or $(0.04) per share, compared to a net loss of $(2.0) million, or $(0.03) per share, in the third quarter of 2012. Adjusted EBITDA for the third quarter of 2013 was approximately $8.1 million, compared to $2.2 million for the third quarter of 2012.

Net revenue for the nine months ended September 30, 2013 was $162.3 million, an increase of 68% compared to $96.4 million in the same period last year. Net loss for the nine months ended September 30, 2013 was $(8.0) million, or $(0.12) per share, compared to a net loss of $(13.8) million, or $(0.27) per share, in the comparable period in 2012. Adjusted EBITDA for the first nine months of this year was approximately $19.0 million compared to $2.8 million for the first nine months last year.

"We saw another quarter of strong momentum *thanks to the high-quality, authentic content contributed by Yelpers around the world*," said Jeremy Stoppelman, Yelp's chief executive officer. . . .

"We continue to deliver outstanding results, with year over year revenue growth of 68%," added Rob Krolik, Yelp's chief financial officer. . . .

**Business Highlights**

- **Yelp mobile**: Consumer engagement with Yelp mobile continues to grow. In the third quarter, approximately 46% of local ads were shown on mobile devices, approximately 62% of searches were on mobile, and mobile app usage increased to approximately 11.2 million unique devices on a monthly average basis. Additionally, Yelp added a number of mobile features including the ability to write and post reviews.

- **Closing the loop with businesses**: In July, Yelp launched Yelp Platform, which enables consumers to transact with businesses directly on its site, and acquired SeatMe, a web and iPad-app based reservation solution for the restaurant and nightlife categories.

*       *       *

**Business Outlook**

As of today, Yelp is initiating guidance for the fourth quarter of 2013 and raising its full year 2013 revenue and adjusted EBITDA guidance.

- For the fourth quarter of 2013, net revenue is expected to be in the range of $66 million to $67 million, representing growth of approximately 62% compared to the fourth quarter of 2012. Adjusted EBITDA is expected to be in the range of $9 million to $10 million.

- For the full year of 2013, net revenue is expected to be in the range of $228 million to $229 million, representing growth of approximately 66%

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW

compared to the full year of 2012.  Adjusted EBITDA is expected to be in the range of $28 million to $29 million.

(Footnote omitted.)

23.    On October 30, 2013, the Company announced the pricing of 3.75 million shares of its Class A common stock at $67.00 per share and that the registration statement for the offering had been declared effective on October 29, 2013:

. . . Yelp Inc. announced today the pricing of its underwritten registered public offering of 3,750,000 shares of Class A common stock at a price to the public of $67.00 per share, for a total of approximately $251.3 million.  In addition, Yelp has granted the underwriters a 30-day option to purchase up to 562,500 additional shares of Class A common stock.

\*        \*        \*

Goldman, Sachs & Co., Citigroup Global Markets Inc. and Jefferies LLC are the bookrunning managers for the offering.  Oppenheimer & Co. Inc. and Cowen and Company are co-managers for the offering.

24.    On November 5, 2013, the Company issued a press release announcing that it had closed the secondary offering and that the Company had raised $288 million:

Yelp Inc. announced today the closing of its underwritten registered public offering of an aggregate of 4,312,500 shares of Class A common stock, including 562,500 shares of Class A common stock sold pursuant to the full exercise by the underwriters of their option to purchase additional shares.  All of the shares were sold at a price to the public of $67.00 per share, for a total of approximately $288.9 million.

\*        \*        \*

Goldman, Sachs & Co., Citigroup Global Markets Inc. and Jefferies LLC were the bookrunning managers for the offering.  Oppenheimer & Co. Inc. and Cowen and Company were co-managers for the offering.

25.    On November 5, 2013, after the report of the closing of the Company's secondary offering, the Company's stock closed at $71.13 per share.

26.    On January 7, 2014, the Virginia Court of Appeals issued a ruling in a case titled *Yelp, Inc. v. Hadeed Carpet Cleaning Inc.*, No. 0116-13-4.  The ruling required Yelp to disclose the identities of anonymous Yelp reviewers who had written negative reviews about Hadeed Carpet Cleaning.

