1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   KENNETH J. BLACK (291871)
3  Post Montgomery Center
   One Montgomery Street, Suite 1800
4  San Francisco, CA  94104
   Telephone:  415/288-4545
5  415/288-4534 (fax)
   shawnw@rgrdlaw.com
6  kennyb@rgrdlaw.com

7  Attorneys for Plaintiff

8  [Additional counsel appear on signature page.]

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11  JOSEPH CURRY, Individually and on Behalf  )  Case No. 3:14-cv-03547-JST
    of All Others Similarly Situated,         )
12                                            )  CLASS ACTION
                             Plaintiff,       )
13                                            )  CONSOLIDATED CLASS ACTION
              vs.                             )  COMPLAINT FOR VIOLATIONS OF THE
14                                            )  FEDERAL SECURITIES LAWS
    YELP INC., et al.,                        )
15                                            )
                             Defendants.      )
16  _____ )

17

18

19

20

21

22

23

24

25

26

27

28

981194_1

1

**TABLE OF CONTENTS**

2

**Page**

3  INTRODUCTION ....................................................................................................1

4  BACKGROUND OVERVIEW .................................................................................1

5  JURISDICTION AND VENUE ................................................................................7

6  PARTIES ..................................................................................................................7

7  CONTROL PERSONS ..............................................................................................8

8      Yelp Admits that It Aggressively Manipulates – Curates – Reviews Posted on
9      Yelp's Website Establishing Knowledge and Control Over Content ..................9

   SOURCES OF INFORMATION ..............................................................................12
10

11  FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD.......13

12      Virginia Court of Appeals Orders Yelp to Disclose the Identity of Yelpers
        Who Wrote Negative and Potentially False Reviews ..........................................29

13      During the Class Period and Prior to Disclosure of Thousands of Business
14      Complaints of Extortion-like Business Tactics, Insiders Unload More than
        One Million Shares of Yelp Stock for Proceeds of $81.5 Million...................36
15

16      The True Facts Begin to Be More Widely Disclosed, Including Public
        Reports of Federal Trade Commission Complaints Emerging, Many
17      Claiming that Yelp Posted Fraudulent and Negative Reviews After They
        Declined to Pay for Advertising – Stock Price Declines ....................................37

18      Post Class Period Publications Corroborate the Negative Impact of the April
19      Disclosures on the Company's Stock Price – Financial Condition and
        Outlook. ..............................................................................................................42
20

   LOSS CAUSATION/ECONOMIC LOSS ...............................................................45
21

22  NO SAFE HARBOR ................................................................................................49

23  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET..........49

24  CLASS ACTION ALLEGATIONS .........................................................................50

25  COUNT I ..................................................................................................................51

26      For Violation of §10(b) of the 1934 Act  and Rule 10b-5 Against All
        Defendants .............................................................................................................51

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST             - i -

1

2                                                                                        **Page**

3

COUNT II ...................................................................................................................52

        For Violation of §20(a) of the 1934 Act Against All Defendants ......................................52

PRAYER FOR RELIEF .........................................................................................................52

JURY DEMAND ....................................................................................................................52

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                        - ii -

**INTRODUCTION**

1.      This is a securities class action brought on behalf of all persons who purchased or otherwise acquired the common stock of Yelp from October 29, 2013, through April 3, 2014, inclusive (the "Class Period"), against Yelp, Inc. ("Yelp" or the "Company") and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"), including Jeremy Stoppelman ("Stoppelman"), the co-founder and Chief Executive Officer ("CEO"), Robert J. Krolik ("Krolik"), Yelp's Chief Financial Officer ("CFO") and Geoffrey Donaker ("Donaker"), the Company's Chief Operating Officer ("COO").

**BACKGROUND OVERVIEW**

2.      Yelp describes itself generally as an online networking platform that connects people with great local businesses.  Stoppelman co-founded the Company in 2004.  The Company held its Initial Public Offering in March 2012, and the Company's shares are traded on the New York Stock Exchange ("NYSE") under ticker symbol "YELP."

3.      The Company generates revenue primarily from the sale of advertising on its website and mobile application to local businesses of all sizes that seek to reach its growing audience of consumers.  For the nine months ended September 30, 2013, according to the Company, substantially all of its revenue was generated by the sale of advertising products on its website. During the fiscal year ended December 31, 2013, the Company reported that it generated net revenue of $233.0 million, representing 69% growth over 2012, but the Company has struggled to achieve profitability, reporting a FY13 net loss of $10.1 million and adjusted EBITDA of $29.4 million.[1]

4.      Before the Class Period, Yelp had managed to sell advertising packages to only a fraction of the businesses the Company had created Yelp pages for (according to September 5, 2013 Deutsche Bank report, Yelp had created 47 million business pages, only 1.2 million of which had been claimed by the business owner, and only 4.2% of those claimed businesses elected to advertise

---

[1]   Yelp reported on a fiscal year that ran from January 1 to December 31.  As used herein "FY" means Yelp's fiscal year.  Thus, FY14 means Yelp's fiscal year 2014, which ran from January 1, 2014 to December 31, 2014.  Specific quarters are designated by the quarter number followed by the letter Q.  Thus, 2Q13 indicates Yelp's second quarter in fiscal year 2013, which ran from April 1, 2013, to June 30, 2013.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                                    - 1 -

1    in 2Q13). In order to grow the Company's revenue, defendants knew the Company would have to

2    convince existing and prospective advertisers alike that Yelp's advertising products offer a material

3    benefit and can generate a competitive return relative to the other alternatives. Defendants assured

4    investors that they would demonstrate Yelp's value, and in doing so increase revenue, by offering an

5    array of new services to paying advertisers. Defendants referred to these efforts as "closing the

6    loop" *i.e.*, offering new products of value to local businesses.

7        5.    Knowing that the Company's revenue and earnings growth potential was directly tied

8    to gaining paying local business accounts and securing business that was heavily reliant upon the

9    quality and authenticity of reviews on its website, defendants made materially false and misleading

10   statements concerning the Company's true business and financial condition, including, but not

11   limited to, (i) the true nature of the so-called "firsthand" reviews appearing on the Company's

12   website; (ii) the robustness of its processes and algorithms purportedly designed to screen unreliable

13   reviews; (iii) the relationship between solicitation of advertising revenue from local businesses and

14   when or whether reviews would be recommended or filtered; and (iv) the Company's forecasted

15   financial growth prospects and the extent to which they were reliant upon undisclosed business

16   practices, including, but not limited to, requiring business customers to pay to suppress negative

17   reviews.

18       6.    Those misrepresentations, including false denials of the Company's extortion-like

19   business practices, caused the Company's stock price to trade at artificially inflated prices during the

20   Class Period as high as $101.75 on March 5, 2014.

21       7.    Beginning with the Company's October 29, 2013, press release announcing 3Q13

22   financial results and the Prospectus and Registration Statement of the same day, the Company falsely

23   stated that the reviews on the Company's website were authentic and that the contributors to the

24   website provided high-quality, first-hand information about local businesses:

25   • ***We saw another quarter of strong momentum thanks to the high-quality, authentic content contributed by Yelpers around the world.***

26
27   • ***[C]ontributors provide rich, firsthand information about local businesses, such as reviews, ratings and photos.***

28       8.    The Company's motto has reportedly been "Real People, Real Reviews." In fact,

notwithstanding prior accusations that the Company manipulated business reviews and pressured local businesses to purchase advertising, Yelp publicly and falsely denied the veracity of any such allegations and suggested that those who complained of the Company's business tactics simply had it wrong or were disgruntled about the negative reviews provided by legitimate customers:

- ***The media has previously reported allegations that we manipulate our reviews, rankings and ratings in favor of our advertisers and against non-advertisers.  These allegations, though untrue, could adversely affect our reputation and brand*** . . . .  (October 29, 2013, Registration Statement)

- Jeremy Stoppelman, Yelp's chief executive, told me at the time that the San Francisco company doesn't strong-arm merchants.  ***He blamed talk of shakedowns on disgruntled business owners spreading "false rumors***."  (March 31, 2014, *Los Angeles Times*)

9.      In truth however, as alleged herein, reviews, including anonymous reviews, appearing on the Company's website were not all authentic, high-quality "firsthand" reviews, but instead included a substantial amount of false reviews by reviewers who did not have first-hand experience with the businesses being reviewed.  At the end of the Class Period, *The Wall Street Journal* widely reported that thousands of businesses lodged complaints with the Federal Trade Commission ("FTC") against the Company, demonstrating the falsity of defendants' representations of quality and authenticity and undermining the Company's prior denials.  For example, some of the complaints were as follows:

- "Customer made complaint on yelp but said she [Yelp sales person] would take down [negative reviews] if paid $265.00. I have in text message from her. B[ut Y]elp will not investigate not respond." (FTC 49911277, 10/17/13, Irvine, CA)

- "Yelp has enabled an individual (or competitor) to publish libel about our company. ***We have provided evidence to Yelp*** indicating that the information provided in the review written by "[redacted by FTC]" is wholly inaccurate and indicative of an individual who has ***no first-hand knowledge of our practice***."  (FTC 44799905, 4/3/13, San Francisco, CA)

- "We had excellent reviews and a couple negative ones.  Yelp's 'filtering' system then hid all but one of our positive reviews. ***The negative reviews are not verified customers and contain lies and defamations.  We have evidence supporting our claim of these false reviews***.  We contacted Yelp to see if they could remove the false reviews and restore our real reviews.  They refused."  (FTC 46194128, 4/22/13, Los Angeles, CA)[2]

---

[2]    A number of the FTC complaints are quoted herein, each time followed in parentheses by the reference number, date, and location of the complainant, *i.e.*, "Quotation" (FTC 00000000,

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                            - 3 -

10.     Defendants' Class Period statements concerning the authenticity and quality of the reviews appearing on the Yelp website were not simple puffing.  Defendants repeatedly and consistently emphasized to investors that Yelp's revenue and overall financial success was entirely dependent on maintaining the authenticity and quality of the contributor created business reviews (*i.e.*, Yelp's content) without which the entire value proposition breaks down:

> *[M]aintaining trust and protecting the integrity of our content*.  And for us, really, *that is Job 1*, that *we have to not just generate quality content, but maintain the integrity of that content*.  Because consumers rely on the content and they trust it. *And the minute they don't, the entire value proposition breaks down*.

11.     In addition to repeatedly and falsely extolling the authenticity and quality of the reviews appearing on the Company's website, defendants made false and misleading statements throughout the Class Period concerning Yelp's business practices.  Defendants falsely represented that local businesses could purchase advertising to promote themselves through targeted search advertising and that there was simply no relationship between whether local businesses spent advertising dollars with the Company and when or whether reviews would appear on the website or would be prominent or filtered:

- *[B]usinesses can also pay for premium services to promote themselves through targeted search advertising, discounted offers and further enhancements to their business page*.

- *[T]here is zero relationship between the timing of when a review gets recommended and when a business decides to – or declines to – advertise.*

- *[T]here is no relationship between reviews and anything having to do with Yelp ads or the Yelp ads sales process.  Period.*

12.     In truth, each of these statements regarding local business advertising and recommendations were materially false and misleading as well.  Although businesses could indeed purchase advertising from Yelp, defendants knew but failed to disclose that if local businesses in fact declined the Company's overtures to purchase advertising, or cancelled advertising contracts, for example, Yelp would often immediately retaliate against such business by removing positive reviews or relegating these positive reviews to the filter and permitting only negative or fake reviews to

---

Month/Day/Year, City, State).  Spelling and grammar are as they appear in the original FTC complaints.

remain prominent.  Multiple examples of specific business experiences demonstrate the falsity of the Company's representations:

- "Yelp representative called me and asked if I wanted to advertise for $350 per month.  *I declined and the next day all our positive reviews were removed*."  (FTC 45635762, 5/3/13, Tucson, AZ)

- *"i was asked to advertise on yelp- when i declined-the next day all my good reviews were filtered and all that was left was the one bad review."*  (FTC 47776722, 7/1/13, New York, NY)

- "*When I told them I could not afford the hundreds of dollars to advertise with them* since I am a one person business.  After that *yelp removed all of my positive reviews (14 of them) and left up only the one nasty review*."  (FTC 50646092, 11/25/13, Farmingville, NY)

- "All of our real reviews from our customers have been filtered and only fake, negative reviews are under our account.  *As soon as I agreed to advertise with Yelp, they released 3 positive reviews and filtered out the bad reviews. [But] When I [later] said I would no longer advertise with Yelp, the positive reviews were filtered out and the negative reviews were back online*."  (FTC 51567318, 2/10/14, East York, ON, Canada)

13.     In light of the above facts, the representations concerning the Company's current and future financial prospects, and the extent to which they were reliant upon undisclosed business practices, did not have a reasonable basis.

