1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 JOSEPH CURRY, et al.,

Plaintiffs,

8

v.

9

10 YELP INC., et al.,

Defendants.

11

Case No.  14-cv-03547-JST

**ORDER GRANTING MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**

Re: ECF No. 34

12       This is a securities action brought against Yelp Inc., its Co-founder and Chief Executive

13 Jeremy Stoppelman, its Chief Financial Officer Robert Krolik, and its Chief Operating Officer

14 Geoffrey Donaker (collectively, "Defendants").  Plaintiffs allege that Defendants made material

15 misrepresentations about the authenticity of reviews hosted on Yelp's website, and about whether

16 Yelp manipulated reviews in favor of businesses that advertised with Yelp.  Defendants have

17 moved to dismiss the Complaint for failure to state a claim pursuant to the Private Securities

18 Litigation Reform Act of 1995, 15 U.S.C. § 78u–4.  This matter came for a hearing on April 16,

19 2014.

20       Because the Consolidated Class Action Complaint fails to satisfy the requirements for a

21 securities fraud claim, the Court will grant the motion to dismiss with leave to amend.

22 **I.     Background**

23      **A.     Allegations of the Complaint**

24       Yelp, Inc. is a company founded in 2004 that "describes itself generally as an online

25 networking platform that connects people with great local businesses" by hosting user-generated

26 reviews.  Complaint, ECF No. 33 at ¶ 2.  Yelp generates revenue from selling advertising on its

27 website and mobile application.  Id. at ¶ 3.

28       This putative class action is brought on behalf of "all persons who purchased or otherwise

United States District Court
Northern District of California

acquired the common stock of Yelp from October 29, 2013, through April 3, 2014, inclusive." ("The class period")  ECF No. 33 at ¶ 1.  Plaintiffs allege that Defendants made false and misleading statements regarding Yelp's advertising practices and financial condition, causing Yelp's stock to trade at artificially-inflated prices during the class period.  Id. at ¶ 6.

Plaintiffs allege that the misrepresentations began with Yelp's October 29, 2013 press release announcing the company's financial results for the Third Quarter of 2013 and the Prospectus and Registration Statement released the same day.  These materials stated that Yelp "saw another quarter of strong momentum thanks to the high-quality, authentic content contributed by Yelpers around the world" and that Yelp "contributors provide rich, firsthand information about local businesses, such as reviews, ratings and photos." Id. at ¶ 7.  The Registration Statement acknowledged that "[t]he media has previously reported allegations that we manipulate our reviews, rankings and rating in favor of our advertisers and against non-advertisers.  These allegations, though untrue, could adversely affect our reputation and brand." Id. at ¶ 8.

Although Defendants disclosed both before and during the class period that Yelp actively curated and controlled the presentation of reviews on its website, Defendants consistently denied manipulating businesses' reviews in exchange for payment.  Id. at ¶ 32.  For instance, Yelp touted its use of recommendation software to curate reviews in order to ensure the authenticity, quality, and integrity of the reviews hosted on the website.  Id.  Vince Sollitto, Yelp's VP of Communications and Public Affairs, stated that Yelp employed algorithms as a "very aggressive means of filtering out attempts to game the system, fakes and shills." Id.  Yelp also admitted that it controlled reviews and content through the assistance of community managers, paid employees of Yelp who would generate content by writing reviews of local businesses.  Id.

Plaintiffs allege that Defendants' statements regarding the authentic and firsthand nature of its reviews were false and misleading because Defendants "knew, or recklessly disregarded and failed to disclose" that "reviews, including anonymous reviews, appearing on the Company's website were not all 'authentic' or 'first-hand' reviews." Id. at ¶ 46.  Plaintiffs allege that Yelp "hosted a substantial amount of fraudulent reviews from reviewers Yelp knew did not have first-

hand experience with the business being reviewed and/or for which Yelp had credible evidence that the reviews were false." Id. Despite Yelp's claims that it used effective algorithms and filtering software to ensure the authenticity of reviews, Plaintiffs allege that unreliable or fake reviews of non-advertising businesses were frequently not screened or removed, in some cases even after businesses submitted evidence of the falsity of those reviews to Yelp. Id.

Plaintiffs allege that the inclusion of unreliable and inauthentic reviews was in some cases not the result of mere oversight, but was Yelp's calculated business strategy designed to shakedown non-advertising businesses for payment. Id. According to the Complaint, Yelp's statements denying previously-reported media allegations that Yelp manipulated its reviews in favor of advertisers and against non-advertisers were knowingly false. Id. Plaintiffs claim that Yelp employees in fact commonly attempted to coerce businesses into buying advertising in exchange for offers to remove fake or inauthentic negative reviews. Id. Although Yelp maintained that businesses that purchased advertising would be merely paying to promote themselves, "the truth was that in many instances unless local businesses purchased advertising, Yelp would often filter legitimate, authentic, first-hand reviews" of those businesses. Id.

Plaintiffs state that the truth about Yelp's manipulation of reviews in favor of advertisers and against non-advertisers was revealed by an April 2, 2014 Wall Street Journal article that detailed the results of a FOIA request served on the FTC regarding customer complaints about Yelp. Id. at ¶ 82. In response to the Wall Street Journal's inquiry, the FTC released 2,046 consumer complaints filed with the FTC between 2008 and March 4, 2014. See https://www.ftc.gov/system/files/attachments/frequently-requested-records/yelp-foia-2014-00610.pdf. As a result of the Wall Street Journal article, Plaintiffs allege that the market became aware of "new facts concerning the volume and the apparent corroborative nature of business owner complaints of Yelp's extortion-like tactics and thus Yelp's operations and financial condition." ECF No. 33 at ¶ 82. Plaintiffs claim that the article's publication caused a decline in Yelp's stock, which, after closing at $80.18 on April 1, 2014, fell to $75.63 by the close of April 2, 2014. Id. at ¶ 83. On April 3, 2014, the stock price fell further to $70.61 by close, before falling to $65.76 by the close of April 4, 2014. Id. at ¶¶ 87, 89.