27.     On January 8, 2014, *The Washington Times* published an article entitled "YELP critics must be identified, court rules in online landscape altering decision."  The article discussed the January 7, 2014 ruling from the Virginia Court of Appeals:

> In a decision that could reshape the rules for online consumer reviews, a Virginia court has ruled that the popular website Yelp must turn over the names of seven reviewers who anonymously criticized a prominent local carpet cleaning business.

> The case revolves around negative feedback against Virginia-based Hadeed Carpet Cleaning.  The owner, Joe Hadeed, said the users leaving bad reviews were not real customers of the cleaning service . . . .

> *       *       *

> In a 25-page majority opinion, Judge William G. Petty said, "Generally, a Yelp review is entitled to First Amendment protection because it is a person's opinion about a business that they patronized.

> "The anonymous speaker has the right to express himself on the Internet without the fear that his veil of anonymity will be pierced for no other reason than because another person disagrees with him," Judge Petty wrote.

> However, the court said that First Amendment rights do not cover deliberately false statements and agreed that Mr. Hadeed provided sufficient reason to think the users might not have been customers.

> If "the reviewer was never a customer of the business, then the review is not an opinion; instead, the review is based on a false statement" and not subject to First Amendment protection, the opinion stated.

> *       *       *

> Hadeed Carpet, which advertises heavily throughout the D.C. area and in The Washington Times, has a two out of five star rating on Yelp, based on nine reviews. The ninth review was posted Wednesday and is a one-star condemnation of Hadeed's lawsuits.

> But the review site also has a long, contentious history of hiding reviews, listing them as "not recommended."  Hadeed Carpet has 88 hidden reviews, the majority of them negative, though the business has received a number of five-star reviews.

> Mr. Hadeed has responded to most of the reviews his business has received, thanking the good reviews and saying he wants to address the concerns of negative reviewers.  The response to negative reviews always asks for more information, including the Yelp user's full name.

> Mr. Delaney argued that the fact Mr. Hadeed had so many hidden reviews is telling. Reviews typically are hidden only when Yelp suspects them of being false or violating its terms of service.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW                                        - 8 -

1  "The problem we had was that these posts were not filtered; they were out
2  there in the open. After we complained, Yelp filtered them," he said. "What does that tell you?"

3  28. On January 10, 2014, *The Atlantic* published an article about the Virginia appellate

4  court decision entitled "Court Rules That Yelp Must Unmask the Identities of Seven Anonymous

5  Reviewers":

6  Over the past few years, seven people have been so dissatisfied with the
7  service they received from Hadeed Carpet Cleaning of Alexandria, Virginia, that they took to Yelp to air the details of their dissatisfaction. They, like so many unhappy customers since Yelp launched in 2004, did so under pseudonym.

8  *        *        *

9
10  Hadeed Carpet Cleaning believes that those seven unhappy reviewers lied in their Yelp reviews. It's not that the little details of the reviews were wrong, but that they were made up altogether. The seven reviewers were never customers at all, Hadeed Carpet Cleaning claims. If that is indeed the case, then the reviews are false. And if they've additionally caused harm, then the reviews are defamatory. . . .
11
12
13  But in order to press that claim, Hadeed Carpet Cleaning would need to know who made those reviews. And so to find out, they subpoenaed Yelp to turn over the identities. Yelp refused, and the case headed to court. Earlier this week, the Court of Appeals of Virginia ruled that Yelp must out its seven anonymous reviewers refused, and the case headed to court.
14

15  29. After news of the Virginia appellate court ruling, the potential disclosure of the

16  anonymous sources began to be more widely discussed, including speculation that the Company

17  might be covertly engaged in the creation of negative reviews. As a result, the Company's stock

18  price suffered significant volatility and material declines, falling from a close of $82.21 per share on

19  January 10, 2014 to a close of $75.84 per share on January 13, 2014.

20  30. On February 5, 2014, the Company issued a press release announcing its fourth

21  quarter and fiscal year 2013 financial results. The Company announced fourth quarter and fiscal

22  year 2013 revenue and earnings that materially beat Wall Street analysts' expectations. In addition,

23  the Company increased the Company's fiscal 2014 financial guidance:

24  **Revenue Growth in the Fourth Quarter Accelerates to 72%**

25  . . . Yelp Inc., the company that connects consumers with great local
26  businesses, today announced financial results for the fourth quarter ended December 31, 2013.