14.     Simultaneous with the alleged misrepresentations, insiders including the defendants capitalized on the artificial inflation of Yelp's stock during the Class Period.  Between November 14, 2013, and March 10, 2014, Yelp executives unloaded more than 1.1 million shares of their Yelp stock at artificially inflated prices as high as $98.18 per share for insider trading proceeds in excess of $8l.5 million.

| Name | Shares | Proceeds |
|------|--------|----------|
| Geoffrey Donaker | 125,000 | $9,877,471 |
| Peter H. Fenton | 64,012 | $4,002,692 |
| Robert J. Krolik | 35,000 | $2,556,917 |
| Max R. Levchin | 281,584 | $18,187,095 |
| Jeremy S. Levine | 381,244 | $24,673,766 |
| Joseph R. Nachman | 122,830 | $11,775,649 |
| Jeremy Stoppelman | 132,350 | $8,493,479 |
| Laurence Wilson | 26,250 | $1,968,638 |
| TOTAL | 1,168,170 | $81,535,707 |

15. Business analysts noted the unusual nature of Yelp executives insider trades. For example, on March 10, 2014, Seeking Alpha published a report titled "If Yelp's CEO Refuses to Own Any Shares, Why Should You?" The report noted that insiders had unloaded 41% of their shares in the prior four months, suggesting Yelp management believed that the Company's stock price was overvalued:

**Massive insider selling:**

To the tune of *41% of insider shares in the last 4 months alone*. The CEO, Jeremy Stoppleman, has exercised $15.25 million of stock options in the last year and *seems to own almost no shares*.

The *rampant insider selling over the last 4 months* began at a stock price of $65.63. This indicates that *management (who knows the workings of the company and its long term growth prospects the best) believes that* at a price 50% below today's price *the stock was blatantly overvalued*.

16. Then, on or around April 2, 2014, *The Wall Street Journal* publicly and widely reported that, uncovered by way of a Freedom of Information Act ("FOIA") request, the FTC had received and made public more than 2,000 complaints concerning Yelp's extortion-like business practices, many contending that Yelp would solicit businesses to buy advertisements on the Company's website and would retaliate if businesses declined by deleting positive reviews and claiming the deletions were due to an updated "automated algorithm." The April 2, 2014, *Wall Street Journal* article noted that the FTC posted their response to the FTC website[3] and that Yelp's stock was down as a result:

On Wednesday, the Federal Trade Commission disclosed on its website that it received 2,046 complaints about Yelp from 2008 through March 4 of this year, noting that its disclosure was part of a Freedom of Information Act request from The Wall Street Journal. *Yelp was down 6%, or $4.82, to $75.36 in Wednesday afternoon trading in the wake of the disclosure*.

17. On April 3, 2014, SunTrust Robinson Humphrey published a report titled "Yelp Shares Drop On FTC Complaints Disclosure," describing the impact of the disclosure of the April 2, 2014 FTC complaints on Yelp's stock price, "Yelp shares were down nearly 6% yesterday (vs. Nasdaq up 0.2%) on 1.5x normal volume. We attribute the underperformance to an FTC disclosure

---

[3] Letter from Dione J. Stearns to Angus Loten, dated March 18, 2014, *available at* http://www.ftc.gov/system/files/attachments/frequently-requested-records/yelp-foia-2014-00610.pdf

1   that it received 2,046 consumer complaints targeting Yelp over a 5-year period ending March 4,

2   2014."

3         18.    As the true facts concerning the Company's business practices began to be widely

4   revealed to the investing public the Company's stock price declined as a result, falling from a Class

5   Period high of $101.75 per share to $65.76 per share at the end of the Class Period.

6                   **JURISDICTION AND VENUE**

7         19.    Jurisdiction is conferred by 28 U.S.C. §§1331 and 27 of the 1934 Act.  The claims

8   asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and

9   Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

10        20.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Yelp is

11   headquartered in this District and many of the acts and practices complained of herein occurred in

12   substantial part in this District.

13                       **PARTIES**

14

15        21.    Plaintiff Joseph Curry purchased or acquired Yelp common stock during the Class

Period and was damaged by the conduct alleged herein.

16        22.    On November 17, 2014, this Court appointed the City of Miami Fire Fighters' and

17   Police Officers' Retirement Trust ("City of Miami Firefighters") Lead Plaintiff for the Class.  During

18   the Class Period, City of Miami Fire Fighters' purchased Yelp common stock and was damaged by

19   the conduct alleged herein.

20        23.    Defendant Yelp is incorporated in the state of Delaware and its stock trades on the

21   NYSE under the ticker symbol "YELP."  The Company's corporate headquarters are located at 140

22   New Montgomery Street, San Francisco, California.

23        24.    Defendant Stoppelman is, and was at all relevant times, CEO of the Company.

24   Stoppelman co-founded Yelp in July 2004 and has served as CEO since 2004.  Stoppelman is a

25   computer software engineer by training and is reportedly responsible for overseeing product

26   development and driving the vision and product experience for Yelp.  During the Class Period,

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST          - 7 -

1  Stoppelman sold approximately 132,350 shares of Yelp common stock at artificially inflated prices

2  for proceeds of $8,493,479.

3      25.    Defendant Krolik is, and was at all relevant times, CFO of the Company.  Krolik has

4  served as CFO since July 2011 and oversees corporate finance, accounting, investor relations and

5  real estate functions.  During the Class Period, defendant Krolik sold approximately 35,000 shares of

6  Yelp stock at artificially inflated prices for proceeds of $2,556,917.

7      26.    Defendant Donaker is, and was at all relevant times, COO of the Company.  Donaker

8  has served as COO since June 2006 after joining Yelp in November 2005 to head business

9  development.  Donaker oversees the Company's business operations including sales, marketing and

10  administration.  During the Class Period, Donaker sold approximately 117,640 shares of Yelp stock

11  at artificially inflated prices for proceeds of $9,877,471.

12      27.    The defendants named in ¶¶24-26 are referred to herein as the "Individual

13  Defendants."

14  **CONTROL PERSONS**

15      28.    As officers and controlling persons of a publicly held company whose common stock

16  was and is traded on the NYSE and is governed by the provisions of the federal securities laws, the

17  Individual Defendants each had a duty to promptly disseminate accurate and truthful information

18  with respect to the Company's financial condition, performance, growth, operations, financial

19  statements, business, markets, management, earnings and present and future business prospects, and

20  to correct any previously issued statements that had become materially misleading or untrue, so that

21  the market price of the Company's common stock would be based upon truthful and accurate

22  information.  The Company's and Individual Defendants' misrepresentations and omissions during

23  the Class Period violated these specific requirements and obligations.

24      29.    The Individual Defendants participated in the drafting, preparation and/or approval of

25  the various public, shareholder and investor reports and other communications complained of herein

26  and were aware of, or recklessly disregarded, the misstatements contained therein and omissions

27  therefrom, and were aware of their materially false and misleading nature.  Because of their Board

28  membership and/or executive and managerial positions with Yelp, each of the Individual Defendants

had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Yelp and its business or adopted by the Company materially false and misleading.

30.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various United States Securities and Exchange Commission ("SEC") filings, press releases and other public statements pertaining to the Company issued during the Class Period. Each Individual Defendant was provided with copies or had access to the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

31.     The Company and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Yelp common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Yelp's business, operations, management and the intrinsic value of Yelp common stock; (ii) allowed Yelp insiders, including the Individual Defendants, to sell over 1.16 million shares of their Yelp stock at artificially inflated prices for insider trading proceeds of more than $81.5 million; and (iii) caused plaintiffs and other members of the Class to purchase Yelp common stock at artificially inflated prices.

Yelp Admits that It Aggressively Manipulates – Curates – Reviews Posted on Yelp's Website Establishing Knowledge and Control Over Content

32.     Defendants made multiple statements before and during the Class Period that Yelp controlled and curated the content presentation of the reviews on its website, including manually, through the creation of content and reviews by its own employees (community managers, scouts, ambassadors) and through its recommendation software.

1            (a)     <u>Recommendation Software</u>: According to Yelp, its recommendation software was designed and programmed by the Company and determined when and whether reviews were recommended and when they were filtered.  According to the Company, the control over the content and presentation of reviews through scouts and community managers, in combination with software technology, was the key to authenticity of the published reviews and in turn the Company's business success:

- We believe our recommendation technology is one of the key contributors to the quality, authenticity and integrity of the reviews on our platform and the success of our service. [2013 Form 10-K]

- Our recommendation software operates continually, and the results of its determinations with respect to particular reviews may change over time as it factors in new information. [2013 Form 10-K]

- [W]e take that content [Yelp reviews] and then we curate it using very aggressive means of filtering out attempts to game the system, fakes and shills. [December 11, 2013, Yelp! Inc. at Cantor Fitzgerald Internet Conference]

            (b)     <u>Scouts</u>: The Company also exerted control over the content and reviews on its website with Company "scouts."  According to the Company, Yelp employs "scouts" to build interest in newly launched locales, including by writing initial business reviews:

- We sometimes hire temporary local employees, called "scouts," ***to provide additional*** rich content, such as reviews, photos and hours of operation.  ***To bolster the integrity of the content they provide, we closely monitor their contributions to the platform . . . .*** [2012 and 2013 Forms 10-K]

            (c)     <u>Community Managers</u>: Defendants also admittedly controlled reviews and content in part through Yelp employees titled "Community Managers" which the Company assigned to different cities or towns.  According to Yelp, Community Managers are paid Yelp employees who serve as "brand ambassador[s]," and are responsible both for creating content by actually writing reviews and posting pictures and for encouraging others to do so.  Community Managers, in fact, generate content by writing reviews of local businesses.  The Company uses the reviews written by its own Community Managers to encourage traffic on the website for any particular business being reviewed.

- [Krolik] [W]hat we do is we go into a country [or US city]. **We have a community manager that generates the content**, that helps foster and support the community that generates the content. . . .[4]

- [Sollitto] **We put community managers in the market, they grow content, that content grows, traffic begins to grow, and then we begin to monetize**.[5]

- [Krolik] [S]tarts that flywheel with a **community manager creating the content**, and then starting to monetize the traffic that comes from all that content.[6]

(d)　　Curation: Vince Sollitto, the Company's VP of Communications & Public Affairs, admitted and even bragged that the Company largely controlled the presentation of the content that was submitted by Yelpers and specifically stated that the content submitted by Yelpers was processed and very aggressively "curated" by Yelp to increase the quality:

> We go into every market in which we operate, and we put boots on the ground, and we nurture and create a community of passionate contributors that generate this very deep, rich, high-quality content. . . .
>
> **And then we take that content and then we curate it using very aggressive means of filtering out attempts to game the system, fakes and shills**. And so that content creation and then **that content curation** [sic] **results in very high-quality content** . . .[7]

33.　　Elite Yelpers: Finally, the Company controlled the presentation and content of reviews through the use of "Elite Yelpers." An "Elite Yelper" is a reviewer who has been awarded the designation by Yelp. According to an August 3, 2014, *SFGate* article titled "Yelp Elites: Prolific reviewers get perks, VIP treatment," Yelp refers to Elite Yelpers as the "'true heart of the Yelp community, both on and offline'" and relies on them to contribute a substantial portion of Yelp's content and encourage other users to engage with the website.[8] Yelp, in turn, exercises considerable influence over Elite Yelpers. According to an August 22, 2014, *Business Insider* article titled "Elite

---

[4]　Krolik, December 3, 2013, Yelp Inc at Credit Suisse Technology Conference.

[5]　Sollitto, December 11, 2013, Yelp! Inc at Cantor Fitzgerald Internet Conference.

[6]　Krolik, March 4, 2014, Yelp, Inc at JMP Securities' Technology Research Conference.

[7]　Sollitto, December 11, 2013, Yelp! Inc. at Cantor Fitzgerald Internet Conference.

[8]　*See* Kristen V. Brown, *Yelp Elites: Prolific reviewers get perks, VIP treatment*, SFGate (Aug. 3, 2014) http://www.sfgate.com/restaurants/article/Yelp-Elites-Prolific-reviewers-get-perks-VIP-5664932.php.

1   Yelpers Hold Immense Power, And They Get Treated Like Kings By Bars And Restaurants Trying

2   To Curry Favor," Elite Status is conferred by the "San Francisco-based Elite Council, a mysterious

3   group" that can both award and withdraw Elite status (and the benefits that come with it), and does

4   so without relying on specific benchmarks.[9]

5       34.    The admitted control over the process and content of presentation and the "quality"

6   and "authenticity" of reviews on the Yelp website far exceed what was necessary to establish

7   knowledge and control.

8                               **SOURCES OF INFORMATION**

9       35.    The allegations herein are based on plaintiff's ongoing investigation, including review

10  of relevant Company documents, SEC filings, press releases, analyst reports and other reports by

11  third parties, complaints against Yelp filed with the FTC and plaintiff's interviews of local business

12  owners and reviewers.  Plaintiffs believe that substantial additional evidentiary supports will exist

13  for the allegations set forth herein after reasonable opportunity for discovery.

14

15      36.    The FTC complaints referred to herein were initially reported by *The Wall Street*

16  *Journal* on or around April 2, 2014, and consist of more than 2,000 complaints filed by local

17  businesses around the country.  As described herein, the FTC, while redacting the identity of the

18  complainants, disclosed the content of the complaints as well as certain identifying information

19  (including time of complaint and location of complainant) pursuant to an FOIA request from *The*

20  *Wall Street Journal*.  The FTC assigned each complaint a reference number and disclosed this

21  information on the FTC's own website, and the quantity and content of the complaints was thereafter

22  reported on widely.

23

24

25

26  [9]   *See* Complaint for Wages at ¶¶71-72, *Jeung v. Yelp Inc*, No. CV-14-06223 FMO(ASx), (C.D.
    Cal. Aug. 7, 2014) (Elite Yelpers allege, among other things , that Yelper required them to write
27  glowing reviews of the venues that sponsor company events and that Yelp controls its reviews to
    pander to its advertisers.).
28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                          - 12 -

37.     The information provided in the FTC complaints and by the local business owners provide strong indicia of personal knowledge of the information provided and tend to be corroborative of one another and are corroborated by other information alleged herein.

**FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**[10]

38.     <u>False and Misleading Statement</u>:  On October 29, 2013, the Company issued a press release announcing its financial results for the third quarter of 2013.  The Company's reported earnings missed Wall Street earnings expectations, posting a loss of $2.3 million.  However, Yelp beat forecasted revenue expectations.  In addition to announcing the Company's financial results and financial outlook for the fourth quarter and full fiscal year 2013, the Company falsely stated that its 3Q13 positive results and basis of its increased full year financial outlook were due to and a result of the high quality and authentic content contributed by Yelpers which would continue to drive increasing financial growth:

**Local Revenue Accelerates to 80% Over Third Quarter 2012**

. . . Yelp Inc., the company that connects consumers with great local businesses, today announced financial results for the third quarter ended September 30, 2013.

•      Net revenue was $61.2 million in the third quarter of 2013, reflecting 68% growth in net revenue from the third quarter of 2012

\*       \*       \*

•      Active local business accounts grew 61% year over year to approximately 57,200

\*       \*       \*

"***We saw another quarter of strong momentum thanks to the high-quality, authentic content contributed by Yelpers around the world***," said Jeremy Stoppelman, Yelp's chief executive officer."

\*       \*       \*

---

[10]   False and Misleading Statements are primarily identified with bold-italics in sections underlined <u>False and Misleading Statement(s)</u>.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 13 -

**Business Outlook**

As of today, Yelp is initiating guidance for the fourth quarter of 2013 and raising its full year 2013 revenue and adjusted EBITDA guidance.

• For the fourth quarter of 2013, net revenue is expected to be in the range of $66 million to $67 million, representing growth of approximately 62% compared to the fourth quarter of 2012. Adjusted EBITDA is expected to be in the range of $9 million to $10 million.

• For the full year of 2013, net revenue is expected to be in the range of $228 million to $229 million, representing growth of approximately 66% compared to the full year of 2012. Adjusted EBITDA is expected to be in the range of $28 million to $29 million.

39. That same day, October 29, 2013, Yelp conducted its 3Q13 earnings conference call to discuss the Company's 3Q13 results and 4Q13 and increased FY13 fiscal revenue and earnings guidance. The call was hosted by Stoppelman, Krolik and Donaker. During the call defendants repeated the financial results reported in the financial press release of the same day and again attributed the Company's strong performance and future growth prospects to the high-quality content of Yelp's reviews, and ability to further connect with local businesses to monetize the website traffic derived therefrom:

[Stoppelman]: We are delighted by the ***high quality of rich reviews*** we continue to see [comparing mobile reviews favorably to those made via PC]. . . .[11]

\*       \*       \*

[I]t's really about, ***as we have more and more high-quality content***, the stuff that we're known for, obviously, domestically, it naturally gets organic exposure. . . .

\*       \*       \*

[Donaker]: ***those high-quality reviews that we've talked about are going to be the focus***.

---

[11]  Recognizing that certain types of statements can be considered "puffing," plaintiffs are ***not*** alleging that the statements concerning "high-quality" by themselves are materially false or misleading. However, in this case, the "quality" and "authenticity" of the reviews on the Company's website were admittedly the central element of Yelp's value proposition. While falsely denying reports that it manipulated the content or presentation of reviews on its website and strong-armed local businesses to advertise with the Company, Yelp, indeed, sought to warn that if the "quality" and "authenticity" of reviews were compromised, the Company's business could be harmed. The context of the Company's representations of the purported authenticity and quality of the content of the reviews coupled with the importance of the authenticity and quality of the reviews to the Company's future financial growth rendered the statements material, not puffery, and they were knowingly false and misleading as detailed herein.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                          - 14 -

40.   <u>False and Misleading Statements</u>:  On the same day, October 29, 2013, the Company filed the October 29, 2013, Registration Statement and Prospectus ("Registration Statement") with the SEC setting forth the terms of Yelp common stock, offering of 3.75 million shares of its Class A common stock at $67.00 per share.  The Registration Statement incorporated by reference a number of other documents – including the October 29, 2013, Press Release (¶38),the Company's FY12 Form 10-K and the Company's 2013 Forms 10-Q filed with the SEC.  Certain of the documents contained false statements similar to those detailed above at ¶¶38-39.  For example, the October 29, 2013, republication FY12 Form 10-K falsely stated that Yelp contributors provided "firsthand information" about local businesses, reiterated the "quality of the reviews" on the website and stated that businesses can pay for advertising to promote themselves:

Yelp connects people with great local businesses.  Our users have contributed a total of approximately 47.3 million[12] cumulative reviews of almost every type of local business . . . .

*       *       *

Contributors. . . .  **These contributors provide rich, firsthand information about local businesses, such as reviews, ratings and photos**. . . .

Consumers. . . .  **Our strong brand and the quality of the reviews content on our platform have enabled us to attract this large audience with almost no traffic acquisition costs**.

Local Businesses.  Our platform provides businesses with a variety of free and paid services that help them engage with consumers at the critical moment when they are deciding where to spend their money. . . .  **Local businesses can also pay for premium services to promote themselves through targeted search advertising, discounted offers and further enhancements to their business page**.

Our Filtering Technology. **In order to maintain and enhance the quality, authenticity and integrity of the reviews on our platform, we employ proprietary filtering technology to analyze and screen all of our reviews**. Our filtering software looks at a wide range of data associated with each review and reviewer in order **to determine the review's relevance and reliability**. Our filtering software operates continually, and the results of its determinations with respect to particular reviews may change **over time as it factors in new information**.[13]  This can result in reviews that were previously unfiltered becoming filtered and reviews that were previously

---

[12]   47.3 million is the number reported in the Registration Statement.  Yelp reports 36.0 million in the FY12 Form 10-K, and 52.8 million in the FY13 Form 10-K.

[13]   The Company knew but failed to disclose that the "new information" factored in by its recommendation software, which could or would result in previously recommended reviews being filtered and vice versa, in truth included inputs regarding efforts to sell local businesses advertising.

1

2

3

4

5

filtered being restored to unfiltered status. Filtered reviews do not factor into a business's overall star rating and are segregated from unfiltered reviews on our website. By clicking on a link on a reviewed business's page on our website, users can access the filtered reviews for that business, as well as the star rating and other information about reviews that we have removed for violation of our terms of service. We believe *our filtering technology is one of the key contributors to the quality, authenticity and integrity of the reviews on our platform and the success of our service*.

6

7

8

9

10

11

12

13

14

15

16

17

41.     As detailed herein, each of these statements were knowingly materially false and misleading because defendants knew or deliberately disregarded that much of the review content on Yelp's website was not authentic or first-hand information thus compromising the so-called "quality" of the reviews.  The Company also knew or deliberately disregarded and failed to disclose that while local businesses could pay for advertising to promote themselves, when local businesses declined the Company's overtures to purchase advertising, the Company would often retaliate by removing or filtering their good reviews and displaying only negative and sometimes fake reviews to encourage non-advertising local businesses to purchase ads.  The Company would often offer to suppress negative reviews for a fee.  Nor did the Company disclose that part of its business practice and apparent basis of future financial growth of local business advertising, the largest source of revenue growth, was a continuation of targeting local businesses and promising to remove bad reviews for a fee.  *See, e.g.*, ¶¶46-48.

18

19

20

21

22

23

24

25

26

27

42.     <u>False and Misleading Statements</u>: The FY12 Form 10-K (as incorporated by the Registration Statement) also purported to warn investors in its common stock that complaints (as opposed to the truth) about the quality of Yelp's reviews and review filter, and alleged business practices, *could* harm Yelp's brand and bottom line.  At the same time, however, the Company neutralized any value to such warning by materially and falsely stating that prior reports that Yelp manipulated reviews and ratings were "***untrue***."  Each of the purported warnings, including, but not limited, to the warnings below, were false however because they omitted material facts known to defendants:

*The media has previously reported allegations that we manipulate our reviews, rankings and ratings in favor of our advertisers and against non-advertisers. These allegations, though untrue, could adversely affect our reputation and brand* . . . .

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                      - 16 -

43.   <u>False and Misleading Statement</u>: Throughout the Class Period, defendants also falsely stated that there was absolutely "no relationship" between the filtering of reviews published on the Yelp website and whether businesses purchased advertising from the Company.  Yelp's website, for example, under Common Questions, stated (and continues to state):

**Do Yelp advertisers get preferential treatment?**

*No.  Our recommendation software treats advertisers and non-advertisers exactly the same*. . . .

*Furthermore, there is zero relationship between the timing of when a review gets recommended and when a business decides to – or declines to – advertise* . . . .

*In short, there is no relationship between reviews and anything having to do with Yelp Ads or the Yelp Ads sales process.  Period*.[14]

44.   On October 29, 2013, after the report of the Company's 3Q13 financial results and increased 4Q13 and FY13 guidance, Yelp's stock price closed at $68.83 on 6.2 million volume trading compared to a close of $67.59 on 2.9 million trading volume on October 28.

45.   On October 30, 2013, Barclays published a report titled "Closing the Loop on Future Growth," discussing the October 29, 2013, results and indicating that defendants had made a strong case that Yelp could grow its business on the strength of increasing paying accounts (advertising revenue) with local business:

We believe Yelp will continue to benefit from the migration of local ad dollars online, a natural tailwind to revenue that will likely be accelerated by product initiatives aimed at "closing the loop" between merchant and consumer. . . .

\*        \*        \*

**Raising estimates and price target**: We are raising our 4Q revenue estimate to $68M from $65M, *mainly due to our more positive outlook for paying accounts*.[15]

46.   <u>Reasons Why Statements in ¶¶38-43 Were Knowingly False and Misleading</u>.  Each of the statements set forth above in ¶¶38, 40, 42 and 43 concerning the Company's business practices

---

[14]   *See* Common Questions Yelp for Business Owners, Yelp, https://biz.yelp.com/support/common_questions (last visited Jan. 4, 2015).

[15]   On November 5, 2013, the Company issued a press release announcing that it had closed the secondary offering of shares at $67.00 per share and that the Company had raised approximately $288.9 million.

1   and financial condition, specifically statements that: (i) Yelp contributors provided authentic, first-

2   hand information about local businesses (¶38); (ii) businesses can also pay to promote themselves

3   through targeted advertising (¶40); (iii) accusations that Yelp manipulated reviews in favor of

4   advertisers over non-advertisers were untrue (¶¶42, 43); and (iv)  strong performance and raised

5   financial guidance was driven by that authentic, first-hand content (¶¶38-40) were materially false

6   and misleading when made.   In truth, defendants knew, or recklessly disregarded and failed to

7   disclose, the following facts:

8          (a)    Reviews, including anonymous reviews, appearing on the Company's website

9   were not all "authentic" or "first-hand" reviews.  Instead, Yelp hosted a substantial amount of

10  fraudulent reviews from reviewers Yelp knew did not have first-hand experience with the business

11  being reviewed and/or for which Yelp had credible evidence that the reviews were false.  Yelp's

12  algorithms or recommendation or filtering software purportedly designed to screen unreliable

13  reviews did not comprehensively or effectively screen unreliable or fake reviews.  As evidenced not

14  only by media reports and some litigation, the merits of which were flatly and falsely denied by

15  Yelp, the disclosures from the FTC (reported by *The Wall Street Journal* on or around April 2,

16  2014), detailed specific instances prior to and during the Class Period that demonstrate that not only

17  were fake, inauthentic reviews identified and reported to Yelp, but also Yelp's efforts to very

18  specifically offer the removal of fake, inauthentic reviews in exchange for advertising revenues.