United States District Court
Northern District of California

Plaintiffs allege that the article and the complaints cited therein were particularly damaging to Yelp's revenue prospects because they called into question the veracity of Yelp's denials of previous media reports alleging that Yelp manipulated reviews of businesses in connection with advertising. Id. at ¶ 83. Plaintiffs point to several news reports from this period linking the decline in Yelp stock to the Wall Street Journal article, including an April 3, 2014 SunTrust Robinson Humphrey report titled "Yelp Shares Drop On FTC Complaints Disclosure." Id. at ¶ 85.

Plaintiffs plead that "[b]etween November 14, 2013, and March 10, 2014, many of the Company's executive officers and directors," including Defendants Stoppelman, Krolik, and Donaker, "suspiciously sold more than 1.1 million shares of their Yelp stock at artificially inflated prices as high as $98.18 per share for insider trading proceed in excess of $81.5 million." Id. at ¶ 63. Plaintiffs contend that these sales indicate that Defendants and other insiders knew that Yelp's stock was overvalued as a result of the alleged misrepresentations and therefore support an inference of scienter.

**B.    Procedural History**

On August 6, 2014, Plaintiff Joseph Curry filed a "Complaint for Violations of the Federal Securities Laws" against Defendants. ECF No. 1. Later that month, Plaintiff Mary Adams filed a similar complaint against Yelp in a separate action, 14-cv-03832, which also alleged violations of the federal securities laws and concerned the same class period as the Curry action. This Court subsequently ordered the Adams and Curry actions related. ECF No. 17.

After the cases were related, two potential lead plaintiffs– an individual named Dru L. Pio and the City of Miami Fire Fighters' and Police Officers' Retirement Trust ("the Trust")– filed motions asking the Court to consolidate the two cases pursuant to Federal Rule of Civil Procedure 42(a). ECF Nos. 19, 21. Both motions also requested that the Court appoint the party who filed that motion as lead counsel under 15 U.S.C. §78u-4(a)(3)(B)(v). Id.

The Court ordered the actions consolidated. ECF No. 30. The Court appointed the Trust the lead plaintiff, as the Trust had alleged the greatest financial stake in the outcome of the case, pleading approximately $372,000 in losses in light of the decline in Yelp stock, and otherwise satisfied the requirements of Federal Rule of Civil Procedure 23. Id. at 2-4. The Trust

United States District Court
Northern District of California

1  subsequently filed a Consolidated Class Action Complaint ("the Complaint") for Violations of the

2  Federal Securities Laws.  ECF No. 33.

3        Defendants subsequently filed the present Motion to Dismiss the Complaint.  ECF No. 34.

4        **C.     Jurisdiction**

5        Because this action arises under the Securities Exchange Act of 1934, the Court has

6  jurisdiction pursuant to 28 U.S.C. § 1331.

7  **II.    Defendants' Requests for Judicial Notice**

8        Pursuant to Federal Rule of Evidence 201, Defendants ask the Court to take judicial notice

9  of several different categories of documents attached to their motion.  ECF No. 37.  The Plaintiffs

10  have partially opposed this request as to certain categories of documents.  ECF No. 41.

11        **A.     Legal Standard**

12        "[A] district court may not consider any material beyond the pleadings in ruling on a Rule

13  12(b)(6) motion." Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19

14  (9th Cir. 1990).  Federal Rule of Civil Procedure 12(d) provides: "If, on a motion under Rule

15  12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the

16  motion must be treated as one for summary judgment under Rule 56."  However, courts may

17  properly take judicial notice of material attached to the complaint.  See Lee v. City of Los

18  Angeles, 250 F.3d 668, 688–69 (9th Cir. 2001); Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir.

19  1994), rev'd on other grounds by Galbraith v. Cnty. of Santa Clara, 307 F.3d 1119 (9th Cir. 2002).

20  If the documents are not attached to the complaint, they may be considered if their authenticity is

21  not contested and the complaint "necessarily relies on them."  Lee, 250 F.3d at 688.  This has

22  become known as the "incorporation by reference" doctrine.  Knievel v. ESPN, 393 F.3d 1068,

23  1076 (9th Cir. 2005).

24        In addition, a Court may take judicial notice of matters in the public record.  Federal Rule

25  of Evidence 201(b) provides: a "judicially noticed fact must be one not subject to reasonable

26  dispute in that it is either: (1) generally known within the territorial jurisdiction of the trial court;

27  or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot

28  reasonably be questioned."  In contrast, a fact "subject to reasonable dispute" may not be

United States District Court
Northern District of California

1    considered.  Lee, 250 F.3d at 689 (quoting Fed. R. Evid. 201(b)).

2          At the motion to dismiss stage, "'[t]he court has complete discretion to determine whether

3    or not to accept any material beyond the pleadings that is offered in conjunction with a Rule

4    12(b)(6) motion.'"  Nat'l Agr. Chemicals Ass'n v. Rominger, 500 F. Supp. 465, 472 (E.D. Cal.

5    1980) (quoting 5 Wright & Miller, Federal Practice & Procedure, § 678 (1969)).

6          **B.      Form 4 Filings of Defendants and Other Yelp Insiders**

7          Plaintiffs do not object to the Defendants' request that the Court take judicial notice of

8    Exhibits H, J, L, N, P, and R to the Serota Declaration, ECF No. 35, which are Form 4

9    submissions that were filed with the SEC by individual Defendants and other Yelp insiders that

10   detail sales and holdings of their securities.   The Court will take judicial notice of the Form 4

11   filings as their authenticity is not contested and the complaint necessarily relies on alleged insider

12   sales to support an inference of scienter.  See In re Copper Mountain Sec. Litig., 311 F. Supp. 2d

13   857, 863 (N.D. Cal. 2004).

14         Defendants have submitted as Exhibits I, K, M, O, Q, and S to the Serota Declaration

15   summaries, prepared by Defendants' counsel, of the information contained in the Form 4 filings.

16   Plaintiffs opposed the Court's taking judicial notice of these documents, however Defendants

17   subsequently explained in their reply brief that they do not seek judicial notice of the Form 4

18   summaries, but only the Form 4 filings themselves.  ECF No. 43 at 3.  Therefore, the Court will

19   not take judicial notice of these summaries.

20         **C.      Various Other SEC Forms**

21         Plaintiffs do not object to Exhibits A through G to the Serota Declaration.  Plaintiffs do not

22   contest the authenticity of these forms and the complaint references and relies on certain of these

23   documents.  Therefore, the Court will grant judicial notice of these documents.