27  • Net revenue was $70.7 million in the fourth quarter of 2013, reflecting 72%
28  growth from the fourth quarter of 2012

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW     - 9 -

- Cumulative reviews grew 47% year over year to approximately 53 million

- Average monthly unique visitors grew 39% year over year to approximately 120 million

- Active local business accounts grew 69% year over year to approximately 67 thousand

Net loss in the fourth quarter of 2013 was $(2.1) million, or $(0.03) per share, compared to a net loss of $(5.3) million, or $(0.08) per share, in the fourth quarter of 2012. Adjusted EBITDA for the fourth quarter of 2013 was approximately $10.4 million, compared to $1.8 million for the fourth quarter of 2012.

Net revenue for the full year ended December 31, 2013 was $233.0 million, an increase of 69% compared to $137.6 million in 2012. Net loss for the full year ended December 31, 2013 was $(10.1) million, or $(0.15) per share, compared to a net loss of $(19.1) million, or $(0.35) per share, for 2012. Adjusted EBITDA for the full year 2013 was approximately $29.4 million compared to Adjusted EBITDA of $4.6 million for the prior year.

*       *       *

"We are very pleased with our performance in 2013," added Rob Krolik, Yelp's chief financial officer. "Full year revenue growth accelerated to 69% over 2012 while we demonstrated leverage in the model with more than a six-fold increase in adjusted EBITDA."

*       *       *

**Business Outlook**

As of today, Yelp is providing its outlook for the first quarter of 2014 and full year 2014.

- For the first quarter of 2014, net revenue is expected to be in the range of $73.5 million to $74.5 million, *representing growth of approximately 60% compared to the first quarter of 2013*. Adjusted EBITDA is expected to be in the range of $8 million to $9 million. Stock-based compensation is expected to be in the range of $10 million to $11 million, and depreciation *and amortization is expected to be approximately 5% of revenue*.

- *For the full year of 2014, net revenue is expected to be in the range of $353 million to $358 million*, representing growth of approximately 53% compared to the full year of 2013. Adjusted EBITDA is expected to be in the range of $54 million to $58 million.

(Footnote omitted.)

31.     After the Company's February 5, 2014 financial results and increased financial guidance, Yelp's share price spiked nearly 20%, from $75.23 per share on February 5, 2014 to $89.46 per share on February 6, 2014.

32.    On March 3, 2014, the Company filed its Form 10-K for the fiscal year ended December 31, 2013.  The Form 10-K was signed by defendants Stoppelman, Krolik and Donaker and all of the Company's directors.  With respect to the Company's business practices and online business reviews, the Company stated that its contributors posted **first-hand** reviews of local business, and boasted of the quality of its reviews and the robust nature of the Company's recommendation software, which was purportedly designed to screen unreliable reviews:

> Yelp connects people with great local businesses.  Our users have contributed a total of approximately 52.8 million cumulative reviews of almost every type of local business, from restaurants, boutiques and salons to dentists, mechanics, plumbers and more.  ***These reviews are written by people using Yelp to share their everyday local business experiences, giving voice to consumers and bringing "word of mouth" online***. . . .

> *Contributors*. . . .  ***These contributors provide rich, firsthand information about local businesses, such as reviews, tips, ratings and photos***.

> *Consumers*. . . .  ***Our strong brand and the quality of the reviews and other content on our platform have enabled us to attract this large audience with almost no traffic acquisition costs***.