19  These reports with the FTC catalogue many of the claimed inauthentic reviews that remained

20  prominent on Yelp's website as well as Yelp's refusal to address them:

21          (i)    "Someone on Yelp filed a false negative review.  It is 100% false because in

22                 the review they state the service issue was regarding a PS3 repair.  A PS3 is

23                 gaming console. ***I don't repair gaming consoles at all.  I am a certified PC***

24                 ***Technician. . . .   The false review even claimed I charged $140 when my***

25                 ***rates for computer repairs are a flat rate of just $50***.  The review also states

26                 '. . . I took my PS3 to fix on December 20 . . .".  ***This is false because I don't***

27                 ***have a store or shop.  I go to customers homes to repair their desktops or***

28                 ***laptops***."  (FTC 46933934, 5/6/13, Miami, FL)

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                          - 18 -

(ii)     "She posted a false review on Yelp. Yelp Involvement/Complaint: . . . . We have contacted them numerous times regarding the fictitious posting on our business.  Nothing has been done at this time, but **they have indicated for a fee unfavorable postings can be removed**."  (FTC 50405883, 11/6/13, Lakewood, CA);

(iii)    "Yelp has enabled an individual (or competitor) to publish libel about our company.  **We have provided evidence to Yelp** indicating that the information provided in the review written by "[redacted by FTC]" is wholly inaccurate and indicative of an individual who has **no first-hand knowledge of our practice**."  (FTC 44799905, 4/3/13, San Francisco, CA)

(iv)    "We had excellent reviews and a couple negative ones.  Yelp's 'filtering' system then hid all but one of our positive reviews.  **The negative reviews are not verified customers and contain lies and defamations.  We have evidence supporting our claim of these false reviews**.  We contacted Yelp to see if they could remove the false reviews and restore our real reviews.  They refused."  (FTC 46194128, 4/22/13, Los Angeles, CA)

(v)     "Why is the review filtering system keeping the one fake review and PROMPTLY filtering out the very real, paying customer reviews?"  (FTC 44021014, 3/6/13, Belmont, NH)

(vi)    "This complaint concerns a review posted on Yelp for my business in Los Angeles, [redacted by FTC].  It was posted Nov. 5, 2010 by [redacted by FTC]., and alleges multiple felonies and police reports, and operating without a license.  The review also contains racial remarks and vulgar language.  **I have offered to provide Yelp with documentation from the police which will show that the allegations of felonies and police reports are false**. . . .  **Yelp has responded that they would not consider any 'evidence' submitted**.  (FTC 30627344, 2/18/11, Los Angeles, CA)

1     (vii)     "So the same [fake] review that was removed by Yelp when I was paying

2               advertising has now become a valid review!  To make things worse, he [the

3               reviewer] ***has added 3 review updates from his account***. . . .  How did I get a

4               different decision in this case when the review is the same.  Aside the fact

5               that I am not paying Yelp any more, is there any other reason that could

6               trigger this?"  (FTC 46137151, 6/22/13, San Francisco, CA)

7     (viii)    "All the 1 star reviews on YELP.com and related websites are 100% False.  I

8               have never met any of these people or spoken to them other then [redacted by

9               FTC]; among many other aliases.  ***I have solid evidence to prove my case***

10              . . . .  After I declined, [advertising . . . Yelp] removed the REAL Reviiews

11              and left the arsenal of obvious Bogus Defamatory reviews out of spite for not

12              paying them. . . ."  (FTC 29825835, 3/3/11, Woodside, NY)

13     (ix)     "[W]e have only 7 reviews posted, 33 reviews have been filtered.  The 7

14              posted are horrible reviews, the majority of the 33 are excellent.  The reviews

15              are authentic and time and time again are removed. . . .  We have been

16              corresponding with yelp for over a year trying to rectify the situation and

17              remove the slanderous, personal attacks and false information . . . .  We do

18              not advertise with yelp, we do not pay them money. . . .  Our business is

19              being bullied by yelp, and I know we are not alone."  (FTC 46139831,

20              6/23/13, Traverse City, MI)

21     (x)      "Customer made complaint on yelp but said she [Yelp sales person] would

22              take down [negative reviews] if paid $265.00. I have in text message from

23              her. B[ut Y]elp will not investigate not respond."  (FTC 49911277, 10/17/13,

24              Irvine, CA);

25     (xi)     "I have tangible evidence – including a signed contract, a video and emails –

26              which prove that this complaint is false."  (FTC 33979197, 8/24/11, Palm

27              Harbor, FL)

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST         - 20 -

1     (xii)   "Yelp has published a fraudulent, slanderous review of my company. They

2            refuse to verify the review, but ***I have evidence that it is fraudulent***. At the

3            same time, they have removed 6 legitimate (and positive) reviews by our

4            payjing customers. ***We have verification that the positive reviews are***

5            ***legitimate in the form of affidavits***." (FTC 34802255, 12/14/11, Boulder,

6            CO)

7     (xiii)   "We tried several times emailing and calling Yelp but ***they will not give us***

8            ***any chance to prove that the event never happened***." (FTC 30628344,

9            4/1/11, Phoenix, AZ)

10    (xiv)   "This company [Yelp] would filter authentic, positive reviews of my business

11           written by my customers and would only post negative reviews, which in

12           most cases were ***written by their so called, "Community Managers."*** The

13           community Managers are paid employees of Yelp. . . ." (FTC 45907813,

14           5/16/13, Hoboken, NJ)

15    (b)    In addition to the above, the Company knew but failed to disclose or

16  specifically denied that it allowed known unreliable or fake reviews to remain prominent at the same

17  time the Company tried to sell advertising space and services with a promise to suppress negative

18  reviews or make them go away. Yelp falsely stated that "businesses could pay to promote

19  themselves," (¶40), but the truth was that in many instances unless local businesses purchased

20  advertising, Yelp would often filter legitimate, authentic, first-hand reviews. Similarly, Yelp would

21  often permit fake reviews to remain prominent notwithstanding evidence that they were unreliable,

22  not first-hand or authentic. As reported by many local businesses when they declined to buy

23  advertising, Yelp or its recommendation software or both concertedly caused reliable positive

24  legitimate first-hand reviews to be either removed or filtered at a rate or pattern indicating that it was

25  more than simple coincidence.

26        (c)    For the same reasons, Yelp's statements that reports of manipulating reviews

27  in favor or advertisers were ***untrue*** (¶42), and that there was zero relationship between when a

28  review is recommended and the purchase of or the decline to purchase advertising (¶43) were

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST        - 21 -

knowingly false and misleading.  Indeed, defendants failed to disclose the extent to which their ability to sell advertising was premised on Yelp's refusal to filter fraudulent reviews and unfilter authentic reviews.  As set forth below, examples of complaints made to the FTC (which were not made public until on or around April 2, 2014), document these practices and demonstrate the falsity of the alleged misrepresentations.  And as set forth below, in many instances, the removal or filtering of good, apparently legitimate, reviews occurred within a day or two or three of local businesses declining to pay for advertising:

> (i) "YELP solicited us to pay for one of their services.  We declined and ***the next day***, 5 ***of our 5star reviews were eliminated*** . . . This is NOT coincidence.  This is extortion."  (FTC 51480011, 12/11/13, Cary, NC)

> (ii) "Yelp representative called me and asked if I wanted to advertise for $350 per month.  ***I declined and the next day all our positive reviews were removed***.  I called back and asked why my positive reviews were removed and I was told to go to a page on their website that explains.  The page gave no explanation I could understand but ***before hanging up the representative said that if I advertised there was a good chance the reviews would go back up***."  (FTC 45635762, 5/3/13, Tucson, AZ)

> (iii) "We have had numerous responses on our YELP account, probably right about 8 or so.  Out of that 8, 2 were negative.  There was one positive that was available on their website for approximately 3 days.  ***Coincidentally***, I received a call from Yelp right about that third day inquiring about me doing paid business with them.  I declined due to the previous deletions of our compliments.  ***Sure enough, by chance the next day, that one positive remark was nowhere to be found***.  YELP has chosen to filter out all of the other 6 positives and only keep the 2 horribly negative ones.  This is just scandalous."  (FTC 42212221, 10/23/12, Tucson, AZ)

(iv)  "*i was asked to advertise on yelp- when i declined-the next day all my good reviews were filtered and all that was left was the one bad review*."  (FTC 47776722, 7/1/13, New York, NY)

(v)  "Yelp called me after a few months and tried to force me into paying for their services.  I declined.  *The next day all but one of my reviews were removed* and YELP put a link on my page telling people to check out other similar pages from people who had paid."  (FTC 26876671, 6/29/10, Los Angeles, CA)

(vi)  "When I declined to pay, *the very next day 100% of my 4 and 5 star Yelp reviews were filtered*."  (FTC 31092586, 5/12/11, San Francisco, CA)

(vii)  "I had a listing on yelp with many positive reviews, they asked me to advertise and I said no because I couldn't afford it.  *The next day, all my great reviews disappeared and now when ever there are good reviews they are taken down*."  (FTC 32295073, 8/2/11, Beverley Hills, CA)

(viii)  "we decided to not go with the Yelp advertising. . . .  At that time, we had one 5* (good) and one 1* (bad) review on Yelp.com for an overall rating of 3*.  *The next day or so*, our 5* review was now "filtered" and our rating dropped to 1* [afterwards, all positive reviews were filtered]. . . .  So *as of the date that we declined to advertise* on Yelp.com to join their $350.00 a month ($4,200year) ad program, they responded in spite by removing ALL (7) positive reviews of our company."  (FTC 42275646, 12/13/12, Cumming, GA)

(ix)  "I declined [to purchase advertising from Yelp] due to slow growth and I'm a new business owner. . . .  *Two days later* i was shocked to see that my Good Reviews were filtered."  (FTC 42398182, 10/31/12, Woodhaven, NY)

(x)  "They contacted me to sign up for their high priced advertising service *and after refusing to do so it was only days later all of our positive reviews were*

1   *removed* except for the negatives." (FTC 30624872, 11/9/10, Huntington

2   Beach, CA)

3   (xi)   "Yelp is filtering out good reviews and keeping the bad ones on the front

4   page *unless we advertise with them* at a rate of $300/month like an extortion.

5   *The more we refuse to advertise with Yelp, the more bad reviews, some*

6   *legitimate some not so, seem to appear on the front page*, and very good

7   legitimate reviews from our loyal customers get filtered out on a hidden page

8   almost the next day they appear on the front page." (FTC 48206548, 7/18/13,

9   San Rafael, CA)

10  (xii)  "After 6 months of putting off advertising with the company I finally told

11  them that I could not afford to advertise with them. *3 days later all of my*

12  *reviews were 'filtered*' . . . ." (FTC 33265609, 9/8/11, Austin, TX);

13  (xiii) "We declined their initial offer [to advertise]. *Three days later* all of our

14  good reviews were filtered out." (FTC 36523957, 3/6/12, Dallas, TX)

15  (xiv)  "offering me to advertise on Yelp.com for about $300 per week, which I of

16  course refused. *A couple of days later Yelp.com removed 42 of my*

17  *companies' reviews!!! Leaving us with only bad reviews*." (FTC 30626216,

18  1/20/11, Simi Valley, CA)

19  (xv)   "*A sales rep named Nikki contacted me asking me if I was interested in*

20  *paid advertising, I declined. A few days later all of my customer reviews*

21  *were 'filtered' which meant none of my reviews were showing*" (FTC

22  50600411, 11/25/13, Olympia, WA)

23  (xvi)  "*[Yelp] wanted "$1,000.00/ month to advertise with them!* It was too

24  expensive for us and *as soon as I declined, my 5 star rating went down to 3*

25  *stars*. They had filtered out the 5 star ratings and only left the bad reviews.

26  Since then I had been contacted numerous times with Yelp stating they could

27  bump the negative reviews down and bring the positive reviews up if I

28  advertise with them . . . again it was $1,0000/ month. Again, no was my

answer.  And my star rating went down to 2 1/2. . . . we got a call the next day from Yelp saying there was a lot of activity on our account and we need to advertise with them and *they could bump up our 5 star reviews so people could view them and they would bump down the lower ratings and hide them*.    Again it was $1,0000/ month.    And again, I said it was too expensive. . . .  *Since then only the negative reviews have been posted for people to view and the 4 or and 5 stars have been filtered*."   (FTC 42666602, 11/20/12, Gardena, CA)

(xvii)    "All of our real reviews from our customers have been filtered and only fake, negative reviews are under our account.  *As soon as I agreed to advertise with Yelp, they released 3 positive reviews and filtered out the bad reviews. [But] When I [later] said I would no longer advertise with Yelp, the positive reviews were filtered out and the negative reviews were back online*.  I have picture evidence with dates as the positive reviews were released and negative reviews filtered, and then once I said I would never advertise with Yelp, I have picture evidence on a daily basis of our positive reviews again being filtered and our negative reviews released."  (FTC 51567318, 2/10/14, East York, ON, Canada)

(xviii)   "*So the same [fake] review that was removed by Yelp when I was paying advertising has now become a valid review* [now that the business owner did not renew the advertising contract]! . . . *How did I get a different decision in this case when the review is the same.  Aside the fact that I am not paying Yelp any more*, is there any other reason that could trigger this?"   (FTC 46137151, 6/22/13, San Francisco, CA)

(xix)    "In January of this year, *as I was nearing the end of my advertising contract with Yelp, Yelp filtered all of the positive reviews for my business.  I believe they did this in order to coerce me into renewing the contract with them*." (FTC 45889533, 5/23/13, San Diego, CA)

(xx)     "***When I told them I could not afford the hundreds of dollars to advertise with them*** since I am a one person business.  After that ***yelp removed all of my positive reviews (14 of them) and left up only the one nasty review***."  (FTC 50646092, 11/25/13, Farmingville, NY)

(xxi)    "Yelp is blackmailing me into advertising with them.  Since I have declined our good reviews have been filtered and a handful of bad reviews remain. . . .  We had a 3.5 star average until I was contacted by a gentleman named Chris that worked for Yelp.  Chris called almost every day for a few weeks.  He explained to me about the benefits of advertising with Yelp!  ***I declined to buy advertising and since then all of our good and great reviews have been filtered out of their website and only the small number of bad reviews remain. . . .  We have over 45 reviews of our restaurant on Yelp! and only 5 are visible***. . . .  ***Chris from Yelp explained to me that by giving his seemingly transparent company money (about $399) every month we could hide any bad reviews of our restaurant and bolster any good reviews***."  (FTC 47501265, 7/29/13, Dacula, GA)

(xxii)   "I opened up a restaurant recently and getting good reviews little by little, but ***Yelp is filtering all the good reviews while leaving all the bad reviews***.  My customers come back to our restaurant saying their reviews are gone.  Yelp does that to make us pay $350 per month for advertising.  ***My sister has a restaurant and she was a bit afraid of bad reviews so she paid $350 per month and she has only 4 filtered reviews out of 500 and I have 9 out of 20***."  (FTC 38427479, 4/30/12, New York, NY)

(xxiii)  "Within 1 or 2 days of that bad review going up, Yelp called me for the 1st time from their sales office to try & sell me advertising.  When I told them I could not afford it, they said '***We can make your rating increase & take away that one star review for you, if you advertise with us***' . . . .  I've also had many clients write a 5 star review for my business & Yelp insists on

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                                  - 26 -