24         **D.      The FTC Documents**

25         The Plaintiffs' object to Defendants' request for judicial notice of four FTC documents.

26   Two of the documents are letters from Dione J. Stearns, Assistant General Counsel to the FTC,

27   responding to FOIA requests seeking complaints filed against Yelp.  The other two documents are

28   copies of the complaints against Yelp disclosed by the FTC pursuant to the same FOIA requests.

United States District Court
Northern District of California

Plaintiffs quote and cite to the complaints submitted to the FTC at length in their complaint and the complaints are properly incorporated by reference.  Although Plaintiffs note that these documents were not submitted as Exhibits, they do not explain why this failure should result in the Court refusing to take judicial notice of properly noticeable documents.  Courts may notice publicly available documents even where those documents are not part of the judicial record.  <u>See</u>, <u>e.g.</u>, <u>Northstar Fin. Advisors Inc. v. Schwab Investments</u>, 779 F.3d 1036, 1043 (9th Cir. 2015).

### E.      Media Articles

Exhibits T through Y are media articles of which the Defendants ask the Court to take judicial notice.  Plaintiffs acknowledge that Exhibit T, an April 3, 2014 SunTrust Robinson Humphrey article, is incorporated by reference in the complaint and can be judicially noticed, but asks the Court not to notice that Exhibit for the truth of the matters asserted therein.  ECF No. 41 at 4.  Defendants acknowledge that they do not offer the Exhibit for the truth of the matter asserted, but rather as evidence of information available to the public.  The Court will take judicial notice of Exhibit T for this purpose.

Exhibits U-Y are media articles that are not incorporated by reference in the complaint.  Plaintiffs note that only Exhibit X was published during the class period.  Plaintiffs argue that the other Exhibits in this group, whose publication predated the class period, go toward Defendants' truth-on-the-market defense, which they assert is not properly raised at the motion to dismiss stage.  Plaintiffs have not disputed that the copies of the articles provided in the Exhibits are authentic.  The Court will take notice of these exhibits, as Defendants do not seek to introduce the Exhibits for the truth of the statements made therein, but rather to demonstrate "that the market was aware of the information" contained therein prior to the class period.  <u>See</u> <u>Heliotrope Gen.</u>, <u>Inc. v. Ford Motor Co.</u>, 189 F.3d 971, 981 (9th Cir. 1999) (noticing such documents at the judgment on the pleadings stage).

## III.    Legal Standard

On a motion to dismiss, courts accept the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true.  <u>Navarro v. Block</u>, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true

is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To be entitled to the presumption of truth, a complaint's allegations "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

While generally, to survive a motion to dismiss, a plaintiff need only to plead "enough facts to state a claim to relief that is plausible on its face," see Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), "[s]ecurities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 604 (9th Cir. 2014).  Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission. 15 U.S.C. § 78u–4(b)(2)(A).  The PSLRA also requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Id. at § 78u–4(b)(1)(B).

The Ninth Circuit has held that under the PSLRA, securities fraud plaintiffs must plead all the elements of a securities fraud action with particularly, including loss causation.  Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 605 (9th Cir. 2014).  If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint.  15 U.S.C. § 78u–4(b)(3)(A).

## IV.    Motion to Dismiss

Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security.  To state a claim for violation of section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss

1   causation.  See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008).

2        Defendants move to dismiss the complaint, which they argue fails to properly plead the

3   elements of materially false statements, loss causation, or scienter.

4        **A.    Materially False Statements**

5        Defendants contend that Plaintiffs have failed to allege any actionable statements by

6   Defendants.  For statements to be actionable under the PSLRA, they must be both false or

7   misleading *and* material.  A statement or omission is misleading under the PSLRA and Section

8   10(b) of the Exchange Act "if it would give a reasonable investor the impression of a state of

9   affairs that differs in a material way from the one that actually exists."  Berson v. Applied Signal

10  Tech., Inc., 527 F.3d 982, 985 (9th Cir. 2008) (internal quotations and citation omitted).  A false

11  or misleading statement or omission is material if there is a "substantial likelihood that the

12  disclosure of the omitted fact would have been viewed by the reasonable investor as having

13  significantly altered the 'total mix' of information made available."  TSC Indus., Inc. v. Northway,

14  Inc., 425 U.S. 438, 449 (1976).

15       **i.    Statements Touting the "Authentic" and "First-Hand" Nature of
16            Reviews**

17       First, Plaintiffs have pled that statements made by Defendants and other Yelp executives

18  touting the "authentic" and "first-hand" nature of the reviews hosted on its website were materially

19  false or misleading.  ECF No. 33 at ¶¶ 7-9.  Despite these representations, Plaintiffs argue that

20  many reviews hosted on Yelp's website were in fact false or unreliable, as demonstrated by the

21  consumer complaints submitted to the FTC.  ECF No. 39 at 6-7.  Furthermore, Plaintiffs allege

22  that the FTC complaints revealed to the market that Yelp frequently failed to respond to

23  businesses' complaints that customer reviews were inauthentic or inaccurate, despite purporting to

24  have sophisticated mechanisms in place to screen reviews for authenticity.  Id. at 8.

25       Defendants respond that "Yelp does not and has not claimed that every review ever posted

26  on its sites are authentic, high-quality, or otherwise uniformly reliable."  ECF No. 34 at 6.

27  Defendants reason that the allegedly false statements merely reflected Yelp's general confidence

28  in the strength of the reviews hosted on its website.  Defendants also point to statements made by

United States District Court
Northern District of California

9

1    Yelp in its SEC Form S-1 Registration Statement– a document that Plaintiffs allege contained

2    false statements– acknowledging that Yelp could not "guarantee the effective or adequacy" of

3    efforts to screen unreliable or biased reviews.  ECF No. 35-1 at 16.

4          The Court agrees with Defendants that the statements about the quality and authenticity of

5    the reviews hosted on the website were not materially false or misleading.  First, Defendants'

6    statements would not have deceived a reasonable investor into believing that *all* of the reviews

7    hosted on the Yelp website at a given moment in time were authentic and reliable.  Yelp's

8    business model is widely understood to depend on user-generated business reviews.  A reasonable

9    investor would have understood that Yelp did not guarantee that no user would ever post an

10   inauthentic or unreliable review to Yelp's website.