> *Local Businesses*.  Our platform provides businesses with a variety of free and paid services that help them engage with consumers at the critical moment when they are deciding where to spend their money. . . .  ***Businesses can also pay for premium services to promote themselves through targeted search advertising, discounted offers and further enhancements to their business page***.

> *       *       *

> • *Our Recommendation Software*.  In order to maintain and enhance the quality, authenticity and integrity of the reviews on our platform, ***we employ our proprietary automated recommendation software to analyze and screen all of our reviews***.  Our recommendation software looks at a wide range of data associated with each review and reviewer in order to determine the review's relevance and reliability.  Our recommendation software operates continually, and the results of its determinations with respect to particular reviews may change over time as it factors in new information.  This can result in reviews that were previously recommended becoming not recommended and reviews that were previously not recommended being restored to recommended status.  Reviews that are not recommended do not factor into a business's overall star rating and are segregated from recommended reviews on our website.  By clicking on a link on a reviewed business's page on our website, users can access reviews that are not recommended for that business, as well as the star rating and other information about reviews that we have removed for violation of our terms of service.  We believe our recommendation technology is one of the key contributors to the quality, authenticity and integrity of the reviews on our platform and the success of our service.

1      33.    Each of the defendants' Class Period statements set forth above concerning the

2  Company's current business and financial condition was materially false and misleading when made

3  and caused the Company's stock price to trade at artificially inflated prices because defendants

4  knew, or recklessly disregarded, the following true facts:

5      (a)    Reviews, including anonymous reviews, appearing on the Company's website

6  were not all authentic "firsthand" reviews, but instead included fraudulent reviews by reviewers who

7  did not have first-hand experience with the business being reviewed;

8      (b)    Algorithms purportedly designed to screen unreliable reviews did not

9  comprehensively do so, and instead, the Company allowed such unreliable reviews to remain

10  prominent while the Company tried to sell services designed to suppress negative reviews or make

11  them go away; and

12      (c)    In light of the above facts, the representations concerning the Company's

13  current and future financial condition and prospects, and the extent to which they were reliant upon

14  undisclosed business practices, did not have a reasonable basis.

15      34.    Nevertheless, between November 11, 2013 and March 10, 2014, Company insiders,

16  including the Individual Defendants, sold 1,160,910 shares of Yelp stock at prices as high as $98.99

17  per share for insider trading proceeds of more than $81.5 million.

18      35.    On March 31, 2014, the *Los Angeles Times* published an article entitled "Yelp's

19  practices sound to some like extortion."  The article discussed the Company's practice of offering

20  customers a service to suppress negative reviews for a fee and compared the practice to extortion:

21      ***A merchant is told by Yelp that for a fee, troubling ads on the site can be
made to go away.  A Yelp spokesman says what was meant is that the merchant***

22      ***"could buy out the ad space on your own page***."

23      Yelp just can't stop living the thug life.

24      Five years ago, I asked whether the popular review site was a shakedown
racket for merchants.  I quoted a number of small-business owners who said Yelp

25  had threatened to run negative reviews more prominently if they didn't pay for
advertising.

26

27      Jeremy Stoppelman, Yelp's chief executive, told me at the time that the San
Francisco company doesn't strong-arm merchants.  He blamed talk of shakedowns
on disgruntled business owners spreading "false rumors."

28

I guess this is another one of those.

Rick Fonger, 62, decided a few years ago to end a career in journalism and move from Canada to Alhambra, where he opened a jewelry store.

\*     \*     \*

To give his shop, called 58 Facets Jewelry, a little social-media boost, Fonger spent about $300 a month advertising on Yelp. "It worked OK, not great," he said.

After six months, he decided to shift his limited marketing budget to direct mail. He canceled his Yelp ad in February.

The very next day, Fonger said, a Yelp employee called to say she wanted to help. She pointed out that competitors' ads were now appearing above the reviews for his store.

"***She said that for $75 a month, she could make those ads go away,*" Fonger** ***recalled***.

***He responded that this sounded a lot like extortion***.

"***She said she could understand why I'd think that," Fonger said. "But she*** ***said they do it to everyone***."