1       keeping them 'Filtered' so that viewers can only see the 1 star review." (FTC

2       48130435, 8/26/13, Phoenix, AZ)

3   (xxiv)   "In late December [2010], a Yelp advertising representative called me and

4       asked me to pay a monthly marketing fee.  When I declined to pay, *the very*

5       *next day 100% of my 4 and 5 star Yelp reviews were filtered*.  What started

6       happening after that, is that *3 fake 1 star reviews got posted to my*

7       *business*. . . . *I have 18 4 & 5 star reviews, mostly 5 star, and 100% of my 5*

8       *star reviews are filtered*."  (FTC 31092586, 5/12/11, San Francisco, CA)

9   (xxv)   "Yelp filters out legitimate 5 star reviews while simultaneously leaving less

10       favorable reviews posted on our page.  We continually receive emails and

11       calls from yelp asking us to advertise on their site and the natural implication

12       is that if we advertise with them our reviews will stop being filtered."  (FTC

13       42398213, 9/11/12, Brooklyn, NY)

14   (xxvi)   "Yelp has been trying to extort money from me for 2 years now to advertise

15       on their site.  When I said no, and refused to pay for advertising on their site,

16       all of our 20+ positive reviews were filtered (with the exception of the Elite

17       Yelpers reviews, which Yelp cannot filter), leaving only the few 1,2,3 star

18       reviews.  *I tested them*.  A sales person called me and asked if I would

19       advertise with them.  I answered that all my positive reviews were filtered,

20       and I can't advertise if I only have 2.5 / 5 stars.  I would need to wait to see

21       that my rating is 4 or 5 stars.  *Within a couple of days, they started releasing*

22       *our positive reviews and filtering the negative ones to give us 4 stars*.  A few

23       days after that the sales person called back and said 'see, you are at 4 stars

24       now, can we sign you up'.  I absolutely refused, and *I told her about the test*

25       *we did to show the extortion*.  She hung up the phone.  *Within a week, all of*

26       *our positive reviews were filtered again, leaving only any negative or low*

27       *rating reviews*."  (FTC 51673743, 2/21/14, Toronto, ON, Canada).

28

47.     On November 19, 2013, *NBC News Los Angeles* published an article titled "Yelp Under Fire for Alleged Pandering to Advertisers." The article discussed a lawsuit and specific small businesses that accused Yelp of manipulating customer reviews if those small business owners refused to spend money advertising on Yelp. In this instance, Yelp reportedly promised to remove negative reviews in exchange for advertising dollars and fulfilled the promise. When the dentist decided to cancel advertising, the negative reviews returned.

> NBC4 spoke with a SoCal dentist, Gary Hollander, who said he could attest to such practices.
>
> "This is a forum for anybody to write in," said Hollander, who says getting people into his dental practice got much tougher in the midst of the recession when he started getting several negative reviews on Yelp.
>
> "I wrote to Yelp figuring that they could knock it off," he said. "Instead, I got an email back stating (that) they can't interfere with factual disputes."
>
> The tone quickly changed, according to Hollander and his wife Mary, when a month later, Yelp called him back asking him if he wanted to buy an advertisement.
>
> ***"My husband said 'I don't like the negative reviews, what will happen with those if I pay the $350?' and they said 'no problem we can remove these negative reviews,' and they did," said Mary Hollander.***
>
> Gary Hollander claims he called Yelp back a few weeks later to inform the company he decided not to advertise.
>
> "My husband said to me 'the negative reviews are back,'" said Mary Hollander. "Since he didn't pay the $350. That's extortion!"

48.     The same November 19, 2013, article described the account of a former Elite Yelper (defined at ¶33) who corroborated complaints made by local business owners that Yelp would in fact filter positive reviews of businesses that were on a list of those which the Company was seeking advertising revenue.

> ***"If you wrote a positive review for a business that was on the list of business they were trying to get to advertise they would filter the review,"*** explained [Lily Jeung] formerly an "elite" Yelper]. "If you were to write a negative review about a business that was giving them a lot of money -- they would delete your account as well."

49.     Throughout December 2013, Yelp's stock price continued to trade at artificially inflated levels.

Virginia Court of Appeals Orders Yelp to Disclose the Identity of Yelpers Who Wrote Negative and Potentially False Reviews

50.     On January 7, 2014, the Virginia Court of Appeals issued a ruling requiring Yelp to disclose the identities of anonymous Yelp reviewers who had written negative reviews about Hadeed Carpet Cleaning.[16]  On January 8, 2014, *The Washington Times* published an article titled "YELP critics must be identified, court rules in online landscape altering decision."  The article discussed the January 7, 2014, ruling from the Virginia Court of Appeals:

> In a decision that could reshape the rules for online consumer reviews, a Virginia court has ruled that the popular website Yelp must turn over the names of seven reviewers who anonymously criticized a prominent local carpet cleaning business.

> The case revolves around negative feedback against Virginia-based Hadeed Carpet Cleaning.  The owner, Joe Hadeed, said the users leaving bad reviews were not real customers of the cleaning service . . . .

> *              *              *

> If "***the reviewer was never a customer of the business, then the review is not an opinion; instead, the review is based on a false statement***" . . . .

51.     On January 10, 2014, *The Atlantic* published another article about the Virginia appellate court decision titled "Court Rules That Yelp Must Unmask the Identities of Seven Anonymous Reviewers" and focused on the fact that the negative reviews appeared to be totally fabricated.

52.     After news of the Virginia appellate court ruling, the potential disclosure of the anonymous sources began to be more widely discussed, including speculation that the Company might be covertly engaged in the creation of negative reviews.  Following these revelations, the Company's stock price suffered significant volatility and material declines, falling from a close of $82.21 per share on Friday, January 10, 2014 to a close of $75.84 per share on Monday, January 13, 2014.[17]

53.     Underlined{False and Misleading Statement}: On February 5, 2014, the Company issued a press release announcing its fourth quarter and fiscal year 2013 financial results.  The Company

---

[16]  *See Yelp, Inc. v. Hadeed Carpet Cleaning, Inc.*, 62 Va. App. 678 (2014).

[17]  On January 14, 2014, the Company's stock price rebounded to close at $81.40.

1  announced fourth quarter and fiscal year 2013 revenue and earnings that materially beat Wall Street

2  analysts' expectations.  In addition, the Company increased the Company's fiscal 2014 financial

3  guidance:

**Revenue Growth in the Fourth Quarter Accelerates to 72%**

4

5          . . . Yelp Inc., (NYSE: YELP), the company that connects consumers with
great local businesses, today announced financial results for the fourth quarter ended
6      December 31, 2013.

7          •       Net revenue was $70.7 million in the fourth quarter of 2013, reflecting
72% growth from the fourth quarter of 2012
8
                                        *          *          *
9
          •       Active local business accounts grew 69% year over year to
10     approximately 67 thousand

11                                      *          *          *

12      **Business Outlook**

13          As of today, Yelp is providing its outlook for the first quarter of 2014 and full
year 2014.
14
          •       For the first quarter of 2014, net revenue is expected to be in the range
15     of $73.5 million to $74.5 million, representing growth of approximately 60%
compared to the first quarter of 2013. . . .
16
          •       For the full year of 2014, net revenue is expected to be in the range of
17     $353 million to $358 million, representing growth of approximately 53% compared
to the full year of 2013.  Adjusted EBITDA is expected to be in the range of $54
18     million to $58 million.

19          54.   <u>False and Misleading Statement</u>:   On February 5, 2014, the Company held a

20  conference call for analysts and investors to discuss Yelp's 4Q13 and FY13 financial results.  The

21  call was hosted by Stoppelman, Krolik and Donaker.  During the call, after stating that "over time

22  our goal is to be the first place new local businesses turn for advertising," defendants repeated the

23  4Q13 and FY13 financial results and 2014 financial outlook reported earlier that day and stated the

24  following:

25          [Krolik]: With that thought fresh in our minds, let's turn to the guidance for
the first-quarter and full-year 2014.  For the first quarter we expect revenues in the
26     range of $73.5 million to $74.5 million.

27          We expect adjusted EBITDA for the first quarter to range between $8 million
and $9 million.

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                      - 30 -

1

\*       \*       \*

2      We expect full-year 2014 revenue to be in the range of $353 million to $358
million, or approximately 53% revenue growth over 2013. **For the full year, we**

3   **expect adjusted EBITDA to range between $54 million and $58 million, a 90%
increase over 2013.**

4

5      55.      Analysts and investors reacted positively to 4Q13 and FY13 financial results and

6   continued to credit Yelp efforts to "Close the Loop" with local businesses to drive advertising

7   revenue.  Barclays, for example, in a February 6, 2014, report "Yelp, Inc.: Five Star Growth for

8   Paying Accounts," stated that increases in Yelp's active advertising accounts must be evidence that

9   Yelp's "closing the loop" services were attracting local businesses to advertise:

10      We continue to believe that YELP has the most compelling addressable
market in our coverage and is well positioned to penetrate that market by showing
merchants a more demonstrable ROI [return on investment] on their ad spend

11   through its "closing the loop" products. . . .

12      Paying account growth reflects progress from closing the loop: Yelp added
10,200 paying accounts in 4Q–an organic increase of 8,000 . . . .  Also encouraging,

13   the growth rate for the oldest cohort of Yelp markets accelerated for the 2nd
consecutive quarter to 62% from 57%, **evidence we believe of how products that**

14   **"close the loop" between consumers and merchants are helping to convert
customers to paying accounts at an accelerating pace**.

15

16      56.      And RBC Capital Markets, in a February 6, 2014 report "Roundup of Yelp Q4:13

17   EPS Results," agreed that Yelp's Local Advertising revenue was the most important part of the

18   Company's business and key to the Company's financial future:

19      Local Advertising revenue, Yelp's most important segment, grew 71% Y/Y
to $58.1MM in Q4 (representing 82% of total revenue) . . . .  **We continue to believe**

20   **that Yelp's Local Ad revenue growth is a testament to their ability to continue to
offer a compelling value for both consumers and advertisers**.

21      \*       \*       \*

22      Active Local Business Accounts, the main driver of Yelp's Local Ad
Revenue, grew 69% Y/Y to 67,300 in Q4, accelerating from 61% growth in Q3.  We

23   would note that Local Business Account growth benefitted from approximately 2,200
net adds . . . . (emphasis in original)

24      57.      After the Company's February 5, 2014, financial results and increased financial

25   guidance, Yelp's share price continued to trade at artificially inflated prices including an increase to

26   $89.46 per share on February 6, 2014, and $97.39 by February 27, 2014.

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                              - 31 -

58. <u>Reasons Why Statements in ¶¶53-54 Were Knowingly False and Misleading</u>. The statements in ¶¶53 and 54 to the effect that the Company was increasing its first quarter 2014 and fiscal 2014 financial outlook were materially false and misleading and without reasonable basis to the extent that defendants knew but failed to disclose such increase was based upon the Company's knowing business practice of manipulating ("curating") local business reviews in order to compel local businesses into buying advertising. In light of the above facts, the representations concerning the Company's current and future financial condition and future revenue and earnings prospects, and the extent to which they were reliant upon undisclosed business practices, were materially false and misleading, and did not have a reasonable basis. In truth, defendants knew or deliberately disregarded that Yelp's ability to generate revenue from advertisers was dependent upon undisclosed business practice of leveraging inauthentic reviews to compel businesses to purchase Yelp's services as the price to suppress those inauthentic reviews. *See infra* ¶¶46-48.

59. <u>False and Misleading Statements</u>: On March 3, 2014, the Company filed its Form 10-K for the fiscal year ended December 31, 2013. The Form 10-K was signed by defendants Stoppelman, Krolik and Donaker and all of the Company's then directors.[18] The Form 10-K reiterated the fourth quarter and fiscal year 2013 financial results announced on February 5, 2014, and repeated certain of the materially false statements alleged above at ¶40. With respect to the Company's business practices and online business reviews, the Company repeated the false statements that (a) its contributors posted "first-hand" reviews of local business, (b) businesses could also pay to promote themselves through targeted search advertising, and (c) boasted of the quality of its reviews and the robust nature of the Company's recommendation software, which, according to Yelp, was among the key contributors to the quality and authenticity of the reviews.

> Yelp connects people with great local businesses. Our users have contributed a total of approximately 52.8 million cumulative reviews of almost every type of local business . . . .

> *Contributors*. . . . These contributors provide **rich, firsthand information about local businesses, such as reviews, tips, ratings and photos**.