11         This common-sense understanding of what it means for a website to host user-generated

12   content was supplemented by Yelp's own public statements, which acknowledged that Yelp could

13   not "guarantee the effectiveness or adequacy" of its screening mechanisms.[1]  SEC Form S-1

14   Registration Statement, ECF No. 35-1 at 16.  Yelp's public admissions that it employed

15   algorithms to screen unreliable reviews informed reasonable investors that some of the user-

16   generated reviews posted to the Yelp website were not credible and required screening.  In In re

17   Lululemon Sec. Litig., Judge Forrest of the Southern District of New York held that lululemon's

18   statements regarding the "high quality" of its products compared to others in the industry were not

19   rendered actionably false by the company's subsequent recall of products that were found to have

20   quality issues.  No. 13 CIV. 4596 KBF, 2014 WL 1569500 (S.D.N.Y. Apr. 18, 2014).  Judge

21   Forrest reasoned that, even prior to the recall, lululemon's website when read in context "implie[d]

22   that such defects occur and with enough regularity to have an established policy as to how they are

23

24   _____

       [1] Plaintiffs argue that the Court should not consider what it characterizes as Defendants' "truth-on-
25   the-market defense" at the motion to dismiss stage.  See ECF No. 39 at 14-15 (citing Amgen Inc.
       v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1204, 185 L. Ed. 2d 308 (2013)).  But
26   Defendants' admissions that Yelp could not guarantee the effectiveness of its screening
       mechanisms were made in the same Registration Statement that Plaintiffs allege was materially
27   false or misleading.  Therefore, the Court considers these statements not to assess whether the
       market was generally aware of the truth and thus not affected by the allegedly false statement, but
28   rather to resolve whether Yelp's statements were even false.

handled, with actions ranging from sales in outlet stores to total removal from all shelves into the recycle bin." Id. Similarly, Yelp's disclosure that it employed various methods to screen unreliable reviews from the website informed investors that, although Yelp prided itself on authentic reviews, it continued to combat the posting of unreliable and inauthentic reviews.

To the extent that Plaintiffs allege that Defendants' statements that Yelp actively sought to screen "attempts to game the system, fakes and shills" and ensure their quality and authenticity and were also false, id. at ¶ 32, the Complaint also fails to allege falsity. Plaintiffs rely on the 2,046 complaints released by the FTC in response to an inquiry by The Wall Street Journal, certain of which claimed that, although businesses reported the existence of false reviews to Yelp, those reviews nonetheless remained prominent on Yelp's website. ECF No. 33 at ¶ 42. Again, Yelp acknowledged in its Registration Statement that it could not "guarantee the effectiveness or adequacy" of its screening efforts. ECF No. 35-1 at 16. Customer complaints indicating that some unreliable reviews remained on the Yelp website after business owners had reported them to Yelp do not establish that Yelp was making no efforts to screen or filter inauthentic reviews.

The information that reviews hosted on the Yelp website "were not all authentic or first-hand," ECF No. 33 at ¶ 46, and that Yelp in some instances allowed reviews to remain prominent on its website even after business owners contested their authenticity, ECF No. 39 at 8, did not significantly altered the "total mix" of information available to the market. S.E.C. v. Todd, 642 F.3d 1207, 1215 (9th Cir. 2011) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). Therefore, Plaintiffs have not pled with particularity that Yelp's statements about the authenticity of the reviews hosted on its website or Yelp's attempts to screen unreliable reviews were materially false.

### ii. Statements Denying Manipulation of Reviews in Favor of Advertisers and Against Non-Advertisers

Plaintiffs also allege that Defendants' statements denying that Yelp manipulated reviews in favor of advertising businesses and against non-advertising businesses were false and material. Plaintiffs point to the statement made on Yelp's website and in Yelp's Registration Statement that "there is zero relationship between the timing of when a review gets recommended and when a

business decides to– or declines to– advertise." ECF No. 33 at ¶¶ 43, 60. In those same sources, Yelp also stated that "[o]ur recommendation software treats advertisers and non-advertisers exactly the same." ¶¶ 40, 43, 59, 60. Again, Plaintiffs allege that the customer complaints released by the FOIA request <u>The Wall Street Journal</u> filed with the FTC revealed that these statements were false, as in those complaints "several business owners report[ed] being specifically told that Yelp would remove bad reviews for a fee." ECF No. 39 at 9.

Defendants respond that "[a]llegations concerning Yelp's advertising sales practice, despite their lack of credibility," have been present in the marketplace since before the beginning of the class period. ECF No. 34 at 12. Yelp's Registration Statement acknowledged that "[n]egative publicity could adversely affect our reputation and brand," specifically noting previous media reports of allegations that Yelp "manipulates [] reviews, rankings and ratings in favor of our advertisers and against non-advertisers." ECF No. 35-1 at 16. Elsewhere in the Registration Statement, Yelp disclosed that "various businesses have sued us alleging that we manipulate Yelp reviews in order to coerce them and other businesses to pay for Yelp advertising (one such suit was voluntarily dismissed and two others were conciliated and recently dismissed with prejudice, although the plaintiffs are seeking an appeal)." <u>Id.</u> at 22.[2] Therefore, Defendants argue that a reasonable investor during the class period already would have been aware of the allegations disclosed in the FTC complaints.[3]

---

[2] Defendants direct the Court to the complaint filed in this District in 2010 in <u>Levitt v. Yelp! Inc.</u>, wherein business owners alleged "that Yelp extorted or attempted to extort advertising payments from them by manipulating user reviews and penning negative reviews of their businesses." <u>See Levitt v. Yelp! Inc.</u>, 765 F.3d 1123, 1126 (9th Cir. 2014). The District Court dismissed the complaint for failure to state a claim for violation of California's Unfair Competition Law ("UCL"), civil extortion, or attempted civil extortion. <u>Levitt v. Yelp! Inc.</u>, No. C-10-1321 EMC, 2011 WL 5079526, at *1 (N.D. Cal. Oct. 26, 2011) The Ninth Circuit affirmed in full. <u>Levitt</u>, 765 F.3d 1123.