As if that makes it OK. "***It certainly sounds like extortion***," said Kevin Dean, president of WSI Net Advantage, a Fremont, Calif., Internet marketing firm.

"If Yelp just sold the ad space to someone else, fine," he said. "But to then call up and offer to make the ad go away for a price, that seems like an unscrupulous business practice."

\*     \*     \*

Yelp is a for-profit business itself, and it makes the bulk of its money from neighborhood merchants. About 83% of the company's nearly $71 million in revenue in the most recent quarter came from local ads.

This gives Yelp a powerful incentive to turn the screws on small businesses as much as it can.

Vince Sollitto, a Yelp spokesman, said that when the company's rep told Fonger that she could make competitors' ads go away for $75 a month, what she meant was that "you could buy out the ad space on your own page."

He said Yelp is doing the same thing that phone books do: selling ads that accompany related business listings.

***The difference, of course, is that the Yellow Pages never told businesses*** ***they could pay extra to get rid of someone else's ad***.

By offering this service, Yelp has introduced a more cutthroat approach to marketing, with itself as the broker for whose pitch is seen first by users of the site.

\* \* \*

Sollitto said he was surprised that Fonger likened the company's practices to extortion.  He said Yelp is "all about connecting local businesses and consumers."

I asked how offering businesses a chance to pay a monthly fee for erasing a rival's ad was different from websites that post people's mug shots from arrests and then charge a fee to take them down.

Sollitto seemed offended that I'd even make such a comparison.

"Yelp has created a platform for sharing information," he said.  "It's a discovery engine for small businesses."

And maybe he believes that.  **The reality, however, is that Yelp has created an online venue at which a merchant's competitors can post negative reviews and run their own ads.**

**Yelp then makes money by charging to downplay others' negative reviews and to keep rivals' ads away**.

\* \* \*

This strikes me as an unfair business practice.  But, so far, Yelp has weathered various lawsuits challenging its policies.  "Their claims keep getting dismissed for lack of any fact-based evidence," Sollitto wrote last year on Yelp's blog.

**I'm no lawyer, but I know a racket when I see one**.  Anybody who calls to say that you now have a problem but that they can make that problem go away for $75 a month isn't your friend.

\* \* \*

I asked Fonger how Yelp's tactics differed from, say, Tony Soprano's or Michael Corleone's.

"Well," he answered, "no one's come by to break my legs."

Then he thought about it a moment.  "At least not yet."

36.     On or around April 2, 2014, it was publicly disclosed and reported that the Federal Trade Commission had received more than 2,000 complaints about Yelp, many contending that Yelp would solicit businesses to buy advertisements on the Company's website and would retaliate if businesses declined by deleting positive reviews and claiming the deletions were due to an updated "automated algorithm."

37.     On April 4, 2014, Zack's issued a report on this disclosure and its impact on the Company's stock price:

Shares of *Yelp Inc. (YELP)* fell $5.02 (6.6%) to close at $70.61 on Apr 3, 2014, after the Federal Trade Commission said that it received an overwhelming number of complaints about the company's business review practices over the last five years.

The FTC recently announced that it received more than 2,046 complaints against Yelp. *According to The Wall Street Journal, most of the complaints were lodged by small business owners alleging that Yelp posts fraudulent reviews that defame their reputation*.

*Most of these business owners said that the negative reviews posted on the website appeared after they declined to pay Yelp for sponsorship*.

38.     These disclosures cause the Company's stock price to suffer sharp declines, as between April 1, 2014 and April 4, 2014, Yelp's stock price dropped from a close of $80.18 per share on April 1, 2014 to a close of $65.76 per share on April 4, 2014.