---

[18]   Max Levchin (Chairman of the Board of Directors), Fred Anderson, Peter Fenton, Robert Gibbs, Diane Irvine, Jeremy Levine and Mariam Naficy.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                                    - 32 -

\*       \*       \*

*Local Businesses. . . . **Businesses can also pay for premium services to promote themselves through targeted search advertising, discounted offers and further enhancements to their business page**. . . .*

\*       \*       \*

- *Our Recommendation Software. **In order to maintain and enhance the quality, authenticity and integrity of the reviews on our platform, we employ our proprietary automated recommendation software to analyze and screen all of our reviews**. Our recommendation software looks at a wide range of data associated with each review and reviewer in order **to determine the review's relevance and reliability**. Our recommendation software operates continually, and the results of its determinations with respect to particular reviews may change **over time as it factors in new information**. This can result in reviews that were previously recommended becoming not recommended and reviews that were previously not recommended being restored to recommended status. . . . We believe **our recommendation technology is one of the key contributors to the quality, authenticity and integrity of the reviews on our platform and the success of our service**.*

60.     <u>False and Misleading Statement</u>: As alleged in ¶43, throughout the Class Period, defendants also falsely stated and maintained that there was absolutely "no relationship" between the filtering of reviews published on the Yelp site and whether businesses purchased advertising from the Company. Defendants also falsely claimed that there was zero relationship between the timing of recommendations and when a business decides to or declines advertising. Yelp's website, for example, under Common Questions, stated (and continues to state):

**Do Yelp advertisers get preferential treatment?**

*No. **Our recommendation software treats advertisers and non-advertisers exactly the same**. . . .*

*Furthermore, **there is zero relationship between the timing of when a review gets recommended and when a business decides to – or declines to – advertise** . . . .*

*In short, **there is no relationship between reviews and anything having to do with Yelp Ads or the Yelp Ads sales process. Period**.*

61.     <u>Reasons Why the Statements in ¶¶59 and 60 Were Knowingly False and Misleading</u>. Each of the defendants' Class Period statements set forth above concerning the Company's current business and financial condition, specifically statements concerning: (i) the statement that "[t]hese contributors provide rich, firsthand information about local businesses" (¶59); (ii) businesses can pay to promote themselves through targeted advertising (¶59); (iii) our recommendation technology is

1    one of the key contributors to the quality, authenticity and integrity of the reviews on our platform

2    and the success of our service (¶59); and (iv) the statement in (¶60) that there is zero relationship

3    between the timing of when a review gets recommended and when a business decides to – or

4    declines to – advertise, were each materially and knowingly false and misleading when made for all

5    of the reasons set forth in ¶¶46-48 and caused the Company's stock price to trade at artificially

6    inflated prices.

7           62.    In addition to the numerous complaints filed with the FTC demonstrating the falsity

8    of the representations alleged herein, additional reports from local business owners who brought

9    their complaints to Yelp's attention demonstrate the knowing falsity of the representations alleged

10   herein:

11          (a)    Russel Kassman – R. Kassman Purveyor of Fine Pianos in Berkeley, CA.

12   Russel Kassman is the owner of R. Kassman Purveyor of Fine Pianos in Berkeley, California.

13   Kassman reported he brought to Yelp's attention reviews posted by non-customers which Yelp

14   refused to address (in particular, a number of non-customers who left negative reviews claiming their

15   cars had been towed after parking in a space reserved for Kassman's customers). Kassman also

16   reported that Yelp has been filtering authentic good reviews of his business. According to Kassman,

17   Yelp has filtered most of the positive reviews of R. Kassman Purveyor of Fine Pianos since he

18   declined advertising and the remaining unfiltered reviews are currently mostly not positive.

19   Kassman reported that he has provided Yelp with numerous contracts of sale to prove that filtered

20   reviews were left by actual customers, but Yelp has refused to consider this evidence and make the

21   appropriate adjustments. Instead, according to Kassman, the Yelp page for R. Kassman Purveyor of

22   Fine Pianos displays ads for his direct competitors.

23          (b)    Kassman also reported that one customer, Debbie Schwarzer, an attorney and

24   former partner at Wilson Sonsini Goodman & Rosati, posted a review of his business that was

25   filtered. Subsequently, Ms. Schwarzer reported that she specifically contacted Yelp and provided a

26   bill of sale to prove she was real customer who had left a legitimate and truthful review based upon

27   her personal experience. Yelp nevertheless filtered her review. Ms. Schwarzer described her

28   experience having reviews filtered and attempting to contact Yelp, and later the Better Business

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                      - 34 -

1    Bureau, in a letter she sent to the *San Francisco Chronicle*.  Ms. Schwarzer's letter outlined her

2    experience including the fact that she is a member of Yelp and her good review had been filtered

3    while other of her reviews (all for companies that had paid for advertising) were not filtered.

4          Several years ago, Mr. Kassman assisted me in choosing a piano.  I was
       exceptionally pleased with the service and the instrument that I bought, and wrote a
5       factually accurate review, which I posted to Yelp. Mr. Kassman told me that I should
       expect my review to be filtered quickly.  Since I am a member of Yelp, and Yelp has
6       no reason to think that I am other than a bona fide reviewer (all of my previous
       sincere and factually accurate reviews of other businesses had been posted promptly
7       and can still be found), I was puzzled why that would be.  He explained that *Yelp
       had approached him and "suggested" that he purchase advertising.  He said he
8       had declined, and ever since, any positive reviews had been filtered within a day.
       True enough, mine disappeared quickly*. While truly hateful and vitriolic reviews
9       are prominently displayed on the page relating to Mr. Kassman's business – reviews
       so bad that I have to wonder who was paid to write them, having my own personal
10      experience with Mr. Kassman and his business – you can only see mine by going
       through all of the effort to look at filtered reviews.  There, you will find my review as
11      well as a sizeable number of other positive reviews.  Some of the foul reviews
       encourage shoppers to go to competing businesses.  *Not coincidentally, these shops
12      do purchase advertising from Yelp*. . . .

13                            *      *      *

14          Mr. Kassman and I have stayed in contact since that incident, and he has told
       me of a number of subsequent incidents of customers posting favorable reviews
15      following genuine and positive experience with his business and then having the
       reviews disappear within 24 hours.  *I'm not talking about some reviews, I'm talking
16      about every single positive review written by local people with actual knowledge
       and no motive other than wishing to support a business that has provided good
17      service. I can't imagine how this would happen unless there is a setting on Yelp's
       systems that directs the site to take all reviews over 1 or 2 stars and filter them.*

18

19          I was astonished that this could happen to me. I'm an honest person, and what
       I wrote was sincerely felt. I opened a case with the BBB and asked, as a resolution of
20      the matter, that my positive review and all other positive reviews be restored to the
       business's main page; they forwarded Yelp's response that "there was nothing they
21      could do."   When I objected and insisted that they were perfectly capable of
       reviewing their filtering algorithm, and insisted that my original request be honored, I
22      received the same reply back, and BBB closed the case.  I have worked with software
       programmers all of my professional life, and I frankly found it a little difficult to
23      believe that Yelp could not find a way to adjust their review filter. As I stated above, I
       have to think in fact that they have deliberately adjusted their filter in Mr.
24      Kassman's case. I would love to be able to do discovery on Yelp and see if my
       suspicions are true.

25                            *      *      *

26          My only interest in this matter is fairness.  I have no financial arrangement of
       any kind with Mr. Kassman, no ongoing relationship other than continuing
27      enjoyment of the beautiful piano he helped me choose.  *But I hate it when the big*

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                          - 35 -

*guy, in this case Yelp, can get away with behavior that by any measure is unethical and is clearly damaging, just because that person declined to pay money.*[19]

During the Class Period and Prior to Disclosure of Thousands of Business Complaints of Extortion-like Business Tactics, Insiders Unload More than One Million Shares of Yelp Stock for Proceeds of $81.5 Million

63.    Between November 14, 2013, and March 10, 2014, many of the Company's executive officers and directors, including the Company's CEO Stoppelman, CFO Krolik and COO Donaker, at the same time defendants issued false and misleading statements suspiciously sold more than 1.1 million shares of their Yelp stock at artificially inflated prices as high as $98.18 per share for insider trading proceeds in excess of $8l.5 million.

| Name | Shares | Proceeds |
|------|--------|----------|
| Geoffrey Donaker | 125,000 | $9,877,471 |
| Peter H. Fenton | 64,012 | $4,002,692 |
| Robert J. Krolik | 35,000 | $2,556,917 |
| Max R. Levchin | 281,584 | $18,187,095 |
| Jeremy S. Levine | 381,244 | $24,673,766 |
| Joseph R. Nachman | 122,830 | $11,775,649 |
| Jeremy Stoppelman | 132,350 | $8,493,479 |
| Laurence Wilson | 26,250 | $1,968,638 |
| TOTAL | 1,168,170 | $81,535,707 |

64.    On March 10, 2014, Seeking Alpha published a report titled "If Yelp's CEO Refuses to Own Any Shares, Why Should You?" noting that insiders had unloaded 41% of their shares in the prior four months and suggesting that management believed that the Company's stock price was overvalued:

**Massive insider selling:**

To the tune of *41% of insider shares in the last 4 months alone*.  The CEO, Jeremy Stoppleman, has exercised $15.25 million of stock options in the last year and *seems to own almost no shares*.  Instead, Mr. Stoppleman on a weekly basis seems to convert free stock options to the tune of about 15,000 shares and then sell them that day.

The *rampant insider selling over the last 4 months* began at a stock price of $65.63.  This indicates that *management (who knows the workings of the company and its long term growth prospects the best) believes that* at a price 50% below today's price *the stock was blatantly overvalued*.

---

[19]   Plaintiffs spoke with Ms. Schwarzer and confirmed the report and the letter.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                                      - 36 -

65.     Later, after the Class Period on June 6, 2014, another Seeking Alpha analyst published a report discussing the massive insider sales at Yelp in an article titled "Yelp, Inc.,: In A State Of Cognitive Dissonance."  The analyst was even more incredulous, highlighting that insiders had sold more than three times the revenue earned by the Company:

> Yelp insiders have sold $928 million worth of stock.  ***This is unreal as only in America can you have an enterprise value of $4.3 billion and insiders have sold more absolute dollar value of stock than FY2013 revenue by a factor of three, yet retail investors are chasing this name***.

The True Facts Begin to Be More Widely Disclosed, Including Public Reports of Federal Trade Commission Complaints Emerging, Many Claiming that Yelp Posted Fraudulent and Negative Reviews After They Declined to Pay for Advertising – Stock Price Declines

66.     On March 31, 2014, the *Los Angeles Times* published an article titled "Yelp's practices sound to some like extortion."  The article discussed the Company's practice of offering customers a service to suppress negative reviews for a fee and compared the practice to extortion and detailed the experience of a jeweler who refused to advertise.  In addition, the article reported that Sollito acknowledged that though a Yelp representative may have indeed promised to make competitors ads disappear, the rep only meant that they could buy out the ad space.

> ***A merchant is told by Yelp that for a fee, troubling ads on the site can be made to go away.  A Yelp spokesman says what was meant is that the merchant "could buy out the ad space on your own page***."

> Yelp just can't stop living the thug life.

> Five years ago, I asked whether the popular review site was a shakedown racket for merchants.  I quoted a number of small-business owners who said Yelp had threatened to run negative reviews more prominently if they didn't pay for advertising.

> Jeremy Stoppelman, Yelp's chief executive, told me at the time that the San Francisco company doesn't strong-arm merchants.  ***He blamed talk of shakedowns on disgruntled business owners spreading "false rumors***."

> I guess this is another one of those.

> Rick Fonger, 62, decided a few years ago to end a career in journalism and move from Canada to Alhambra, where he opened a jewelry store.

> *          *          *

> To give his shop, called 58 Facets Jewelry, a little social-media boost, Fonger spent about $300 a month advertising on Yelp.  "It worked OK, not great," he said.

After six months, he decided to shift his limited marketing budget to direct mail. He canceled his Yelp ad in February. ***The very next day, Fonger said, a Yelp employee called to say she wanted to help***. She pointed out that competitors' ads were now appearing above the reviews for his store. "***She said that for $75 a month, she could make those ads go away," Fonger recalled. He responded that this sounded a lot like extortion***. "***She said she could understand why I'd think that," Fonger said. "But she said they do it to everyone***."

As if that makes it OK. "***It certainly sounds like extortion***," said Kevin Dean, president of WSI Net Advantage, a Fremont, Calif., Internet marketing firm.

"If Yelp just sold the ad space to someone else, fine," he said. "But to then call up and offer to make the ad go away for a price, that seems like an unscrupulous business practice."

\*       \*       \*

***Yelp is a for-profit business itself, and it makes the bulk of its money from neighborhood merchants. About 83% of the company's nearly $71 million in revenue in the most recent quarter came from local ads***.

This gives Yelp a powerful incentive to turn the screws on small businesses as much as it can.

Vince Sollitto, a Yelp spokesman, said that when the company's rep told Fonger that she could make competitors' ads go away for $75 a month, what she meant was that "you could buy out the ad space on your own page."

He said Yelp is doing the same thing that phone books do: selling ads that accompany related business listings.

***The difference, of course, is that the Yellow Pages never told businesses they could pay extra to get rid of someone else's ad***.

\*       \*       \*

And maybe he believes that. ***The reality, however, is that Yelp has created an online venue at which a merchant's competitors can post negative reviews and run their own ads***.

***Yelp then makes money by charging to downplay others' negative reviews and to keep rivals' ads away***.

67.     On March 31, 2014, Wells Fargo published a report that, while optimistic on Yelp because of various "digital trends" (*i.e.*, increased mobile use), noted that an increasing number of Yelp's potential customers were voicing their displeasure with Yelp. Wells Fargo warned that although Yelp had consistently denied giving preferential treatment to advertisers, or perhaps because they had, Yelp's revenue growth would be "compromised" if local businesses concluded otherwise:

- **Veracity of user reviews remains a question**. Yelp's review filtering algorithm remains a controversial topic among a portion of small business owners, who frequently take to the local press to vent claims that Yelp extends preferential treatment to small businesses that pay for advertising services. ***Though the company consistently denies that sales considerations play any role whatsoever in the review recommendation and filtering process, if a growing number of SMBs come to this conclusion, we believe Yelp's advertising revenue growth could be compromised***.