[3] As the Court observed in footnote 3, the Court need not resolve the question of whether a "truth-on-the-market" defense is properly considered at the motion to dismiss stage. Yelp disclosed the existence of persistent allegations that Yelp manipulated reviews in favor of advertisers in its Registration Statement. Because this disclosure existed within the four corners of a statement that Plaintiffs allege was false or misleading, the Court need not analyze whether the truth was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations."

United States District Court
Northern District of California

The Court agrees that the disclosure of the FTC complaints did not alter the "total mix" of information available to the market.  S.E.C. v. Todd, 642 F.3d 1207, 1215 (9th Cir. 2011) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).  This is because nothing in the FTC complaints establishes that Yelp's statements denying manipulating reviews in favor of advertisers were false.  Following the FTC's release of the complaints, the market continued to hear two competing claims regarding Yelp's manipulation of reviews.  Some in the media continued to claim that Yelp manipulates "reviews, rankings and ratings in favor of our advertisers and against non-advertisers"– just as they had before the beginning of the class period, as acknowledged in Yelp's Registration Statement.  ECF No. 33 at ¶ 8.  But Yelp also continued to deny such practices– just as it had prior to the beginning of the class period, as conveyed in Yelp's Registration Statement.  The release of the FTC complaints therefore does not establish that Defendants made materially false statements when they denied manipulating reviews.

Plaintiffs claim that "the specific and corroborative nature of the thousands of previously unreleased complaints to the FTC exposed for the first time defendants' false statements tied to their extortionate business practices."  ECF No. 39 at 24.  But the existence of these complaints does not conclusively establish that Yelp manipulated reviews in favor of advertisers or against non-advertisers.

First, Plaintiffs have not pointed the Court to any case holding that customer complaints alleging a state of affairs contrary to a defendant's representations independently suffice to establish the falsity of those representations.  In contrast, Defendants direct the Court to In re Netflix, Inc. Sec. Litig., wherein Judge Smith of this District concluded that Plaintiffs could not rely on customer complaints to establish the falsity of statements made by Defendant Netflix regarding improvements to its service.  No. C04-2978 FMS, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005).  Plaintiffs alleged that Netflix had falsely claimed improvements to its service had

---

Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996).  Yelp's representations were not one-sided.  Yelp acknowledged the existence of the allegations.  Any investor who read the Registration Statement was aware that some business owners alleged Yelp manipulated reviews in favor of advertising businesses and against non-advertising businesses.

United States District Court
Northern District of California

made Netflix more profitable.  To establish the falsity of the statements, Plaintiffs attempted to

point to customer complaints about service quality, which they argued demonstrated that Netflix

"was aware that its service was much worse than represented and was leading to customer

defections."  <u>Id.</u>  Judge Smith held that the customer complaints did not demonstrate the falsity of

Netflix's representations, as "every large company can expect to have some customer complaints,

and the existence of such complaints fails to render Netflix's statements about its service false."

<u>Id.</u>

The Court agrees with <u>Netflix</u>'s conclusion that customer complaints generally do not, on

their own, establish the veracity of the allegations contained therein and the falsity of a

defendant's representations to the contrary.  Even if the Court were to accept the premise that, in

some cases, a high volume of strongly corroborative customer complaints could establish the

falsity of a statement that a securities defendant continued to maintain was truthful, the Court

concludes the complaints in this instance are not of such a high volume or strongly corroborative

nature.  The FTC complaints span a period of six years and, as argued by Defendants, represent a

small fraction of the total number of businesses reviewed on Yelp.

Moreover, even as presented by Plaintiffs in the Complaint, the complaints submitted to

the FTC are not strongly corroborative of one another, as they do not paint a uniform picture of

Yelp's allegedly extortionate practices.  Some complaints merely claim that a Yelp user filed a

false negative review of a business, but do not allege that Yelp took any action.  <u>See, e.g.</u>, ECF

No. 33 ¶ 46(a)(i) (stating "[s]omeone on Yelp filed a false negative review.").  Other complaints

claim that a Yelp user filed a false negative review of a business, the business contacted Yelp with

evidence that the review was false, and Yelp insinuated it would remove the post for a fee.  <u>See,</u>

<u>e.g.</u>, <u>id.</u> at ¶ 46(a)(ii) ("We have contacted them numerous times regarding the fictitious posting on

our business.  Nothing has been done at this time, but they have indicated for a fee unfavorable

postings can be removed.").  Still other complaints state that a Yelp user filed a false negative

review of a business, the business contacted Yelp with evidence that the review was false, and,

although Yelp refused to take action to remove the review, it also never offered to do so for a fee.

<u>See, e.g.</u>, <u>id.</u> at ¶ 46(a)(iv) (alleging "[t]he negative reviews are not verified customers and contain

14

1   lies and defamations.  We have evidence supporting our claim of these false reviews.  We

2   contacted Yelp to see if they could remove the false reviews and restore our real reviews.  They

3   refused.") and ¶ 46(a)(vi) ("I have offered to provide Yelp with documentation from the police

4   which will show that [the statements contained in the reviews] are false . . . . Yelp has responded

5   that they would not consider any 'evidence' submitted.").

6            Perhaps most suggestive of the manipulative practices denied by Yelp are those 25 FTC

7   complaints identified by the Complaint that were made by businesses alleging that, after declining

8   to advertise with Yelp, the prominence of negative reviews of their business drastically increased

9   and positive reviews were filtered or removed.  See ECF No. 33 at ¶¶ 46(c)(i)-(xxvi).  But even

10   these complaints, when considered in the full context of Yelp's business, do not establish that

11   Yelp engaged in large-scale manipulation of customer reviews.  Defendants note that 18 of these

12   25 customer complaints do not even allege "that Yelp ever told the business owner that purchasing

13   advertising would influence the filtering of reviews."  ECF No. 34 at 9.  Instead, in these 18

14   complaints, business owners drew their own inferences about Yelp's manipulation of reviews

15   based upon what they regarded as suspiciously-timed manipulations of the reviews for their

16   business.  See, e.g., ¶ 46(c)(i) ("YELP solicited us to pay for one of their services.  We declined

17   and the next day, 5 of our 5star reviews were eliminated . . .  This is NOT coincidence.  This is

18   extortion."); ¶ 46 (c)(vi) ("When I declined to pay, the very next day 100% of my 4 and 5 star

19   Yelp reviews were filtered"); ¶ 46(c)(xix) ("In January of this year, as I was nearing the end of my

20   advertising contract with Yelp, Yelp filtered all of the positive reviews for my business.  I believe

21   they did this in order to coerce me into renewing the contract with them");  ¶ 46(c)(xxv) ("Yelp

22   filters out legitimate 5 star reviews while simultaneously leaving less favorable reviews posted on

23   our page.  We continually receive emails and calls from yelp asking us to advertise on their site

24   and the natural implication is that if we advertise with them our reviews will stop being filtered.").