## LOSS CAUSATION/ECONOMIC LOSS

39.     During the Class Period, as detailed herein, defendants made false and misleading statements about the strength of the Company's business and prospects and engaged in a scheme to deceive the market. This artificially inflated Yelp's stock price and operated as a fraud or deceit on Class Period purchasers of Yelp common stock. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Yelp's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of Yelp common stock during the Class Period, plaintiff and other members of the Class (as defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

40.     Yelp's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

41.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Yelp who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated

1    to be such assumptions underlying or relating to any projection or statement of future economic

2    performance when made, nor were any of the projections or forecasts made by defendants expressly

3    related to or stated to be dependent on those historic or present tense statements when made.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

42.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiff and other members of the Class purchased Yelp common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

43.    At all relevant times, the market for Yelp's common stock was efficient for the following reasons, among others:

(a)    As a regulated issuer, Yelp filed periodic public reports with the SEC; and

(b)    Yelp regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

**CLASS ACTION ALLEGATIONS**

44.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Yelp common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, and directors and officers of Yelp and their families and affiliates.

1    45.    The members of the Class are so numerous that joinder of all members is

2  impracticable.  The disposition of their claims in a class action will provide substantial benefits to

3  the parties and the Court.  Yelp has more than 59 million shares of stock outstanding, owned by

4  hundreds if not thousands of persons.

5    46.    There is a well-defined community of interest in the questions of law and fact

6  involved in this case.  Questions of law and fact common to the members of the Class that

7  predominate over questions that may affect individual Class members include:

8             (a)    Whether the 1934 Act was violated by defendants;

9             (b)    Whether defendants omitted and/or misrepresented material facts;

10            (c)    Whether defendants' statements omitted material facts necessary in order to

11  make the statements made, in light of the circumstances under which they were made, not

12  misleading;

13            (d)    Whether defendants knew or recklessly disregarded that their statements were

14  false and misleading;

15            (e)    Whether the price of Yelp common stock was artificially inflated; and

16            (f)    The extent of damage sustained by Class members and the appropriate

17  measure of damages.

18    47.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

19  sustained damages from defendants' wrongful conduct.

20    48.    Plaintiff will adequately protect the interests of the Class and has retained counsel

21  who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

22  with those of the Class.

23    49.    A class action is superior to other available methods for the fair and efficient

24  adjudication of this controversy.

**COUNT I**

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

50.    Plaintiff incorporates ¶¶1-49 by reference.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW                                    - 17 -

51.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Yelp common stock during the Class Period.

53.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Yelp common stock.  Plaintiff and the Class would not have purchased Yelp common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

54.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Yelp common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

55.     Plaintiff incorporates ¶¶1-54 by reference.

56.     The Individual Defendants acted as controlling persons of Yelp within the meaning of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about Yelp, the Individual Defendants had the power and ability to control the actions of Yelp and its

1  employees.  Yelp controlled the Individual Defendants and its other officers and employees.  By

2  reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

3                                    **PRAYER FOR RELIEF**

4         WHEREFORE, plaintiff prays for judgment as follows:

5         A.      Determining that this action is a proper class action, designating plaintiff as Lead

6  Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

7  Procedure and plaintiff's counsel as Lead Counsel;

8         B.      Awarding plaintiff and the members of the Class damages and interest;

9         C.      Awarding plaintiff's reasonable costs, including attorneys' fees; and

10         D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

11  proper.

12                                    **JURY DEMAND**

13         Plaintiff demands a trial by jury.

14  DATED:  August 6, 2014                  ROBBINS GELLER RUDMAN
                                            & DOWD LLP
15                                          SHAWN A. WILLIAMS

16

17                                          _____*s/ Shawn A. Williams*_____
                                            SHAWN A. WILLIAMS
18
                                            Post Montgomery Center
19                                          One Montgomery Street, Suite 1800
                                            San Francisco, CA  94104
20                                          Telephone:  415/288-4545
                                            415/288-4534 (fax)
21
                                            ROBBINS GELLER RUDMAN
22                                            & DOWD
                                            DARREN J. ROBBINS
23                                          DAVID C. WALTON
                                            655 West Broadway, Suite 1900
24                                          San Diego, CA  92101-8498
                                            Telephone:  619/231-1058
25                                          619/231-7423 (fax)

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW                        - 19 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
NATHAN HAMLER
110 West A Street, Suite 750
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Yelp.docx

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW                              - 20 -