68. On April 2, 2014, *The Wall Street Journal* published an article titled "Yelp Regularly Gets Subpoenas About Users: FTC Says It Has Received 2,046 Complaints Since 2008." The article disclosed that *The Wall Street Journal* had made a FOIA request to the FTC seeking records of complaints against Yelp. The article noted that the FTC posted their response to the FTC website[20] and that Yelp's stock was down as a result:

> On Wednesday, the Federal Trade Commission disclosed on its website that it received 2,046 complaints about Yelp from 2008 through March 4 of this year, noting that its disclosure was part of a Freedom of Information Act request from The Wall Street Journal. ***Yelp was down 6%, or $4.82, to $75.36 in Wednesday afternoon trading in the wake of the disclosure***.

69. On April 3, 2014, the *Los Angeles Times* published an article titled "Yelp's tactics feel 'nefarious' and 'fishy,' even if they're legal," (apparently written before FTC complaints were disclosed) laying bare the reality that Yelp's ability to generate revenue is predicated not on "connecting" businesses with customers, but on leveraging Yelp-created threats to sell advertising:

> Among the frequently asked questions on Yelp's website, there's this: "Will Yelp remove or reorder bad reviews if a business pays for sponsorship?"
>
> And the answer: "No. You can't pay us to remove or reorder your bad reviews — it's just that simple."
>
> It's not that simple, at least if you listen to the many ***small-business owners who say Yelp routinely uses bad reviews and competitors' ads as leverage to get merchants to cough up some cash***.
>
> "They continually harass you and strong-arm you to get you to pay for their service," said Randy Boelsems, 64, who runs a boating supply company in Fountain Valley.
>
> And ***if you don't play ball, he said, it's likely that negative reviews about your company will be featured more prominently than positive ones***.

---

[20] Letter from Dione J. Stearns to Angus Loten, dated March 18, 2014, *available at* http://www.ftc.gov/system/files/attachments/frequently-requested-records/yelp-foia-2014-00610.pdf (Note that although the letter responding to *The Wall Street Journal* FOIA request posted to the FTC's website is stamped March 18, 2014 it is unclear when the letter was actually posted.).

1                          *        *        *

2          A Yelp spokesman, Vince Sollitto, defended this practice by saying
merchants are being offered the chance to buy out the ad space accompanying their
3    reviews.

4          ***Looked at another way, though, it could be said that Yelp creates a problem
for businesses and then offers to fix it – for a price***.

5                          *        *        *

6
7          I spoke with a number of small-business owners who related stories about
***Yelp demanding payment to remove malicious reviews or being uncooperative in
addressing false claims***.

8
9          Illustrating the power Yelp has over merchants, some asked that their names
not be used.  They said they were afraid of making their relationship with the site
10   even more troublesome or of drawing attention to negative reviews that Yelp has
refused to take down.

11         A Southern California real estate appraiser pointed me toward a review
claiming that he sent an unlicensed trainee to appraise a property, which would be
12   against state law.  He said that when he explained to a Yelp rep that this simply
wasn't true, the rep declined to do anything and refused to put a supervisor on the
13   phone.

14         Chris Monks, 32, said he used to pay Yelp $300 a month to advertise his New
Haven, Conn., moving company.  Then he switched to the $75-a-month plan, which
15   at least kept competitors' ads off his listing.

16         After he canceled that in January, Monks said, "***suddenly past negative
reviews reappeared and all the good reviews disappeared***."

17
          I checked out the Yelp listing for his company, 2 Young Studs Moving. There
18   were four recommended reviews – a five-star review from February, a one-star
review from 2012, a two-star review from 2011 and a five-star review from 2009.  A
19   mixed bag.

20         However, if you click on Yelp's link to "reviews that are not currently
recommended," you'll find some more negative reviews and then page after page of
21   five-star reviews from recent years.  ***It's as if all the good reviews had been
deliberately buried beneath the bad ones***.

22
          Yelp says it has no control over how reviews are played on the site.  It says
23   automated software chooses which reviews to recommend and which ones to
downplay, and "treats advertisers and non-advertisers exactly the same."

24
          I asked to speak once again with Sollitto, Yelp's vice president of corporate
25   communications.  A senior PR manager, Kristen Whisenand, asked what I wanted to
discuss and then emailed me a statement.

26
          "Not sure what's left to explore here," she said of allegations that Yelp is
27   trying to extract money by running competitors' ads on businesses' listings. "Yelp
disagrees and thinks it's a perfectly standard advertising practice."

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                              - 40 -

70. On April 3, 2014, SunTrust Robinson Humphrey published a report titled "Yelp Shares Drop On FTC Complaints Disclosure," describing the impact of the disclosure of the April 2, 2014, FTC complaints on Yelp's stock price: "Yelp shares were down nearly 6% yesterday (vs. Nasdaq up 0.2%) on 1.5x normal volume. *We attribute the underperformance to an FTC disclosure that it received 2,046 consumer complaints targeting Yelp over a 5-year period ending March 4, 2014*."

71. On April 3, 2014, Yelp stock price declined from a close of $75.63 on April 2, 2014, to $70.61 on April 3, 2014, on more than 8 million shares trading volume as compared to only 5.4 million shares traded on April 2, 2014.

72. On April 4, 2014, more reports expanded on the disclosure of the FTC complaints including Zacks which published a report titled "Yelp Drops on FTC Complaints, Lawsuit" regarding the disclosure and its impact on the Company's stock price and specifically attributing the decline to the disclosure of the volume of FTC complaints:

> Shares of Yelp Inc. (YELP) fell $5.02 (6.6%) to close at $70.61 on Apr 3, 2014, after the Federal Trade Commission said that it received an overwhelming number of complaints about the company's business review practices over the last five years.
>
> The FTC recently announced that it received more than 2,046 complaints against Yelp. *According to The Wall Street Journal, most of the complaints were lodged by small business owners alleging that Yelp posts fraudulent reviews that defame their reputation*.
>
> *Most of these business owners said that the negative reviews posted on the website appeared after they declined to pay Yelp for sponsorship*.

73. On April 4, 2014, the Company's stock price declined from a close of $70.61 on April 3, 2014, to $65.76 on April 4, 2014 on more than 12 million shares shared as compared to 8.1 million shares traded on April 3.

74. In sum, the widespread disclosures of official complaints, including the bases of the complaints with the FTC, caused the Company's stock price to suffer sharp declines, as between April 1, 2014, and April 4, 2014, Yelp's stock price dropped from a close of $80.18 per share on April 1, 2014, to a close of $65.76 per share on April 4, 2014.

Post Class Period Publications Corroborate the Negative Impact of the April Disclosures on the Company's Stock Price – Financial Condition and Outlook.

75.     On April 8, 2014, SunTrust Robinson Humphrey published a report titled "Upgrading to Buy, $85 Target Investors Getting Another Shot At Quality Growth Story."  The report characterized the weakness in Yelp's share price, specifically attributing the price decline to the April 2, 2014 disclosure of the FTC complaints and noting that many of the complaints were that negative reviews appeared more prominently after local businesses declined to buy advertising:

> ***Investors Getting Another Shot At Quality Growth Story***.  Yelp stock is down 33% in the past month, the worst performer in our basket of 20 mid and large cap internet peers.  Most of the weakness is explained by the broader market correction, punishing high growth, high multiple, top performers like Yelp.  ***We believe there are also two company specific issues contributing (at the margin) to relative underperformance in the past month: 1) recent negative headlines, regarding FTC complaints and a somewhat related VA Supreme Court case***; and 2) weak international traffic data.  On the first item, we see little if any impact to the business/financials and offer a thorough walk-through in this report. . . .

> \*        \*        \*

> ***The issue of the FTC complaints***.  As we discussed in our note on Thursday (LINK), ***it was recently brought to light, by way of the WSJ, that the FTC received 2,046 complaints targeted at Yelp for the five years ended March 2014***. . . .  Where it gets more interesting is that the ***FTC records, according to the WSJ, show that a significant number of the complaints indicated that the negative reviews picked up after the local business had declined to advertise with Yelp.  Essentially the insinuation here is that Yelp attempted to strong arm these local businesses (through negative reviews) that had opted not to advertise with Yelp***.

> \*        \*        \*

> As it relates to strong-arming tactics, our best sense is that 1) ***there could be some isolated cases where this may have happened, i.e. a young Yelp salesperson acting out of line***; 2) there is likely some coincident cases; and 3) there are probably many of these cases where local businesses are complaining over what are negative but probably fair and legitimate based on the reviewers experience.  We are very suspect of any notion that this issue goes any deeper or Yelp's businesses practices are somehow corrupt.  We are of course watchful and mindful.

76.     On April 16, 2014, the *Star Tribune* published an article titled "Yelp fosters suspicion among small businesses," documenting the experience of Lymarie Jimenez, who opened her own business, Sugar Love Bakery of Woodbury, MN, in January 2014.  As the *Star Tribune* explained, Jimenez experienced the same problems with Yelp that other business owners have described in complaints to the FTC and elsewhere, including the suspicious timing of when and which reviews were filtered:

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 42 -

Lymarie Jimenez opened Sugar Love Bakery in Woodbury in January, and so far she's doing well. . . .

She even caught a break by having the space next door leased by a bridal shop, a great neighbor for someone in the wedding cake business.

Now, if she could only keep Yelp from ruining her life.

What, isn't Yelp a harmless and helpful crowd sourced consumer review site? Not to Jimenez, who believes that nearly 20 positive reviews of her business were suppressed by Yelp, while two negative reviews are prominently displayed as "recommended."

***To her the only logical explanation is retribution for her declining to advertise with Yelp.***

***Her experience is far from an isolated case. Yelp denies that it does this sort of thing, but it has been the subject of frequent complaints to regulators and a number of lawsuits.***

\*          \*          \*

Within weeks of opening she got a call from Yelp, an advertising pitch from a call center in Arizona.

\*          \*          \*

***Jimenez turned Yelp down.***

***Within a couple of days a one-star review showed up, she said, the first review by that poster. That means he opened a Yelp account just to write something bad about her bakery.***

She didn't think much of it, as some great reviews were showing up, too. ***Over the next few days, however, all of the positive reviews left the site. The negative review stayed.***

As Jimenez was telling her story this week, there were four recommended reviews on the Sugar Love page. Two were from so-called "elites," a kind of Yelp super reviewer. One was for three stars and the other was for five stars, the highest rating.

There were also two one-star reviews. One called the staff "extremely rude and immature," and the other didn't have anything specific to say other than that he was disappointed. ***Both were the only such reviews either one had ever posted.***

For a more complete view of what customers really think, here's a tip: Click on the link at the bottom of the page for reviews that aren't "recommended" by Yelp. ***There one finds just one one-star review of the bakery – and 18 four- or five-star reviews.***

**How are reviews filtered?**

These reviews had been "filtered" by Yelp. The filter is a black box, an algorithm, created by Yelp to block reviews that seem fake. Part of the reason

1     business owners don't trust Yelp is that it's never said much about what happens inside its black box.

2

3     *Some of the 19 blocked reviews on Sugar Love were by people who had made no other reviews. Jimenez said she can understand the algorithm deciding these were not real. But why continue to recommend the two one-star reviews, also by first-time contributors?* What made them seem more real*?

4

5     There's no phone number to call, she said, so she said she just dialed extensions in the call center until someone picked up his phone. She got that person to agree that her review history seemed odd. *But he wasn't going to do anything about it*.

6

7     "They kept saying, 'It's not us, it's the software,'" she said. "If it's their software, then fix it."

8

9     Her aggravation with Yelp isn't confined to the curious placement of reviews. She didn't really appreciate feeling pressure to advertise on the Yelp page featuring her business in order to keep her competition from advertising there.

10

11     She didn't create this page for her business or ask for it, but she needed to spend $300 a month to keep a competitor from advertising there?

12

13     That sounded kind of thuggish.

14     On the other hand, it's more or less how publishers of the Yellow Pages made their money for years.

15     The ads now there are for a row of businesses at the bottom under the heading "Best of Yelp Woodbury – Bakeries." *The only thing notable here is that none is actually in Woodbury.*

16

17     77. On June 6, 2014, Seeking Alpha published a report titled "Yelp, Inc.: In A State Of

18 Cognitive Dissonance." The report examined the gulf between Yelp's stated ability to grow

19 revenues by "closing the loop" and the Company's actual, hostile, relationship with its customer

20 base, in particular in light of the disclosure of the FTC complaints:

21     Yelp's steadfast protection of its users' anonymity has led to a ground swell of negative business sentiments towards Yelp from some business owners. *In fact, a*

22 *small group of business owners have become so incensed with Yelp they leveled allegations that positive user reviews suddenly disappeared soon after they refused*

23 *to embark on a Yelp advertising campaign. Perhaps more alarmingly, some vocal business owners claim that strong negative reviews appeared on Yelp and with no*

24 *way of verifying them.* This explains why Yelp only has 73,600 paying business customers, despite its 132 million unique monthly users and its 57 million

25 cumulative reviews posted to its sites since inception. *Moreover, the Federal Trade Commission (FTC) is actively investigating the 2,045 complaints leveled against*

26 *Yelp from businesses during the time period of 2008 and 2014. I'm at a loss for words as to how any investor can feel comfortable owning this stock at this*

27 *valuation when FTC is investigating its aggressive business tactics.* Negative findings could permanently impair Yelp reputation and credibility with would be

28 paying local business owners.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST       - 44 -

Also, according to the SEC filings, *Yelp insiders have sold $928 million worth of stock. This is unreal as only in America can you have an enterprise value of $4.3 billion and insiders have sold more absolute dollar value of stock than FY2013* revenue by a factor of three, yet retail investors are chasing this name.