25            While some of the customer complaints do contain allegations that a Yelp representative

26   directly told a business that Yelp would manipulate reviews in exchange for a fee, the Complaint

27   identifies only a handful of such complaints out of the 2,046 released by the FTC.  See, e.g., ¶

28   46(c)(xvi) ("[W]e got a call the next day from Yelp saying there was a lot of activity on our

United States District Court
Northern District of California

15

United States District Court
Northern District of California

account and we needed to advertise with them and they could bump up our 5 star reviews so people could view them and they would bump down the lower ratings and hide them.  Again it was $1,0000[sic]/ month."), ¶ 46(c)(xxi) ("Chris from Yelp explained to me that by giving his seemingly transparent company money (about $399) every month we could hide any bad reviews of our restaurant and bolster any good reviews."), ¶ 46(c)(xxiii) ("Within 1 or 2 days of that bad review going up, Yelp called me for the 1st time from their sales office to try & sell me advertising.  When I told them I could not afford it, they said 'We can make your rating increase & take away that one star review for you, if you advertise with us.'").

Again, the fact that some businesses made allegations that Yelp manipulated reviews was disclosed by Yelp before the beginning of the class period in the Registration Statement.  For Yelp's denials of these allegations to be materially false, the market must have been exposed to information that powerfully demonstrates Defendants' denials are not credible, altering the "total mix" of information.  Assuming a high number of strongly corroborative customer complaints could in some instances powerfully demonstrate falsity, the FTC complaints do not meet that threshold.  Only a small number of the FTC complaints allege that a Yelp representative told a business that reviews could be manipulated for payment.  The overwhelming majority of the FTC complaints do not allege this.  The existence of a small number of customer complaints does not establish the veracity of the allegations contained therein.  See Netflix, 2005 WL 1562858, at *7.

This is not to say the events alleged in any of the FTC complaints did not occur.  But a reasonable investor during the class period was aware that some businesses maintained that Yelp tried to coerce businesses into advertising by manipulating reviews.  To this day, Yelp continues to deny manipulating reviews in this manner, just as it did during the class period.  The FTC complaints do not make liars out of Defendants, because they do not meaningfully alter the "total mix" of information available to the marketplace on the issue of whether Yelp manipulates reviews of businesses in connection with advertising.

### iii.     Forecasted Growth

Plaintiffs also allege that Yelp's statements regarding future business prospects were false or misleading, as "Defendants failed to disclose that the Company's future revenue in fact relied

upon a business practice that involved deliberately leaving prominent fake and negative reviews, while filtering authentic positive reviews, in order to use each as leverage to sell advertising." ECF No. 39 at 13.  Optimistic statements about a company's prospects can be actionable "if not genuinely and reasonably believed, or if the speaker is aware of undisclosed facts that tend seriously to undermine the statement's accuracy." Cooper v. Pickett, 137 F.3d 616, 629 (9th Cir. 1997).  Short of such awareness, these statements generally are not actionable, as "[t]he statement, 'the storm is passing and it will be sunny tomorrow,' when in fact it continues to snow the next day, may be bad forecasting, but it is not necessarily a lie." Ronconi v. Larkin, 253 F.3d 423, 433 (9th Cir. 2001).  Because the Complaint does not establish that Defendants made false statements relating to filtering of reviews in connection with advertising, Plaintiffs have not pled with particularity that Defendants' optimism about the company's prospects was undermined by undisclosed facts of which they were aware.

## B.    Loss Causation

Defendants also argue that Plaintiffs have failed to plead loss causation, as at most the FTC complaints disclosed the risk or potential for fraudulent conduct.  ECF No. 34 at 14-16.  Plaintiffs argue that they have sufficiently alleged loss causation, as "[n]umerous analysts opined that Yelp's sudden and significant stock price drop was directly attributed to what was disclosed in the April 2, 2014 article."  ECF No. 39 at 23.

"To prove loss causation, the Plaintiffs must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the Plaintiffs."  Oregon Pub. Employees Ret. Fund, 774 F.3d at 608 (internal quotations and citations omitted).  "The plaintiff must plausibly allege that the defendant's fraud was revealed to the market and caused the resulting losses."  Loos v. Immersion Corp., 762 F.3d 880, 887 (9th Cir. 2014) (internal quotations and citations omitted).

Because the Court has concluded that the FTC complaints do not establish the falsity of Defendant's representations, the Court also finds that the release of the FTC complaints did not reveal any fraudulent practices to the market.  In the absence of a false representation, there can be no revelation of falsity to the market.  In Loos, the Ninth Circuit held that a complaint's

United States District Court
Northern District of California

allegations of a "precipitous decline" in stock price on the heels of a company's announcement of an internal investigation did not sufficiently establish loss causation.  762 F.3d at 882.  Agreeing with the Eleventh Circuit's decision in <u>Meyer v. Greene</u>, 710 F.3d 1189 (11th Cir. 2013), the <u>Loos</u> court reasoned that the announcement of an investigation standing alone "does not 'reveal' fraudulent practice to the market," as "at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal."  <u>Id.</u> at 890.  "[A]ny decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred."  <u>Id.</u>  The court allowed that in some circumstances, the announcement of an investigation could form the basis for a viable loss causation theory, such as if it were accompanied by "an express disclosure of actual wrongdoing." <u>Id.</u> at 890 n. 3.