78.     On July 21, 2014, Seeking Alpha published a report titled "Yelped Investors Will Soon be Calling for Help." The report discussed certain of the risks to the Company's business model as follows:

Businesses Deterred

The number of businesses that believe the enhanced pages or ads are worth the cost is quite minimal compared to the overall number of businesses registered. On the entire platform, Yelp has 1.6 million businesses, but only 73,600 are active business accounts which represents roughly 4.6% of the total.

Many businesses may be deterred from entering the platform as the policy of saving user anonymity makes user reviews unverifiable. A situation may arise where competing businesses write negative reviews for each other which will not be able to be removed. Maybe this is to blame for the miniscule percentage of paying businesses.

Moreover, Yelp has a 1-9-90 business model in which 1% of users are dedicated reviewers, 9% are occasional reviewers and 90% only read the reviews. With such a high dependence on a concentrated segment of reviewers, a policy change removing anonymity could significantly reduce the number of reviews. Yelp is certainly in a catch-22.

Further, *the Federal Trade Commission (FTC) is actively investigating 2,045 complaints leveled against Yelp from 2008 to 2014. The integrity of the platform is certainly in question and if continued negative sentiment mounts, Yelp will face an incredibly difficult situation where businesses will flock from it*.

**LOSS CAUSATION/ECONOMIC LOSS**

79.     During the Class Period, as detailed herein, defendants materially misrepresented Yelp's true financial condition by issuing false statements concerning the quality and authenticity of the reviews appearing on the Company's website, falsely stating that there was zero relationship between the purchase of advertising and when reviews were recommended or filtered, the efficacy of the Company's review filtering software and the Company's reliance on undisclosed business practices to meet financial guidance. *See* ¶¶38-43, 53-54, 59-60. In truth, defendants knew and/or deliberately disregarded that the review content on the Company's website was plagued by inauthentic reviews, that the Company often retaliated against businesses who refused to buy advertising and often used those inauthentic reviews as leverage to compel local businesses to

1    purchase advertising packages, and that the Company's financial prospects depended in part on

2    revenue from such practices.  *See* ¶¶46-48, 58, 61-62.

3         80.    Defendants' false and misleading statements had their intended effect and caused

4    Yelp stock to trade at artificially inflated prices throughout the Class Period and to reach a Class

5    Period high of $101.75 per share on March 5, 2014.

6         81.    On April 2, 2014, the true state of the Company's operations began to be widely

7    reported, including the breadth and apparent corroborative nature of local business owner complaints

8    filed with the FTC.  ¶¶36, 68, 70, 72, 75, 82-88.  This disclosure and follow on disclosures caused

9    Yelp's stock price to decline as the prior artificial inflation came out of Yelp's stock price and

10   investors absorbed the significance of the new information and its relationship to the alleged

11   misrepresentations.

12        82.    More specifically, on April 2, 2014, new facts concerning the volume and the

13   apparent corroborative nature of business owner complaints of Yelp's extortion-like tactics and thus

14   Yelp's operations and financial condition began to be widely reported to the market when *The Wall*

15   *Street Journal* published the results of an FOIA request served on the FTC.  The April 2, 2014,

16   edition of *The Wall Street Journal* revealed not only the fact that over 2,000 complaints had been

17   filed with the FTC concerning Yelp's business practices, but also indicated that the content of the

18   complaints, made available on the FTC's website, provided a broad based view into complaints that

19   Yelp manipulated the appearance and prominence or presentation of reviews to compel local

20   businesses to purchase advertising.  *See* ¶¶36, 68.

21        83.    The April 2, 2014, disclosures were also directly related to and sharply inconsistent

22   with defendants' prior misrepresentations, including false denials of such conduct.  Indeed, the

23   disclosures revealed that the Company's future revenue prospects, which apparently relied in part on

24   such business practices, were at much greater risk than previously indicated.  As a result, the

25   Company's stock price declined from a close of $80.18 on April 1, 2014, to a close of $75.63 on

26   April 2, 2014, on substantially increased volume.  *See* ¶71, 74.

27        84.    Investment analysts indeed attributed the stock price decline on April 2, 2014, and

28   following days' decline to this new information.  For example, on Wednesday April 2, 2014,

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 46 -

1  *TheStreet* published an article titled "Why Yelp (YELP) Stock Is Falling Today," which discussed

2  the impact the new information had on the Company's stock price: "Yelp (YELP) shares are down

3  6.6% to $74.93 on Wednesday after the Federal Trade Commission reported that it received 2,046

4  complaints about the business review website dating from 2008 to March 2014," and speculated that

5  they were related to prior extortion claims: "[I]n the past local businesses have accused Yelp of

6  hurting their ratings by posting only negative reviews about their businesses after they refused to buy

7  ads."

8         85.    On Thursday, April 3, 2014, more analysts and other market watchers continued to

9  digest and report on the April 2, 2014, disclosure and discuss potential implications of the over 2,000

10  FTC complaints.  On April 3, 2014, SunTrust Robinson Humphrey published a report titled "Yelp

11  Shares Drop On FTC Complaints Disclosure," stating that "Yelp shares were down nearly 6%

12  yesterday (vs. Nasdaq up 0.2%) on 1.5x normal volume.  We attribute the underperformance to an

13  FTC disclosure that it received 2,046 consumer complaints targeting Yelp over a 5-year period

14  ending March 4, 2014."  On the same day, *MTNewswires* published an article titled "Yelp Falls to 2-

15  Month Low as FTC Complaints, Business Subpoenas Scrutinized," stating that: "Yelp Inc. (YELP)

16  *sinks for a second session* on Thursday *as investors scrutinize* a Federal Trade Commission

17  disclosure this week that revealed 2,046 complaints about the review site from 2008 through March

18  of this year."

19         86.    Similarly, Nicole Petallides, a Fox Business Network correspondent, explained during

20  an April 3, 2014, edition of a Fox television show called "Money" (transcript appearing in 2014 CQ

21  Roll Call, Finance Wire) that investors were concerned about these new disclosures of complaints

22  going back to 2008 and the effect the conduct was having on people signing up with Yelp.  She

23  noted that the stock was getting "hammered" because of this news.

24

25         [Yelp] stock is getting hammered. It is down about seven percent right now.
       But **the problem is the big picture problem which is that you have small business
       owners now complaining month after month, year after year, since back to 2008,**

26     **saying that some of these complaints that people put on to yelp are fraudulent.
       And so this is problematic**.  And this is a whole debate over free speech versus

27     what's fair. . . . So, **this is not a problem that is ending today**, but certainly seems
       like something that is plaguing some of the people who sign up with Yelp and use

28     Yelp.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 47 -

87.     On April 3, 2014, the stock price declined more than $5.00 per share (or 7%) to $70.61 per share on trading volume of over 8.1 million shares.  ¶73.

88.     On Friday, April 4, 2014, *TheStreet* published an article titled "Why Yelp (YELP) Stock Is Lower Today," reporting that Yelp's stock price was ***continuing*** to plummet because disclosure of the FTC complaints had created a continuing "scandal":

> Yelp Inc. is down -7.31% to $65.45 Friday, ***continuing a two day fall beginning on April 2***, when the Wall Street Journal reported that the Federal Trade Commission disclosed over 2,000 complaints against the business review website in response to a Freedom of Information Act request made by the Journal.
>
> ***The company is now facing a scandal*** alleging they posted only negative reviews for businesses that did not purchase advertisements on their site.

89.     On April 4, 2014, the Company's stock price declined from a close of $70.61 on April 3, 2014, to $65.76 on April 4, 2014 on more than 12 million shares shared as compared to 8.1 million shares traded on April 3.

90.     Like other members of the class of purchasers of Yelp stock who purchased at artificially inflated prices during the Class Period, plaintiffs suffered an economic loss, *i.e.*, damages, when Yelp's stock prices declined upon the disclosures correcting the alleged misrepresentations.

91.     The timing and magnitude of Yelp's stock price decline negates any inference that the loss suffered by Lead Plaintiff and other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the class, was a direct result of defendants' fraudulent scheme and misrepresentations to artificially inflate Yelp's stock price and the subsequent significant decline in the value of Yelp stock when the true state of the Company's operations was revealed to the market correcting the misrepresentations.

1

**NO SAFE HARBOR**

2    92.    Yelp's verbal "Safe Harbor" warnings accompanying its oral forward-looking

3  statements ("FLS") issued during the Class Period were ineffective to shield those statements from

4  liability.

5    93.    The defendants are also liable for any false or misleading FLS pleaded because, at the

6  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

7  authorized and/or approved by an executive officer of Yelp who knew that the FLS was false. None

8  of the historic or present tense statements made by defendants were assumptions underlying or

9  relating to any plan, projection or statement of future economic performance, as they were not stated

10  to be such assumptions underlying or relating to any projection or statement of future economic

11  performance when made, nor were any of the projections or forecasts made by defendants expressly

12  related to or stated to be dependent on those historic or present tense statements when made.

13

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET**

14

15    94.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-

16  market doctrine in that, among other things:

17    (a)    Defendants made public misrepresentations or failed to disclose material facts

18  during the Class Period;

19    (b)    The omissions and misrepresentations were material;

20    (c)    The Company's stock traded in an efficient market;

21    (d)    The misrepresentations alleged would tend to induce a reasonable investor to

22  misjudge the value of the Company's stock; and

23    (e)    Plaintiff and other members of the Class purchased Yelp common stock

24  between the time defendants misrepresented or failed to disclose material facts and the time the true

25  facts were disclosed, without knowledge of the misrepresented or omitted facts.

26    95.    At all relevant times, the market for Yelp's common stock was efficient for the

27  following reasons, among others:

28    (a)    As a regulated issuer, Yelp filed periodic public reports with the SEC; and

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                    - 49 -

1        (b)     Yelp regularly communicated with public investors via established market

2 communication mechanisms, including through regular dissemination of press releases on the major

3 news wire services and through other wide-ranging public disclosures, such as communications with

4 the financial press, securities analysts and other similar reporting services.

5                    **CLASS ACTION ALLEGATIONS**

6        96.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

7 of Civil Procedure on behalf of all persons who purchased Yelp common stock during the Class

8 Period (the "Class"). Excluded from the Class are defendants and their families, and directors and

9 officers of Yelp and their families and affiliates.

10       97.    The members of the Class are so numerous that joinder of all members is

11 impracticable. The disposition of their claims in a class action will provide substantial benefits to

12 the parties and the Court. Yelp has more than 59 million shares of stock outstanding, owned by

13 hundreds if not thousands of persons.

14       98.    There is a well-defined community of interest in the questions of law and fact

15 involved in this case. Questions of law and fact common to the members of the Class that

16 predominate over questions that may affect individual Class members include:

17        (a)     Whether the 1934 Act was violated by defendants;

18        (b)     Whether defendants omitted and/or misrepresented material facts;

19        (c)     Whether defendants' statements omitted material facts necessary in order to

20 make the statements made, in light of the circumstances under which they were made, not

21 misleading;

22        (d)     Whether defendants knew or recklessly disregarded that their statements were

23 false and misleading;

24        (e)     Whether the price of Yelp common stock was artificially inflated; and

25        (f)     The extent of damage sustained by Class members and the appropriate

26 measure of damages.

27       99.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

28 sustained damages from defendants' wrongful conduct.

100.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

101.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

102.     Plaintiff incorporates ¶¶1-101 by reference.

103.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Yelp common stock during the Class Period.

105.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Yelp common stock.  Plaintiff and the Class would not have purchased Yelp common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

106.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Yelp common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

107.     Plaintiff incorporates ¶¶1-106 by reference.

108.     The Individual Defendants acted as controlling persons of Yelp within the meaning of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about Yelp, the Individual Defendants had the power and ability to control the actions of Yelp and its employees.  Yelp controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 5, 2015                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                           SHAWN A. WILLIAMS
                                           KENNETH J. BLACK


                                               s/ Shawn A. Williams
                                           SHAWN A. WILLIAMS

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                              - 52 -

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
NATHAN HAMLER
110 West A Street, Suite 750
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

Attorneys for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 5, 2015.

<u>s/ Shawn A. Williams</u>
SHAWN A. WILLIAMS

ROBBINS GELLER RUDMAN
    & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: shawnw@rgrdlaw.com

## Mailing Information for a Case 3:14-cv-03547-JST Curry v. Yelp Inc. et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **David E. Azar**
  dazar@milberg.com,maoffice@milberg.com,cchaffins@milberg.com,jconte@milberg.com

- **Kenneth Joseph Black**
  KennyB@rgrdlaw.com

- **Marjory Anne Gentry**
  Marjory.Gentry@aporter.com,marie.zambrano@aporter.com

- **Lionel Z. Glancy**
  info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Nathan R. Hamler**
  nathanh@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,nathanh@johnsonandweaver.com,shawnf@johnsonandweaver.com,michaelf@johnsonandweaver.com,ceciliar@johnsonandweaver.c

- **Ryan Keats**
  ryan.keats@aporter.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,lpvega@pomlaw.com

- **Francis P McConville**
  fmcconville@pomlaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Charles J. Piven**
  piven@browerpiven.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,mmgoldberg@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Gilbert Ross Serota**
  gilbert.serota@aporter.com,marie.zambrano@aporter.com,SFCalendar@aporter.com

- **David Conrad Walton**
  davew@rgrdlaw.com,ldeem@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,smorris@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)