The FTC complaints in this case likewise did not reveal any fraud to the market.  As the Court discussed above, the FTC complaints merely added more voices to the chorus accusing Yelp of manipulating reviews to encourage businesses to advertise.  These voices were not sufficiently numerous or corroborative to establish the veracity of the accusations they contained.  Like the announcement of an internal investigation in <u>Loos</u>, the complaints were not conclusive proof of any wrongdoing by Yelp.  Because Plaintiffs have not shown the allegations contained in the FTC complaints are true, they also cannot show that Yelp's "share price fell significantly after the truth became known."  <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005).

When asked at the hearing on this motion for authority showing that the facts of the present case demonstrate loss causation, Plaintiffs offered Judge Conti's recent decision in <u>Nathanson v. Polycom, Inc.</u>, No. 13-3476 SC, 2015 WL 1517777, at *1 (N.D. Cal. Apr. 3, 2015).  In that case, defendant Polycom's CEO had claimed "reimbursements for numerous extravagant personal expenses with no legitimate business purpose."  <u>Id.</u>  After an investigation by Polycom's Audit Committee revealed these irregularities, Polycom announced their findings in a press release, but denied that the CEO's wrongfully-claimed expenses had had any material impact on Polycom's prior financial statements.  <u>Id.</u>  Following this release, Polycom's stock declined by 15 percent.  <u>Id.</u>  Polycom argued that the press release did not constitute a corrective disclosure

1   sufficient to establish loss causation because the release had denied that the expense submissions

2   had caused Polycom "to overstate its operating expenses through the class period." Id. at *13.

3   The court concluded that Plaintiffs could nevertheless state a claim for loss causation as no

4   "outright admission of fraud" was required and the press release had revealed new information to

5   the marketplace. Id. (citing Loos, 762 F.3d at 888–89).

6       Nathanson provides no assistance to Plaintiffs. Unlike the announcement of improperly

7   claimed reimbursements in Nathanson, which revealed damaging new information to the

8   marketplace, The Wall Street Journal's publication of the customer complaints did not reveal any

9   new information. And Yelp itself did not make any corrective disclosure or reveal any previously-

10  unknown information to the marketplace in the wake of the release of the customer complaints.

11  Again, Yelp continues to deny manipulation of its reviews in connection with advertising. It does

12  not help the Plaintiffs that Yelp's stock fell in the days following the publication of an article

13  concerning the FTC complaints in The Wall Street Journal. The decline in Yelp's stock, like the

14  decline in Loos, is attributable to "market speculation about whether fraud has occurred," which

15  simply "cannot form the basis of a viable loss causation theory." Loos, 762 F.3d at 890.

16      **C.    Scienter**

17      Finally, Defendants argue that Plaintiffs have also failed to allege that they acted with the

18  required state of mind to deceive, manipulate, or defraud. Plaintiffs argue that Defendants "knew

19  or were deliberately reckless in not knowing that their statements were false," as businesses

20  contacted Yelp regarding false reviews and Defendants admitted the authenticity of reviews were

21  crucial to Yelp's success. ECF No. 39 at 16. Plaintiffs also contend that the Complaint "alleges

22  highly unusual and suspicious stock sales by defendants Stoppelman, Krolik and Donaker, in

23  addition to other insiders, in terms of: (i) amount and percentage of shares they sold; (ii) the

24  timing of the sales; and (iii) the inconsistency with past sales history." Id. at 19.

25      The PSLRA's heightened scienter standard requires that plaintiffs "state with particularity

26  facts giving rise to a strong inference that the defendant acted with the required state of mind." 15

27  U.S.C. § 78u-4(b)(2). The required state of mind is a "mental state embracing intent to deceive,

28  manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193–94 n. 12 (1976).

19

1   Deliberate or conscious recklessness constitutes intentional conduct sufficient to satisfy the

2   scienter requirement.  "[R]eckless conduct may be defined as a highly unreasonable omission,

3   involving not merely simple, or even inexcusable negligence, but an extreme departure from the

4   standards of ordinary care, and which presents a danger of misleading buyers or sellers that is

5   either known to the defendant or is so obvious that the actor must have been aware of it."  In re

6   Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999).  "[T]he ultimate question is

7   whether the defendant knew his or her statements were false, or was consciously reckless as to

8   their truth or falsity."  Gebhart v. SEC, 595 F.3d 1034, 1042 (9th Cir. 2010).

9        The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or

10  'permissible' — it must be cogent and compelling, thus strong in light of other explanations."

11  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).  "A court must compare

12  the malicious and innocent inferences cognizable from the facts pled in the complaint, and only

13  allow the complaint to survive a motion to dismiss if the malicious inference is at least as

14  compelling as any opposing innocent inference."  Zucco Partners, 552 F.3d at 991.  In evaluating

15  whether a complaint satisfies the "strong inference" requirement, courts must consider the

16  allegations and other relevant material holistically, not "scrutinized in isolation."  In re VeriFone

17  Holdings, 704 F.3d at 701.

18              **i.    Allegations Regarding Defendants' Role in the Company**

19        First, Plaintiffs allege that Defendants' scienter can be inferred from their "position of

20  authority in the Company" and "access to information contradicting their statements."  ECF No.

21  39 at 17.  Plaintiffs also seek to invoke the "core operations inference" to allege Defendants must

22  have been aware of Yelp's practices relating to manipulation of advertising, as Defendants

23  repeatedly made statements concerning the importance of authentic reviews to Yelp's brand.

24  Defendants argue in response that Plaintiffs present "conclusory allegations about the presumed

25  knowledge" of Defendants that are insufficient to plead scienter.  ECF No. 42 at 11.

26        "As a general matter, 'corporate management's general awareness of the day-to-day

27  workings of the company's business does not establish scienter—at least absent some additional

28  allegation of specific information conveyed to management and related to the fraud' or other

United States District Court
Northern District of California

20

allegations supporting scienter." S. Ferry LP, No. 2, 542 F.3d at 784-85 (quoting Metzler Inv. GmbH v. Corinthian Colleges, Inc., 534 F.3d 1068, 1087 (9th Cir.2008)).  Under the "core operations inference," plaintiffs may plead scienter with less particularity "in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." S. Ferry LP, No. 2, 542 F.3d at 786 (internal quotations and citations omitted).

Plaintiffs point to the Ninth Circuit's decision in in re Daou Systems, which held that "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter." 411 F.3d 1006, 1022 (9th Cir. 2005).  Daou concerned allegations that defendants who "personally directed [the company's] recognition of revenue, financial reporting and public statements" had systematically violated the generally accepted accounting principles (GAAP) in order to inflate the price of the company's stock.  Id. at 1022.

While it stands to reason that the chief accounting executives of a company would be aware of that company's systematic violations of the GAAP, it is less self-evident that Yelp's chief executives necessarily knew of the veracity of complaints made by individual local business owners who contacted Yelp and offered evidence that reviews of their business were not credible or were being manipulated by Yelp employees because they had declined to advertise.  Plaintiffs allege that "Yelp top executives assured investors that they maintained and monitored every review and created much of the review content themselves, as it was a critical part of the Company's business," supporting an inference of scienter.  ECF No. 39 at 18.  But Defendants never indicated that they personally monitored the authenticity of reviews in their capacity as Yelp executives.  Instead, they touted the strength of their "proprietary automated recommendation software."  ECF No. 33 at ¶ 59.

Again, it is beyond dispute that Defendants were aware of– and acknowledged publicly– the existence of allegations that Yelp manipulated reviews in connection with advertising.  But Plaintiffs allege that, beyond awareness that such allegations existed, Defendants also knew that the allegations were true.  Defendants never indicated they were personally involved in ensuring

United States District Court
Northern District of California

21

the authenticity of Yelp's reviews and disclaimed their ability to ensure the "adequacy" of their filtering algorithm.  Assuming the truth of Plaintiffs' allegations for the moment, it is not "absurd to suggest" under <u>S. Ferry LP, No. 2</u>, 542 F.3d at 786, that, although aware that some businesses had complained about the manipulation of their reviews, Defendants were unaware that, in certain cases, the reviews of businesses that refused to advertise had in fact been manipulated by someone at Yelp.  It also it not "absurd to suggest" that those Yelp representatives who allegedly offered to manipulate reviews in exchange for advertising payments did so without Defendants knowledge or approval.  Therefore, an inference of scienter is not justified based on Defendants' role in the company or the core operations inference.

### ii.      Allegations Regarding Unusual Insider Sales

The Plaintiffs have identified eight Yelp insiders, including Defendants Donaker, Krolik, and Stoppelman, whom they allege engaged in unusual trading between November 14, 2013 and March 10, 2014, supporting an inference of scienter.  ECF No. 33 at ¶ 63.  Plaintiffs claim that these insiders traded their Yelp stock at artificially inflated prices "at the same time defendants issued false and misleading statements."  <u>Id.</u>

In order to establish a sufficiently "strong inference" of scienter based on circumstantial evidence of insider trading, the Ninth Circuit requires plaintiffs to allege "unusual" or "suspicious" stock sales "dramatically out of line with prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside information*."  <u>Ronconi</u>, 253 F.3d 435 (emphasis in original) (internal quotations and citations omitted).  In assessing whether insider sales qualify as unusual or suspicious, courts look to "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."  <u>Id.</u>  Plaintiffs "must allege sufficient context of insider trading for [courts] to determine whether the level of trading is dramatically out of line with prior trading practices."  <u>Id.</u> at 436-37 (internal quotations and citations omitted).

Plaintiffs have not provided any context for the sales described in the Complaint and the Court thus cannot conclude that the sales were suspicious.  The only information Plaintiffs have provided relating to insider sales in the Complaint is a single chart summarizing eight insider's

1   sales between November 2013 and March 2014 by shares and proceeds.  The Court has no basis

2   on which to conclude that there exists a strong inference that these sales were out of line with prior

3   trading practices because the Complaint does not allege any information regarding the insider's

4   prior trading practices.

5            Plaintiffs allege that because Yelp went public in March 2012, there is "virtually no trading

6   history to allege except for the massive short sales shortly before and during the Class Period."

7   ECF No. 39 at 20.  Thus, Plaintiffs argue that requiring them to show unusual or suspicious sales

8   would ask them to "allege the impossible."  Id.  But it is Plaintiffs' burden to plead scienter with

9   particularity should they wish to pursue a securities claim against Defendants.  Insider sales are

10  just one method of establishing scienter by reference to circumstantial evidence.  Thus, although a

11  lack of trading history due to a recent IPO may foreclose a plaintiff from one avenue of pleading

12  scienter, it does not necessarily doom their complaint.  Regardless of whether this makes the

13  Plaintiffs' task more difficult, the Court cannot infer from a vacuum of information about trading

14  history that the trades in question are unusual, as information about trading history is "necessary to

15  determine whether the sales during the Class Period were 'out of line with' historical practices."

16  Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1064 (9th Cir. 2014).

17           To defeat Plaintiffs' claims of unusual trading activity, Defendants also ask the Court to

18  take judicial notice of facts derived from the SEC Form 4 filings, which they argue demonstrate

19  that "the stock sales alleged in the Complaint were consistent with– not out of line with– prior

20  trading by the insiders."  ECF No. 34 at 21.  Defendants further argue that the sales in question

21  were made pursuant to 10b5-1 trading plans, negating any inference of scienter.  The Court need

22  not reach these arguments, as Plaintiffs have not met their burden of pleading with particularity

23  facts from which the Court can draw an inference of scienter that is "cogent and compelling."

24  Tellabs, 551 U.S. at 324.

25       **D.    Plaintiffs' Derivative Section 20(a) Claim**

26           Section 20(a) of the Exchange Act, which forms the basis of Plaintiffs' second cause of

27  action, extends liability to persons who directly or indirectly control a violator of the securities

28  laws.  15 U.S.C. § 78t(a).  A claim under section 20(a) can only survive if the underlying predicate

United States District Court
Northern District of California

Exchange Act violation also survives.  See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).  Because the Court dismisses Plaintiffs' Exchange Act claim, Plaintiffs' second cause of action must also be dismissed.

**IV.    Conclusion**

Plaintiffs fail to plead with particularity material false or misleading statements, loss causation, or scienter and therefore Plaintiffs have not stated a claim for relief under the Exchange Act, either under section 10(b) or 20(a).  The Court hereby dismisses the Consolidated Class Action Complaint.  Plaintiff may amend the complaint in a manner consistent with the terms of this Order within 30 days from the date of this Order.

IT IS SO ORDERED.

Dated:  April 21, 2015

_____
JON S. TIGAR
United States District Judge