ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
AMANDA M. FRAME (253603)
KENNETH J. BLACK (291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
aframe@rgrdlaw.com
kennyb@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH CURRY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> YELP INC., et al., <br><br> Defendants. | Case No. 3:14-cv-03547-JST <br><br> <u>CLASS ACTION</u> <br><br> FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

1030970_1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

AMENDMENTS TO THE COMPLAINT ....................................................................1

BACKGROUND OVERVIEW ....................................................................................2

JURISDICTION AND VENUE ....................................................................................8

PARTIES ......................................................................................................................8

CONTROL PERSONS ...............................................................................................10

    Yelp Admits that It Aggressively Manipulates – Curates – Reviews Posted on
    Yelp's Website Establishing Knowledge and Control Over Content ..............................11

SOURCES OF INFORMATION ................................................................................14

FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD........16

    Virginia Court of Appeals Orders Yelp to Disclose the Identity of Yelpers
    Who Wrote Negative and Potentially False Reviews .......................................................34

    During the Class Period and Prior to Disclosure of Thousands of Business
    Complaints of Extortion-like Business Tactics, Insiders Unload More than
    One Million Shares of Yelp Stock for Proceeds of $81.5 Million....................................42

    The True Facts Begin to Be More Widely Disclosed, Including New Reports
    from Business Owners that the Company Buried Reviews After They
    Declined to Pay for Advertising – Causes Stock Price Decline ........................................43

    Defendants' False and Misleading Statements Alleged Herein and Facts
    Disclosed on April 2, 2014 Were Material to Investors .....................................................51

    Post Class Period Publications Corroborate the Negative Impact of the April
    Disclosures on the Company's Stock Price – Financial Condition and
    Outlook. ..............................................................................................................................57

LOSS CAUSATION/ECONOMIC LOSS ..................................................................61

NO SAFE HARBOR ..................................................................................................65

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET..........65

CLASS ACTION ALLEGATIONS ............................................................................66

COUNT I ....................................................................................................................67

1

2                                                                          **Page**

3

4          For Violation of §10(b) of the 1934 Act  and Rule 10b-5 Against All
           Defendants ...................................................................................................................67

5    COUNT II ............................................................................................................................68

6          For Violation of §20(a) of the 1934 Act Against All Defendants ......................................68

7    PRAYER FOR RELIEF .......................................................................................................68

8    JURY DEMAND ..................................................................................................................69

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                        - ii -

1

**INTRODUCTION**

2  1.  This is a securities class action brought on behalf of all persons who purchased or

3 otherwise acquired the common stock of Yelp from October 29, 2013, through April 3, 2014,

4 inclusive (the "Class Period"), against Yelp, Inc. ("Yelp" or the "Company") and certain of its

5 officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"),

6 including Jeremy Stoppelman ("Stoppelman"), the co-founder and Chief Executive Officer ("CEO"),

7 Robert J. Krolik ("Krolik"), Yelp's Chief Financial Officer ("CFO") and Geoffrey Donaker

8 ("Donaker"), the Company's Chief Operating Officer ("COO").

9

**AMENDMENTS TO THE COMPLAINT**

10  2.  This First Amended Class Action Complaint for Violations of the Federal Securities

11 Laws ("Amended Complaint") contains new facts and allegations that address the Courts' concerns

12 articulated in its April 21, 2015 Order Granting Motion to Dismiss Consolidated Class Action

13 Complaint (Dkt. No. 48) and clarifies prior allegations as follows:

14    (a)  Clarifies that the significance of complaints submitted to the Federal Trade

15 Commission ("FTC") and disclosed on April 2, 2014 were made by local business owners and

16 details that the vast majority of the complaints were new and corroborative of one another and

17 demonstrated that the pace of complaints being filed was accelerating.  Clarifies that the local

18 business owners who lodged complaints were not all "customers" of Yelp, and thus their complaints

19 cannot be fairly categorized as "customer complaints" as defendants' motion to dismiss

20 characterized them.  Instead, the business owners who lodged complaints were primarily potential

21 clients who defendants actively solicited to be paying customers.  Submits an excerpted collection of

22 complaints and quotes from a larger sample, further clarifying the corroborative nature of the

23 individualized accounts reported to the FTC.  *See* Ex. 6.[1]

24    (b)  Includes an event study analyzing the Company's April 2, 2014 stock price

25 reaction to the new information disclosed on April 2, 2014 in *The Wall Street Journal* article and the

26 FTC complaints, establishing that the April 2, 2014 stock price decline was statistically significant at

27 ――――――――――――――
[1]  Unless otherwise indicated, all exhibits referenced herein are attached to the Amended

28 Complaint.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST        - 1 -

1    the 95% confidence level, in turn proving that the decline was caused by the disclosure of the April

2    2, 2014 information and not by chance, and that such information was material.

3             (c)      Specifically identifies by name many Yelp employees/representatives who

4    contacted the local business owners who lodged complaints with the FTC, demonstrating that it was

5    not a handful of rogue employees offering to sell them advertising in exchange for removing bad

6    reviews and recommending more positive reviews, and/or when local businesses declined, filtering

7    positive reviews and unfiltering negative reviews.

8             (d)      Provides additional details concerning the Yelp insiders' percentage of

9    holding of Yelp shares sold during the Class Period.  While plaintiffs' allegations of scienter and

10   knowledge are not reliant upon allegations of insider trading and are not necessary pursuant to the

11   Supreme Court's decision in *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), these

12   allegations provide additional facts relevant to the Court's holistic analysis.

13            (e)      Further clarifies that the alleged misrepresentations were in fact material to

14   investors and the Company based upon the fact that the misstatements concerned the Company's one

15   product, the prominence of the misstatements and the misstatements' stated importance to the

16   Company's financial condition, among other things.

17            (f)      Further clarifies that defendants admittedly manually filtered and removed

18   reviews.

19            (g)      Alleges relevant post-Class Period events and the persistent weakness in

20   Yelp's local advertising revenue growth.

21                                    **BACKGROUND OVERVIEW**

22            3.       Yelp describes itself generally as an online networking platform that connects people

23   with great local businesses.  Stoppelman co-founded the Company in 2004.  The Company held its

24   Initial Public Offering in March 2012, and the Company's shares are traded on the New York Stock

25   Exchange ("NYSE") under ticker symbol "YELP."

26            4.       The Company generates revenue primarily from the sale of advertising on its website

27   and mobile application to local businesses of all sizes that seek to reach its growing audience of

28   consumers.   For the nine months ended September 30, 2013, according to the Company,

1030970_1

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                                  - 2 -

1    substantially all of its revenue was generated by the sale of advertising products on its website.

2    During the fiscal year ended December 31, 2013, the Company reported that it generated net revenue

3    of $233.0 million, representing 69% growth over 2012, but the Company has struggled to achieve

4    profitability, reporting a FY13 net loss of $10.1 million and adjusted EBITDA of $29.4 million.[2]

5        5.    Before the Class Period, Yelp had managed to sell advertising packages to only a

6    fraction of the businesses the Company had created Yelp pages for (according to September 5, 2013

7    Deutsche Bank report, Yelp had created 47 million business pages, only 1.2 million of which had

8    been claimed by the business owner, and only 4.2% of those claimed businesses elected to advertise

9    in 2Q13). In order to grow the Company's revenue, defendants knew the Company would have to

10   convince existing and prospective advertisers alike that Yelp's advertising products offer a material

11   benefit and can generate a competitive return relative to the other alternatives. Defendants assured

12   investors that they would demonstrate Yelp's value, and in doing so increase revenue, by offering an

13   array of new services to paying advertisers. Defendants referred to these efforts as "closing the

14   loop" *i.e.*, offering new products of value to local businesses.

15       6.    Knowing that the Company's revenue and earnings growth potential was directly tied

16   to gaining paying local business accounts and securing business that was heavily reliant upon the

17   authenticity and firsthand nature of reviews on its website, defendants made materially false and

18   misleading statements concerning the Company's true business and financial condition, including,

19   but not limited to, (i) the true nature of the so-called "firsthand" reviews appearing on the

20   Company's website; (ii) the robustness of its processes and algorithms purportedly designed to

21   screen unreliable reviews; (iii) the relationship between solicitation of advertising revenue from local

22   businesses and when or whether reviews would be recommended or filtered; and (iv) the Company's

23   forecasted financial growth prospects and the extent to which they were reliant upon undisclosed

24   business practices, including, but not limited to, requiring business customers to pay to suppress

25

26   [2]   Yelp reported on a fiscal year that ran from January 1 to December 31. As used herein "FY"
     means Yelp's fiscal year. Thus, FY14 means Yelp's fiscal year 2014, which ran from January 1,
27   2014 to December 31, 2014. Specific quarters are designated by the quarter number followed by the
     letter Q. Thus, 2Q13 indicates Yelp's second quarter in fiscal year 2013, which ran from April 1,
28   2013, to June 30, 2013.

1    negative reviews.

2        7.      Those misrepresentations, including false denials of the Company's extortion-like

3    business practices, caused the Company's stock price to trade at artificially inflated prices during the

4    Class Period as high as $101.75 on March 5, 2014.

5        8.      Beginning with the Company's October 29, 2013, press release announcing 3Q13

6    financial results and the Prospectus and Registration Statement of the same day, the Company falsely

7    stated that the reviews on the Company's website were authentic and that the contributors to the

8    website provided high-quality, firsthand information about local businesses:

9    - ***We saw another quarter of strong momentum thanks to the high-quality,
     authentic content contributed by Yelpers around the world.***

10

11   - ***[C]ontributors provide rich, firsthand information about local businesses,
     such as reviews, ratings and photos.***

12       9.      The Company's motto has reportedly been "Real People, Real Reviews."  In fact,

13   notwithstanding prior accusations that the Company manipulated business reviews and pressured

14   local businesses to purchase advertising, Yelp publicly and falsely denied the veracity of any such

15   allegations and suggested that those who complained of the Company's business tactics simply had

16   it wrong or were disgruntled about the negative reviews provided by legitimate customers:

17   - ***The media has previously reported allegations that we manipulate our
     reviews, rankings and ratings in favor of our advertisers and against non-
     advertisers.  These allegations, though untrue, could adversely affect our
     reputation and brand*** . . . .  (October 29, 2013, Registration Statement).

18

19

20   - Jeremy Stoppelman, Yelp's chief executive, told me at the time that the San
     Francisco company doesn't strong-arm merchants.  ***He blamed talk of
     shakedowns on disgruntled business owners spreading "false rumors***."

21   (March 31, 2014, *Los Angeles Times*).  Ex. 4.

22       10.     In truth however, as alleged herein, reviews, including anonymous reviews, appearing

23   on the Company's website were not all authentic, high-quality "firsthand" reviews, but instead

24   included a substantial amount of false reviews by reviewers who did not have first-hand experience

25   with the businesses being reviewed.  At the end of the Class Period, *The Wall Street Journal* widely

26   reported that thousands of businesses lodged complaints with the FTC against the Company,

27   demonstrating the falsity of defendants' representations that reviews were firsthand and authentic

28

1030970_1

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                          - 4 -

and undermining the Company's prior denials.  For example, some of the complaints were as follows:

- "Yelp has enabled an individual (or competitor) to publish libel about our company. *We have provided evidence to Yelp* indicating that the information provided in the review written by "[redacted by FTC]" is wholly inaccurate and indicative of an individual who has *no first-hand knowledge of our practice*."  (FTC 44799905, 4/3/13, San Francisco, CA)

- "We had excellent reviews and a couple negative ones.  Yelp's 'filtering' system then hid all but one of our positive reviews. *The negative reviews are not verified customers and contain lies and defamations. We have evidence supporting our claim of these false reviews*.  We contacted Yelp to see if they could remove the false reviews and restore our real reviews.  They refused."  (FTC 46194128, 4/22/13, Los Angeles, CA)

- "Within 1 or 2 days of that bad review going up, Yelp called me for the 1st time from their sales office to try & sell me advertising.  When I told them I could not afford it, they said '*We can make your rating increase & take away that one star review for you, if you advertise with us*' . . . ."  (FTC 48130435, 8/26/13, Phoenix, AZ)

- "Yelp has been trying to extort money from me for 2 years now to advertise on their site.  When I said no, and refused to pay for advertising on their site, all of our 20+ positive reviews were filtered (with the exception of the Elite Yelpers reviews, which Yelp cannot filter), leaving only the few 1,2,3 star reviews. *I tested them*.  A sales person called me and asked if I would advertise with them.  I answered that all my positive reviews were filtered, and I can't advertise if I only have 2.5 / 5 stars. I would need to wait to see that my rating is 4 or 5 stars. *Within a couple of days, they started releasing our positive reviews and filtering the negative ones to give us 4 stars*.  A few days after that the sales person called back and said 'see, you are at 4 stars now, can we sign you up'.  I absolutely refused, and *I told her about the test we did to show the extortion*.  She hung up the phone. *Within a week, all of our positive reviews were filtered again, leaving only any negative or low rating reviews*." (FTC 51673743, 2/21/14, Toronto, ON, Canada). [3]

11.    Defendants' Class Period statements concerning the authenticity and firsthand nature of the reviews appearing on the Yelp website were not simple puffing.  Defendants repeatedly and consistently emphasized to investors that Yelp's revenue and overall financial success was entirely dependent on maintaining the authenticity and firsthand nature of the contributor created business reviews (*i.e.*, Yelp's content) without which the entire value proposition breaks down:

---

[3]    A number of the FTC complaints are quoted herein, each time followed in parentheses by the reference number, date, and location of the complainant, *i.e.*, "Quotation" (FTC 00000000, Month/Day/Year, City, State).  Spelling and grammar are as they appear in the original FTC complaints.

*[M]aintaining trust and protecting the integrity of our content*.  And for us, really, *that is Job 1*, that *we have to not just generate quality content, but maintain the integrity of that content*.  Because consumers rely on the content and they trust it.  *And the minute they don't, the entire value proposition breaks down*.

12.     In addition to repeatedly and falsely extolling the authenticity and firsthand nature of the reviews appearing on the Company's website, defendants made false and misleading statements throughout the Class Period concerning Yelp's business practices.  Defendants falsely represented that local businesses could purchase advertising to promote themselves through targeted search advertising and that there was absolutely no relationship between whether local businesses spent advertising dollars with the Company and when or whether reviews would appear on the website or would be prominent or filtered:

- *[B]usinesses can also pay for premium services to promote themselves through targeted search advertising, discounted offers and further enhancements to their business page*.

- *[T]here is zero relationship between the timing of when a review gets recommended and when a business decides to – or declines to – advertise.*

- *[T]here is no relationship between reviews and anything having to do with Yelp ads or the Yelp ads sales process.  Period.*

13.     In truth, each of these statements regarding local business advertising and recommendations were materially false and misleading as well.  Although businesses could indeed purchase advertising from Yelp, defendants knew but failed to disclose that if local businesses in fact declined the Company's overtures to purchase advertising, or cancelled advertising contracts, for example, Yelp would often immediately retaliate against such business by removing positive reviews or relegating these positive reviews to the filter and permitting only negative or fake reviews to remain prominent.  Multiple examples of specific business experiences demonstrate the falsity of the Company's representations:

- "Yelp representative called me and asked if I wanted to advertise for $350 per month.  *I declined and the next day all our positive reviews were removed*."  (FTC 45635762, 5/3/13, Tucson, AZ)

- *"i was asked to advertise on yelp- when i declined-the next day all my good reviews were filtered and all that was left was the one bad review."*  (FTC 47776722, 7/1/13, New York, NY)

- "*When I told them I could not afford the hundreds of dollars to advertise with them* since I am a one person business.  After that *yelp removed all of*

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                           - 6 -

*my positive reviews (14 of them) and left up only the one nasty review*." (FTC 50646092, 11/25/13, Farmingville, NY)

- "All of our real reviews from our customers have been filtered and only fake, negative reviews are under our account.  *As soon as I agreed to advertise with Yelp, they released 3 positive reviews and filtered out the bad reviews. [But] When I [later] said I would no longer advertise with Yelp, the positive reviews were filtered out and the negative reviews were back online*." (FTC 51567318, 2/10/14, East York, ON, Canada)

14.   In light of the above facts, the representations concerning the Company's current and future financial prospects, and the extent to which they were reliant upon undisclosed business practices, did not have a reasonable basis.

15.   Simultaneous with the alleged misrepresentations, insiders including the defendants capitalized on the artificial inflation of Yelp's stock during the Class Period.  Between November 14, 2013, and March 10, 2014, Yelp executives unloaded more than 1.1 million shares of their Yelp stock at artificially inflated prices as high as $98.18 per share for insider trading proceeds in excess of $81.5 million.

16.   Business analysts noted the unusual nature of Yelp executives insider trades.  For example, on March 10, 2014, Seeking Alpha published a report titled "If Yelp's CEO Refuses to Own Any Shares, Why Should You?"  The report noted that insiders had unloaded 41% of their shares in the prior four months, suggesting Yelp management believed that the Company's stock price was overvalued:

**Massive insider selling:**

To the tune of *41% of insider shares in the last 4 months alone*.  The CEO, Jeremy Stoppleman, has exercised $15.25 million of stock options in the last year and *seems to own almost no shares*.

The *rampant insider selling over the last 4 months* began at a stock price of $65.63.  This indicates that *management (who knows the workings of the company and its long term growth prospects the best) believes that* at a price 50% below today's price *the stock was blatantly overvalued*.

17.   Then, on or around April 2, 2014, *The Wall Street Journal* publicly and widely reported that, uncovered by way of a Freedom of Information Act ("FOIA") request, the FTC had received and made public more than 2,000 complaints concerning Yelp's extortion-like business practices, many contending that Yelp would solicit businesses to buy advertisements on the

1  Company's website and would retaliate if businesses declined by deleting positive reviews and

2  claiming the deletions were due to an updated "automated algorithm." The article published April 2,

3  2014, in *The Wall Street Journal* noted that the FTC posted their response to the FTC website and

4  that Yelp's stock was down as a result:

> On Wednesday, the Federal Trade Commission disclosed on its website that it received 2,046 complaints about Yelp from 2008 through March 4 of this year, noting that its disclosure was part of a Freedom of Information Act request from The Wall Street Journal. ***Yelp was down 6%, or $4.82, to $75.36 in Wednesday afternoon trading in the wake of the disclosure***.

8      18.     On April 3, 2014, SunTrust Robinson Humphrey published a report titled "Yelp

9  Shares Drop On FTC Complaints Disclosure," describing the impact of the disclosure of the April 2,

10 2014 FTC complaints on Yelp's stock price, "Yelp shares were down nearly 6% yesterday (vs.

11 Nasdaq up 0.2%) on 1.5x normal volume. We attribute the underperformance to an FTC disclosure

12 that it received 2,046 consumer complaints targeting Yelp over a 5-year period ending March 4,

13 2014." Ex. 9.

14     19.     As the true facts concerning the Company's business practices began to be widely

15 revealed to the investing public the Company's stock price declined as a result, falling from a Class

16 Period high of $101.75 per share to $65.76 per share at the end of the Class Period.

17                          **JURISDICTION AND VENUE**

18     20.     Jurisdiction is conferred by 28 U.S.C. §§1331 and 27 of the 1934 Act. The claims

19 asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and

20 Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

21     21.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Yelp is

22 headquartered in this District and many of the acts and practices complained of herein occurred in

23 substantial part in this District.

24                                  **PARTIES**

25     22.     Plaintiff Joseph Curry purchased or acquired Yelp common stock during the Class

26 Period and was damaged by the conduct alleged herein.

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                - 8 -

23.     On November 17, 2014, this Court appointed the City of Miami Fire Fighters' and Police Officers' Retirement Trust ("City of Miami Firefighters") Lead Plaintiff for the Class.  During the Class Period, City of Miami Fire Fighters' purchased Yelp common stock and was damaged by the conduct alleged herein.

24.     Defendant Yelp is incorporated in the state of Delaware and its stock trades on the NYSE under the ticker symbol "YELP."  The Company's corporate headquarters are located at 140 New Montgomery Street, San Francisco, California.

25.     Defendant Stoppelman is, and was at all relevant times, CEO of the Company.  Stoppelman co-founded Yelp in July 2004 and has served as CEO since 2004.  Stoppelman is a computer software engineer by training and is reportedly responsible for overseeing product development and driving the vision and product experience for Yelp.  During the Class Period, Stoppelman sold approximately 132,350 shares of Yelp common stock at artificially inflated prices for proceeds of $8,493,479.

26.     Defendant Krolik is, and was at all relevant times, CFO of the Company.  Krolik has served as CFO since July 2011 and oversees corporate finance, accounting, investor relations and real estate functions.  During the Class Period, defendant Krolik sold approximately 35,000 shares of Yelp stock at artificially inflated prices for proceeds of $2,556,917.

27.     Defendant Donaker is, and was at all relevant times, COO of the Company.  Donaker has served as COO since June 2006 after joining Yelp in November 2005 to head business development.  Donaker oversees the Company's business operations including sales, marketing and administration.  During the Class Period, Donaker sold approximately 117,640 shares of Yelp stock at artificially inflated prices for proceeds of $9,877,471.

28.     The defendants named in ¶¶25-27 are referred to herein as the "Individual Defendants."[4]

---

[4]   All "¶_" and "¶¶__" references are to the Amended Complaint unless otherwise indicated.

**CONTROL PERSONS**

29.     As officers and controlling persons of a publicly held company whose common stock was and is traded on the NYSE and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Company's and Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30.     The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Yelp, each of the Individual Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Yelp and its business or adopted by the Company materially false and misleading.

31.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various United States Securities and Exchange Commission ("SEC") filings, press releases and other public statements pertaining to the Company issued during the Class Period. Each Individual Defendant was provided with copies or had access to the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

32.     The Company and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Yelp common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Yelp's business, operations, management and the intrinsic value of Yelp common stock; (ii) allowed Yelp insiders, including the Individual Defendants, to sell over 1.16 million shares of their Yelp stock at artificially inflated prices for insider trading proceeds of more than $81.5 million; and (iii) caused plaintiffs and other members of the Class to purchase Yelp common stock at artificially inflated prices.

<u>Yelp Admits that It Aggressively Manipulates – Curates – Reviews Posted on Yelp's Website Establishing Knowledge and Control Over Content</u>

33.     Defendants made multiple statements before and during the Class Period that Yelp controlled and curated the content presentation of the reviews on its website, including manually, through the creation of content and reviews by its own employees (community managers, scouts, ambassadors) and through its recommendation software.

(a)     <u>Recommendation Software:</u> According to Yelp, its recommendation software was designed and programmed by the Company and determined when and whether reviews were recommended and when they were filtered.  According to the Company, the control over the content and presentation of reviews through scouts and community managers, in combination with software technology, was the key to authenticity of the published reviews and in turn the Company's business success:

- We believe our recommendation technology is one of the key contributors to the quality, authenticity and integrity of the reviews on our platform and the success of our service.  (2013 Form 10-K)

- Our recommendation software operates continually, and the results of its determinations with respect to particular reviews may change over time as it factors in new information.  (2013 Form 10-K)

- [W]e take that content [Yelp reviews] and then we curate it using very aggressive means of filtering out attempts to game the system, fakes and shills.  (December 11, 2013, Yelp! Inc. at Cantor Fitzgerald Internet Conference)

(b)     <u>Manual Filtering and Removal of Reviews:</u> Though defendants credited the filtering software as one key to the authenticity of the published reviews and in turn the Company's

business success, defendants admitted, and others have reported, that they or their agents personally monitored the authenticity of Yelp reviews, saying the software was but one of the contributors to the authenticity and integrity of Yelp reviews and that "the team" and customer service representatives – *i.e.* defendants and their agents – policed the site and manually removed or filtered reviews.  Defendants' stated purpose in doing so was not to remove offensive material, but rather to maintain a level playing field:

- [R]eviews that fundamentally violate our review guidelines . . . ***are removed by our team . . . we police the site and keep it at a level playing field***.  (April 30, 2014 Q1 2014 Yelp Inc., Earnings Conference Call)

- According to Yelp, reviews may disappear if users, ***Yelp customer service representatives*** or a behind-the-scenes algorithm flag them as improper (Paula Forbes, *FTC Complaints About Yelp Allege Extortion, Libel, More*, Eater, Jan. 23, 2013, "http://www.eater.com/2013/1/23/6491587/ftc-complaints-about-yelp-allege-extortion-libel-more").

(c)     Scouts:  The Company also exerted control over the content and reviews on its website with Company "scouts."   According to the Company, Yelp employs "scouts" to build interest in newly launched locales, including by writing initial business reviews:

- We sometimes hire temporary local employees, called "scouts," ***to provide additional*** rich content, such as reviews, photos and hours of operation.  ***To bolster the integrity of the content they provide, we closely monitor their contributions to the platform . . . .*** (2012 and 2013 Forms 10-K)

(d)     Community Managers:  Defendants also admittedly controlled reviews and content in part through Yelp employees titled "Community Managers" which the Company assigned to different cities or towns.  According to Yelp, Community Managers are paid Yelp employees who serve as "brand ambassador[s]," and are responsible both for creating content by actually writing reviews and posting pictures and for encouraging others to do so.  Community Managers, in fact, generate content by writing reviews of local businesses.  The Company uses the reviews written by its own Community Managers to encourage traffic on the website for any particular business being reviewed.

- [Krolik]  [W]hat we do is we go into a country [or US city].  ***We have a community manager that generates the content***, that helps foster and support the community that generates the content. . . .[5]

---

[5]    Krolik, December 3, 2013, Yelp Inc at Credit Suisse Technology Conference.

- [Sollitto] ***We put community managers in the market, they grow content, that content grows, traffic begins to grow, and then we begin to monetize***.[6]

- [Krolik] [S]tarts that flywheel with a ***community manager creating the content***, and then starting to monetize the traffic that comes from all that content.[7]

(e)    Curation: Vince Sollitto, the Company's VP of Communications & Public Affairs, admitted and even bragged that the Company largely controlled the presentation of the content that was submitted by Yelpers and specifically stated that the content submitted by Yelpers was processed and very aggressively "curated" by Yelp to increase the quality:

> We go into every market in which we operate, and we put boots on the ground, and we nurture and create a community of passionate contributors that generate this very deep, rich, high-quality content. . . .
>
> ***And then we take that content and then we curate it using very aggressive means of filtering out attempts to game the system, fakes and shills***.  And so that content creation and then ***that content curation*** [sic] ***results in very high-quality content*** . . .[8]

34.    Elite Yelpers: Finally, the Company controlled the presentation and content of reviews through the use of "Elite Yelpers."  An "Elite Yelper" is a reviewer who has been awarded the designation by Yelp.  According to an August 3, 2014, *SFGate* article titled "Yelp Elites: Prolific reviewers get perks, VIP treatment," Yelp refers to Elite Yelpers as the "'true heart of the Yelp community, both on and offline'" and relies on them to contribute a substantial portion of Yelp's content and encourage other users to engage with the website.[9]  Ex. 19.  Yelp, in turn, exercises considerable influence over Elite Yelpers.  According to an August 22, 2014, *Business Insider* article titled "Elite Yelpers Hold Immense Power, And They Get Treated Like Kings By Bars And Restaurants Trying To Curry Favor," Elite Status is conferred by the "San Francisco-based Elite

---

[6]    Sollitto, December 11, 2013, Yelp! Inc at Cantor Fitzgerald Internet Conference.

[7]    Krolik, March 4, 2014, Yelp, Inc at JMP Securities' Technology Research Conference.

[8]    Sollitto, December 11, 2013, Yelp! Inc. at Cantor Fitzgerald Internet Conference.

[9]    *See* Kristen V. Brown, *Yelp Elites: Prolific reviewers get perks, VIP treatment*, SFGate (Aug. 3, 2014) http://www.sfgate.com/restaurants/article/Yelp-Elites-Prolific-reviewers-get-perks-VIP-5664932.php.

1  Council, a mysterious group" that can both award and withdraw Elite status (and the benefits that

2  come with it), and does so without relying on specific benchmarks.[10]  Ex. 20.

3      35.    The admitted control over the creation and presentation of content and the

4  "authenticity" and "firsthand" nature of reviews on the Yelp website far exceed what was necessary

5  to establish knowledge and control.

**SOURCES OF INFORMATION**

7      36.    The allegations herein are based on plaintiffs' ongoing investigation, including review

8  of relevant Company documents, SEC filings, press releases, analyst reports and other reports by

9  third parties, complaints against Yelp filed with the FTC and plaintiffs' interviews of local business

10  owners and reviewers.  Plaintiffs believe that substantial additional evidentiary supports will exist

11  for the allegations set forth herein after reasonable opportunity for discovery.

13      37.    The FTC complaints referred to herein were initially reported by *The Wall Street*

14  *Journal* on or around April 2, 2014, and consist of more than 2,000 complaints filed by local

15  businesses around the country and in Canada.  As described herein, the FTC, while redacting the

16  identity of the complainants,[11] disclosed the content of the complaints as well as certain identifying

17  information (including time of complaint and location of complainant) pursuant to an FOIA request

18  from *The Wall Street Journal*.  The FTC assigned each complaint a reference number and disclosed

19  this information on the FTC's own website, and the quantity and content of the complaints was

20  thereafter reported on widely.  *See* Exs. 2, 6.

22      38.    Hundreds of the local business owners who filed complaints with the FTC also

23  identified the Yelp sales representative or representatives and/or customer service representatives

---

[10]   *See* Complaint for Wages at ¶¶71-72, *Jeung v. Yelp Inc*, No. CV-14-06223 FMO(ASx), (C.D. Cal. Aug. 7, 2014) (Elite Yelpers allege, among other things , that Yelper required them to write glowing reviews of the venues that sponsor company events and that Yelp controls its reviews to pander to its advertisers.).

[11]   In some cases, the FTC did neglect to redact the identity of the business owner.  *See, e.g.*, FTC 46590376 (owner George Morrison complaint concerning a fake review).

1  who they personally communicated with. *See, e.g.*, ¶49(c)(xv, xix, xxiv, xxx, xxxi) (describing local

2  businesses' interactions with Yelp representatives Tamara Crabdree, Adam, Nikki, Chris and Bailey

3  Dunn).  The sheer number of different sales representatives identified in the complaints, most of who

4  made similar sales pitches, strongly suggests that attempts to use the manipulation, or the promise of

5  manipulation, of reviews as leverage to compel businesses to purchase advertising was a widespread

6  practice, not the product of a handful of rogue salespersons.  *See* Ex. 24, listing 205 instances in

7  which a complainant identified the Yelp representative by name with whom he or she directly

8  communicated.

9  

10       39.     The information provided in the FTC complaints and by the local business owners

11  provide strong indicia of personal knowledge of the information provided and tend to be

12  corroborative of one another and are corroborated by other information alleged herein.  *See* Exs. 2, 6.

13       40.     The allegations herein are also supported by reports made by named individuals

14  regarding their personal experiences with Yelp.  The details provided by these named individuals are

15  strongly corroborative of the complaints filed with the FTC and disclosed on April 2, 2014:

| | Name | Allegation |
|---|---|---|
| 1. | Russel Kassman (Piano Purveyor, CA) | Piano store owner reported to counsel for plaintiffs that inauthentic reviews appeared on his businesses' Yelp page and that, after he declined to purchase advertising, Yelp filtered most of his positive reviews, but not his negative reviews. |
| 2. | Debbie Schwarzer (Lawyer, CA) | Customer and Yelp review writer reported to counsel for plaintiffs that although she wrote many reviews, Yelp only filtered those she wrote for businesses that did not advertise. |
| 3. | Chris Monks (Moving Company Owner, CT) | Moving company owner reported to the *Los Angeles Times* that when he cancelled his advertising, previously filtered negative reviews were unfiltered and previously unfiltered positive reviews were filtered. |
| 4. | Lymarie Jimenez (Bakery Owner, MN) | Bakery owner reported to the *Star Tribune* that when she declined to advertise with Yelp, not only were positive reviews filtered, but the negative reviews that were not filtered were ones written from Yelp profiles with no other reviews, *i.e.*, exactly the type of review that Yelp claims it filters (does not "recommend") as unreliable. |

| | Name | Allegation |
|---|---|---|
| 5. | Gary Hollander (Dentist, CA) | Dentist reported to *NBC News Los Angeles* that Yelp told him negative reviews would be filtered when he advertised, which they in fact were, and when he stopped paying to advertise they were unfiltered. |
| 6. | Lily Jeung (Elite Yelper, CA) | Former Elite Yelper reported to *NBC News Los Angeles* that Yelp filtered reviews for businesses that advertised or those they were soliciting advertising from, and even deleted Yelp reviewers' accounts if they wrote negative reviews of businesses that were paying Yelp a lot of money. |

**FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**[12]

41.     <u>False and Misleading Statement</u>:  On October 29, 2013, the Company issued a press release announcing its financial results for the third quarter of 2013.  The Company's reported earnings missed Wall Street earnings expectations, posting a loss of $2.3 million.  However, Yelp beat forecasted revenue expectations.  In addition to announcing the Company's financial results and financial outlook for the fourth quarter and full fiscal year 2013, the Company falsely stated that its 3Q13 positive results and basis of its increased full year financial outlook were due to and a result of the high quality and authentic content contributed by Yelpers which would continue to drive increasing financial growth:

**Local Revenue Accelerates to 80% Over Third Quarter 2012**

. . . Yelp Inc., the company that connects consumers with great local businesses, today announced financial results for the third quarter ended September 30, 2013.

•      Net revenue was $61.2 million in the third quarter of 2013, reflecting 68% growth in net revenue from the third quarter of 2012

*        *        *

•      Active local business accounts grew 61% year over year to approximately 57,200

*        *        *

"***We saw another quarter of strong momentum thanks to the high-quality, authentic content contributed by Yelpers around the world***," said Jeremy Stoppelman, Yelp's chief executive officer."

*        *        *

---

[12]     False and Misleading Statements are primarily identified with bold-italics in sections underlined <u>False and Misleading Statement(s)</u>.

**Business Outlook**

As of today, Yelp is initiating guidance for the fourth quarter of 2013 and raising its full year 2013 revenue and adjusted EBITDA guidance.

- For the fourth quarter of 2013, net revenue is expected to be in the range of $66 million to $67 million, representing growth of approximately 62% compared to the fourth quarter of 2012.  Adjusted EBITDA is expected to be in the range of $9 million to $10 million.

- For the full year of 2013, net revenue is expected to be in the range of $228 million to $229 million, representing growth of approximately 66% compared to the full year of 2012.  Adjusted EBITDA is expected to be in the range of $28 million to $29 million.

42.     That same day, October 29, 2013, Yelp conducted its 3Q13 earnings conference call to discuss the Company's 3Q13 results and 4Q13 and increased FY13 fiscal revenue and earnings guidance.  The call was hosted by Stoppelman, Krolik and Donaker.  During the call defendants repeated the financial results reported in the financial press release of the same day and again attributed the Company's strong performance and future growth prospects to the high-quality content of Yelp's reviews, and ability to further connect with local businesses to monetize the website traffic derived therefrom:

[Stoppelman]: We are delighted by the ***high quality of rich reviews*** we continue to see [comparing mobile reviews favorably to those made via PC]. . . .[13]

*          *          *

[I]t's really about, ***as we have more and more high-quality content***, the stuff that we're known for, obviously, domestically, it naturally gets organic exposure. . . .

*          *          *

[Donaker]: ***those high-quality reviews that we've talked about are going to be the focus***.

---

[13]  Recognizing that certain types of statements can be considered "puffing," plaintiffs are ***not*** alleging that the statements concerning "high-quality" by themselves are materially false or misleading.  However, in this case, the "quality" and "authenticity" of the reviews on the Company's website were admittedly the central element of Yelp's value proposition.  ¶¶11, 87.  While falsely denying reports that it manipulated the content or presentation of reviews on its website and strong-armed local businesses to advertise with the Company, Yelp, indeed, sought to warn that if the "quality" and "authenticity" of reviews were compromised, the Company's business could be harmed.  The context of the Company's representations of the purported authenticity and quality of the content of the reviews coupled with the importance of the authenticity and quality of the reviews to the Company's future financial growth rendered the statements material, not puffery, and they were knowingly false and misleading as detailed herein.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 17 -

43.   <u>False and Misleading Statements</u>: On the same day, October 29, 2013, the Company filed the October 29, 2013, Registration Statement and Prospectus ("Registration Statement") with the SEC setting forth the terms of Yelp common stock, offering of 3.75 million shares of its Class A common stock at $67.00 per share. The Registration Statement incorporated by reference a number of other documents – including the October 29, 2013, Press Release (¶41), the Company's FY12 Form 10-K and the Company's 2013 Forms 10-Q filed with the SEC. Certain of the documents contained false statements similar to those detailed above at ¶¶41-42. For example, the October 29, 2013, republication FY12 Form 10-K falsely stated that Yelp contributors provided "firsthand information" about local businesses, reiterated the "quality of the reviews" on the website and stated that businesses can pay for advertising to promote themselves:

Yelp connects people with great local businesses. Our users have contributed a total of approximately 47.3 million[14] cumulative reviews of almost every type of local business . . . .

\*       \*       \*

*Contributors*. . . . ***These contributors provide rich, firsthand information about local businesses, such as reviews, ratings and photos***. . . .

*Consumers*. . . . ***Our strong brand and the quality of the reviews content on our platform have enabled us to attract this large audience with almost no traffic acquisition costs***.

*Local Businesses*. Our platform provides businesses with a variety of free and paid services that help them engage with consumers at the critical moment when they are deciding where to spend their money. . . . ***Local businesses can also pay for premium services to promote themselves through targeted search advertising, discounted offers and further enhancements to their business page***.

*Our Filtering Technology*. ***In order to maintain and enhance the quality, authenticity and integrity of the reviews on our platform, we employ proprietary filtering technology to analyze and screen all of our reviews***. Our filtering software looks at a wide range of data associated with each review and reviewer in order ***to determine the review's relevance and reliability***. Our filtering software operates continually, and the results of its determinations with respect to particular reviews may change ***over time as it factors in new information***.[15] This can result in reviews that were previously unfiltered becoming filtered and reviews that were previously

---

[14]   47.3 million is the number reported in the Registration Statement. Yelp reports 36.0 million in the FY12 Form 10-K, and 52.8 million in the FY13 Form 10-K.

[15]   The Company knew but failed to disclose that the "new information" factored in by its recommendation software, which could or would result in previously recommended reviews being filtered and vice versa, in truth included inputs regarding efforts to sell local businesses advertising.

filtered being restored to unfiltered status. Filtered reviews do not factor into a business's overall star rating and are segregated from unfiltered reviews on our website. By clicking on a link on a reviewed business's page on our website, users can access the filtered reviews for that business, as well as the star rating and other information about reviews that we have removed for violation of our terms of service. We believe *our filtering technology is one of the key contributors to the quality, authenticity and integrity of the reviews on our platform and the success of our service*.

44.     As detailed herein, each of these statements were knowingly materially false and misleading because defendants knew or deliberately disregarded that much of the review content on Yelp's website was not authentic or firsthand information thus compromising the so-called "quality" of the reviews.  The Company also knew or deliberately disregarded and failed to disclose that while local businesses could pay for advertising to promote themselves, when local businesses declined the Company's overtures to purchase advertising, the Company would often retaliate by removing or filtering their good reviews and displaying only negative and sometimes fake reviews to encourage non-advertising local businesses to purchase ads.  The Company would often offer to suppress negative reviews for a fee.  Nor did the Company disclose that part of its business practice and apparent basis of future financial growth of local business advertising, the largest source of revenue growth, was a continuation of targeting local businesses and promising to remove bad reviews for a fee. *See, e.g.*, ¶¶49-51.

45.     <u>False and Misleading Statements</u>: The FY12 Form 10-K (as incorporated by the Registration Statement) also purported to warn investors in its common stock that complaints (as opposed to the truth) about the quality of Yelp's reviews and review filter, and alleged business practices, ***could*** harm Yelp's brand and bottom line.  At the same time, however, the Company neutralized any value to such warning by materially and falsely stating that prior reports that Yelp manipulated reviews and ratings were "***untrue***."  Each of the purported warnings, including, but not limited, to the warnings below, were false however because they omitted material facts known to defendants:

> ***The media has previously reported allegations that we manipulate our reviews, rankings and ratings in favor of our advertisers and against non-advertisers. These allegations, though untrue, could adversely affect our reputation and brand*** . . . .

46. <u>False and Misleading Statement</u>: Throughout the Class Period, defendants also falsely stated that there was absolutely "no relationship" between the filtering of reviews published on the Yelp website and whether businesses purchased advertising from the Company. Yelp's website, for example, under Common Questions, stated (and continues to state):

**Do Yelp advertisers get preferential treatment?**

*No. Our recommendation software treats advertisers and non-advertisers exactly the same*. . . .

*Furthermore, there is zero relationship between the timing of when a review gets recommended and when a business decides to – or declines to – advertise* . . . .

*In short, there is no relationship between reviews and anything having to do with Yelp Ads or the Yelp Ads sales process. Period*.[16]

47. On October 29, 2013, after the report of the Company's 3Q13 financial results and increased 4Q13 and FY13 guidance, Yelp's stock price closed at $68.83 on 6.2 million volume trading compared to a close of $67.59 on 2.9 million trading volume on October 28.

48. On October 30, 2013, Barclays published a report titled "Closing the Loop on Future Growth," discussing the October 29, 2013, results and indicating that defendants had made a strong case that Yelp could grow its business on the strength of increasing paying accounts (advertising revenue) with local business:

We believe Yelp will continue to benefit from the migration of local ad dollars online, a natural tailwind to revenue that will likely be accelerated by product initiatives aimed at "closing the loop" between merchant and consumer. . . .

\*      \*      \*

**Raising estimates and price target**: We are raising our 4Q revenue estimate to $68M from $65M, *mainly due to our more positive outlook for paying accounts*.[17]

49. <u>Reasons Why Statements in ¶¶41-46 Were Knowingly False and Misleading</u>. Each of the statements set forth above in ¶¶41, 43, 45-46 concerning the Company's business practices and

---

[16] *See* Common Questions Yelp for Business Owners, Yelp, https://biz.yelp.com/support/common_questions (last visited May 21, 2015).

[17] On November 5, 2013, the Company issued a press release announcing that it had closed the secondary offering of shares at $67.00 per share and that the Company had raised approximately $288.9 million.

1    financial condition, specifically statements that: (i) Yelp contributors provided authentic, firsthand

2    information about local businesses (¶41); (ii) businesses can also pay to promote themselves through

3    targeted advertising (¶43); (iii) accusations that Yelp manipulated reviews in favor of advertisers

4    over non-advertisers were untrue (¶¶45-46); and (iv)  strong performance and raised financial

5    guidance was driven by that authentic, firsthand content (¶¶41-43) were materially false and

6    misleading when made.  In truth, defendants knew, or recklessly disregarded and failed to disclose,

7    the following facts:

8                    (a)    Reviews, including anonymous reviews, appearing on the Company's website

9    were not all "authentic" or "firsthand" reviews.  Instead, Yelp hosted a substantial amount of

10   fraudulent reviews from reviewers Yelp knew did not have firsthand experience with the business

11   being reviewed and/or for which Yelp had credible evidence that the reviews were false.  Yelp's

12   algorithms or recommendation or filtering software purportedly designed to screen unreliable

13   reviews did not comprehensively or effectively screen unreliable or fake reviews.  As evidenced not

14   only by media reports and some litigation, the merits of which were flatly and falsely denied by

15   Yelp, the disclosures from the FTC (reported by *The Wall Street Journal* on or around April 2,

16   2014), detailed specific instances prior to and during the Class Period that demonstrate that not only

17   were fake, inauthentic reviews identified and reported to Yelp, but also Yelp's efforts to very

18   specifically offer the removal of fake, inauthentic reviews in exchange for advertising revenues.

19   These reports with the FTC catalogue many of the claimed inauthentic reviews that remained

20   prominent on Yelp's website as well as Yelp's refusal to address them:

21                   (i)    "Someone on Yelp filed a false negative review.  It is 100% false because in

22                          the review they state the service issue was regarding a PS3 repair.  A PS3 is

23                          gaming console. ***I don't repair gaming consoles at all.  I am a certified PC***

24                          ***Technician. . . .  The false review even claimed I charged $140 when my***

25                          ***rates for computer repairs are a flat rate of just $50***.  The review also states

26                          '. . . I took my PS3 to fix on December 20 . . .".  ***This is false because I don't***

27                          ***have a store or shop.  I go to customers homes to repair their desktops or***

28                          ***laptops***."  (FTC 46933934, 5/6/13, Miami, FL)

1    (ii)   "She posted a false review on Yelp. Yelp Involvement/Complaint: . . . .  We

2         have contacted them numerous times regarding the fictitious posting on our

3         business.  Nothing has been done at this time, but **they have indicated for a**

4         **fee unfavorable postings can be removed**."  (FTC 50405883, 11/6/13,

5         Lakewood, CA)

6    (iii)   "Yelp has enabled an individual (or competitor) to publish libel about our

7         company.  **We have provided evidence to Yelp** indicating that the information

8         provided in the review written by "[redacted by FTC]" is wholly inaccurate

9         and indicative of an individual who has **no first-hand knowledge of our**

10        **practice**."  (FTC 44799905, 4/3/13, San Francisco, CA)

11    (iv)   "We had excellent reviews and a couple negative ones.  Yelp's 'filtering'

12        system then hid all but one of our positive reviews. **The negative reviews are**

13        **not verified customers and contain lies and defamations.  We have evidence**

14        **supporting our claim of these false reviews**.  We contacted Yelp to see if

15        they could remove the false reviews and restore our real reviews.  They

16        refused." (FTC 46194128, 4/22/13, Los Angeles, CA)

17    (v)   "Why is the review filtering system keeping the one fake review and

18        PROMPTLY filtering out the very real, paying customer reviews?"  (FTC

19        44021014, 3/6/13, Belmont, NH)

20    (vi)   "This complaint concerns a review posted on Yelp for my business in Los

21        Angeles, [redacted by FTC].  It was posted Nov. 5, 2010 by [redacted by

22        FTC]., and alleges multiple felonies and police reports, and operating without

23        a license.  The review also contains racial remarks and vulgar language. **I**

24        **have offered to provide Yelp with documentation from the police which will**

25        **show that the allegations of felonies and police reports are false**. . . . **Yelp**

26        **has responded that they would not consider any 'evidence' submitted**."

27        (FTC 30627344, 2/18/11, Los Angeles, CA)

28

1030970_1

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST      - 22 -

(vii)    "So the same [fake] review that was removed by Yelp when I was paying advertising has now become a valid review!  To make things worse, he [the reviewer] **has added 3 review updates from his account**. . . .  How did I get a different decision in this case when the review is the same.  Aside the fact that I am not paying Yelp any more, is there any other reason that could trigger this?"  (FTC 46137151, 6/22/13, San Francisco, CA)

(viii)   "All the 1 star reviews on YELP.com and related websites are 100% False.  I have never met any of these people or spoken to them other then [redacted by FTC]; among many other aliases.  **I have solid evidence to prove my case** . . . .  After I declined, [advertising . . . Yelp] removed the REAL Reviiews and left the arsenal of obvious Bogus Defamatory reviews out of spite for not paying them. . . ."  (FTC 29825835, 3/3/11, Woodside, NY)

(ix)    "[W]e have only 7 reviews posted, 33 reviews have been filtered.  The 7 posted are horrible reviews, the majority of the 33 are excellent.  The reviews are authentic and time and time again are removed. . . .  We have been corresponding with yelp for over a year trying to rectify the situation and remove the slanderous, personal attacks and false information . . . .  We do not advertise with yelp, we do not pay them money. . . .  Our business is being bullied by yelp, and I know we are not alone."  (FTC 46139831, 6/23/13, Traverse City, MI)

(x)    "Customer made complaint on yelp but said she would take down [negative reviews] if paid $265.00.  I have in text message from her.  B[ut Y]elp will not investigate not respond."  (FTC 49911277, 10/17/13, Irvine, CA)

(xi)    "I have tangible evidence – including a signed contract, a video and emails – which prove that this complaint is false."  (FTC 33979197, 8/24/11, Palm Harbor, FL)

(xii)   "Yelp has published a fraudulent, slanderous review of my company.  They refuse to verify the review, but **I have evidence that it is fraudulent**.  At the

1    same time, they have removed 6 legitimate (and positive) reviews by our

2    payjing customers.  *We have verification that the positive reviews are*

3    *legitimate in the form of affidavits*.”  (FTC 34802255, 12/14/11, Boulder,

4    CO)

5    (xiii)    “We tried several times emailing and calling Yelp but *they will not give us*

6            *any chance to prove that the event never happened*.”  (FTC 30628344,

7            4/1/11, Phoenix, AZ)

8    (xiv)    “This company [Yelp] would filter authentic, positive reviews of my business

9            written by my customers and would only post negative reviews, which in

10           most cases were *written by their so called, “Community Managers.”*  The

11           community Managers are paid employees of Yelp. . . .”  (FTC 45907813,

12           5/16/13, Hoboken, NJ)

13   (xv)     “Shortly after “claiming” our page on Yelp.com for amysskincareoasis.com

14           we began to receive phone calls from a sales person. We would not return

15           their phone calls, and *immediately began to see our existing reviews begin to*

16           *be “filtered” on their website*. They are *all legitimate reviews from existing*

17           *customers*.”  (FTC 43286412, 2/4/13, Roswell, GA)

18   (xvi)    “Yelp has filtered 19 reviews (both negative and positive) from my

19           customers and *continues to only show one negative fake review*. I have

20           received 20 reviews over the last few years with only 4 negative reviews but

21           yet yelp chooses to only show one fake negative review. I have asked several

22           times to have all reviews posted and to not filter the rest with no response.

23           Now *yelp once again wants me to advertise with them to get my positive*

24           *review reinstated*.”  (FTC 51559133, 2/5/14, Bremerton, WA)

25   (xvii)   “Yelp company refuses to remove a review that is *fake and defamatory* from

26           their website.  Our office has *checked and confirmed with our records* there

27           is no one by the name of [redacted by FTC] and no one had bought a frame

28           with a broken arm as mentioned in the review.  We have requested Yelp to

remove the fake review.  However, ***the company has refused to do so***.  Thus, by its action, Yelp is allowing the fake, defamatory review to detrimentally affect my optometry business."  (FTC 51066002, 1/28/14, Long Beach, CA)

(xviii)   "Yelp filters reviews for no apparent reason . . . ***when sales contacted me i offered to show patients records to prove that my reviews are real.  I have 15 total, 13 have been filtered for no reason***, I only have 2 up."  (FTC 51479995, 1/15/14, New York, NY)

(xix)   "***I can prove to Yelp that the clients have never been in to our location as the names used do not match any in our data base***.  Meaning either they were not in our business, or they are using a fake name on Yelp, both reasons are good enough to remove their reviews.  Yelp refuses to do any fact checking and assume that the reviews are legit.  Again, I can prove them to be fake."  (FTC 51487299, 12/12/13, Gulf Shores, AL)

(b)   In addition to the above, the Company knew but failed to disclose or specifically denied that it allowed known unreliable or fake reviews to remain prominent at the same time the Company tried to sell advertising space and services with a promise to suppress negative reviews or make them go away.   Yelp falsely stated that "businesses could pay to promote themselves," (¶43), but the truth was that in many instances unless local businesses purchased advertising, Yelp would often filter legitimate, authentic, first-hand reviews.  Similarly, Yelp would often permit fake reviews to remain prominent notwithstanding evidence that they were unreliable, not firsthand or authentic.   As reported by many local businesses when they declined to buy advertising, Yelp or its recommendation software or both concertedly caused reliable positive legitimate firsthand reviews to be either removed or filtered at a rate or pattern indicating that it was more than simple coincidence.

(c)   For the same reasons, Yelp's statements that reports of manipulating reviews in favor or advertisers were ***untrue*** (¶45), and that there was zero relationship between when a review is recommended and the purchase of or the decline to purchase advertising (¶46) were knowingly false and misleading.  Indeed, defendants failed to disclose the existence of and extent to

1  which their ability to sell advertising was premised on Yelp's refusal to filter fraudulent reviews and

2  unfilter authentic reviews.  As set forth below, examples of complaints made to the FTC (which

3  were not made public until on or around April 2, 2014), document these practices and demonstrate

4  the falsity of the alleged misrepresentations.  And as set forth below, in many instances, the removal

5  or filtering of good, apparently legitimate, reviews occurred within a day or two or three of local

6  businesses declining to pay for advertising:

7       (i)       "YELP solicited us to pay for one of their services.  We declined and ***the***

8                 ***next day***, 5 ***of our 5star reviews were eliminated*** . . . This is NOT

9                 coincidence.  This is extortion."  (FTC 51480011, 12/11/13, Cary, NC)

10      (ii)      "Yelp representative called me and asked if I wanted to advertise for $350

11                per month.  ***I declined and the next day all our positive reviews were***

12                ***removed***.  I called back and asked why my positive reviews were removed

13                and I was told to go to a page on their website that explains.  The page gave

14                no explanation I could understand but ***before hanging up the representative***

15                ***said that if I advertised there was a good chance the reviews would go back***

16                ***up***."  (FTC 45635762, 5/3/13, Tucson, AZ)

17      (iii)     "We have had numerous responses on our YELP account, probably right

18                about 8 or so.  Out of that 8, 2 were negative.  There was one positive that

19                was available on their website for approximately 3 days.  ***Coincidentally***, I

20                received a call from Yelp right about that third day inquiring about me doing

21                paid business with them.  I declined due to the previous deletions of our

22                compliments.  ***Sure enough, by chance the next day, that one positive***

23                ***remark was nowhere to be found***.  YELP has chosen to filter out all of the

24                other 6 positives and only keep the 2 horribly negative ones.  This is just

25                scandalous."  (FTC 42212221, 10/23/12, Tucson, AZ)

26      (iv)      "***i was asked to advertise on yelp- when i declined-the next day all my good***

27                ***reviews were filtered and all that was left was the one bad review***."  (FTC

28                47776722, 7/1/13, New York, NY)

1      (v)      "Yelp called me after a few months and tried to force me into paying for their

2      services.  I declined.  ***The next day all but one of my reviews were removed***

3      and YELP put a link on my page telling people to check out other similar

4      pages from people who had paid."  (FTC 26876671, 6/29/10, Los Angeles,

5      CA)

6      (vi)      "When I declined to pay, ***the very next day 100% of my 4 and 5 star Yelp***

7      ***reviews were filtered***."  (FTC 31092586, 5/12/11, San Francisco, CA)

8      (vii)      "I had a listing on yelp with many positive reviews, they asked me to

9      advertise and I said no because I couldn't afford it.  ***The next day, all my***

10      ***great reviews disappeared and now when ever there are good reviews they***

11      ***are taken down***."  (FTC 32295073, 8/2/11, Beverley Hills, CA)

12      (viii)      "we decided to not go with the Yelp advertising. . . .  At that time, we had

13      one 5* (good) and one 1* (bad) review on Yelp.com for an overall rating of

14      3*.  ***The next day or so***, our 5* review was now "filtered" and our rating

15      dropped to 1* [afterwards, all positive reviews were filtered]. . . .  So ***as of***

16      ***the date that we declined to advertise*** on Yelp.com to join their $350.00 a

17      month ($4,200year) ad program, they responded in spite by removing ALL

18      (7) positive reviews of our company."  (FTC 42275646, 12/13/12, Cumming,

19      GA)

20      (ix)      "I declined [to purchase advertising from Yelp] due to slow growth and I'm a

21      new business owner. . . .  ***Two days later*** i was shocked to see that my Good

22      Reviews were filtered."  (FTC 42398182, 10/31/12, Woodhaven, NY)

23      (x)      "They contacted me to sign up for their high priced advertising service ***and***

24      ***after refusing to do so it was only days later all of our positive reviews were***

25      ***removed*** except for the negatives."  (FTC 30624872, 11/9/10, Huntington

26      Beach, CA)

27      (xi)      "Yelp is filtering out good reviews and keeping the bad ones on the front

28      page ***unless we advertise with them*** at a rate of $300/month like an extortion.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST      - 27 -

1    *The more we refuse to advertise with Yelp, the more bad reviews, some*

2    *legitimate some not so, seem to appear on the front page*, and very good

3    legitimate reviews from our loyal customers get filtered out on a hidden page

4    almost the next day they appear on the front page." (FTC 48206548, 7/18/13,

5    San Rafael, CA)

6    (xii)    "After 6 months of putting off advertising with the company I finally told

7    them that I could not afford to advertise with them.  *3 days later all of my*

8    *reviews were 'filtered'* . . . ."  (FTC 33265609, 9/8/11, Austin, TX);

9    (xiii)    "We declined their initial offer [to advertise].  **Three days later** all of our

10    good reviews were filtered out."  (FTC 36523957, 3/6/12, Dallas, TX)

11    (xiv)    "offering me to advertise on Yelp.com for about $300 per week, which I of

12    course refused.  *A couple of days later Yelp.com removed 42 of my*

13    *companies' reviews!!! Leaving us with only bad reviews*."  (FTC 30626216,

14    1/20/11, Simi Valley, CA)

15    (xv)    "*A sales rep named Nikki contacted me asking me if I was interested in*

16    *paid advertising, I declined.  A few days later all of my customer reviews*

17    *were 'filtered' which meant none of my reviews were showing*" (FTC

18    50600411, 11/25/13, Olympia, WA)

19    (xvi)    "*[Yelp] wanted "$1,000.00/ month to advertise with them!* It was too

20    expensive for us and *as soon as I declined, my 5 star rating went down to 3*

21    *stars*.  They had filtered out the 5 star ratings and only left the bad reviews.

22    Since then I had been contacted numerous times with Yelp stating they could

23    bump the negative reviews down and bring the positive reviews up if I

24    advertise with them . . . again it was $1,0000/ month.  Again, no was my

25    answer.  And my star rating went down to 2 1/2. . . . we got a call the next

26    day from Yelp saying there was a lot of activity on our account and we need

27    to advertise with them and *they could bump up our 5 star reviews so people*

28    *could view them and they would bump down the lower ratings and hide*

1   *them*.   Again it was $1,0000/ month.   And again, I said it was too

2   expensive. . . .  ***Since then only the negative reviews have been posted for***

3   ***people to view and the 4 or and 5 stars have been filtered***."   (FTC

4   42666602, 11/20/12, Gardena, CA)

5   (xvii)   "All of our real reviews from our customers have been filtered and only fake,

6   negative reviews are under our account.  ***As soon as I agreed to advertise***

7   ***with Yelp, they released 3 positive reviews and filtered out the bad reviews.***

8   ***[But] When I [later] said I would no longer advertise with Yelp, the positive***

9   ***reviews were filtered out and the negative reviews were back online***.  I have

10   picture evidence with dates as the positive reviews were released and

11   negative reviews filtered, and then once I said I would never advertise with

12   Yelp, I have picture evidence on a daily basis of our positive reviews again

13   being filtered and our negative reviews released."  (FTC 51567318, 2/10/14,

14   East York, ON, Canada)

15   (xviii)   "I own several small business shops. Yelp is an online review site. They

16   initially contacted and asked if I wanted to advertise on their website. ***I***

17   ***respectfully declined***. They then ***immediately started filtering out all the***

18   ***positive reviews*** (each page has a ## FILTERED button) ***and leaving only***

19   ***negative reviews. This has happened to 3 of my 4 stores***."  (FTC 43283404,

20   1/29/13, Houston, TX)

21   (xix)   "Yelp has been pressuring me to advertise with them for almost a year now

22   for my business [redacted by FTC].  A new representative has just started

23   calling me as of 2/5/13, by the name of ***Bailey Dunn***.  After making it clear

24   that I don't want to pay to advertise with them, they have 'filtered' a majority

25   of my reviews. . . .  ***I simple don't want to be punished for not paying for***

26   ***advertising with Yelp by legitimate reviews being 'filtered'***".  (FTC

27   43861857, 2/14/13, Ashburn, VA)

28

1      (xx)      "We were contacted by Yelps sales associate, **Chase Bryant**, to buy their

2      enhance advertising. We refused to do so because we are new business and

3      we dont have the budget to do so . . . . ***After we turned it down, we started***

4      ***seeing all of our positive reviews got disappear and left only 2 negative***

5      ***reviews . . . just because we refused to pay for Yelps enhancing ad***. This has

6      been affecting our business greatly." (FTC 43940960, 2/23/13, Round Rock,

7      TX)

8      (xxi)      "***So the same [fake] review that was removed by Yelp when I was paying***

9      ***advertising has now become a valid review*** [now that the business owner did

10      not renew the advertising contract]! . . . ***How did I get a different decision in***

11      ***this case when the review is the same.  Aside the fact that I am not paying***

12      ***Yelp any more***, is there any other reason that could trigger this?"  (FTC

13      46137151, 6/22/13, San Francisco, CA)

14      (xxii)      "In January of this year, ***as I was nearing the end of my advertising contract***

15      ***with Yelp, Yelp filtered all of the positive reviews for my business.  I believe***

16      ***they did this in order to coerce me into renewing the contract with them***."

17      (FTC 45889533, 5/23/13, San Diego, CA)

18      (xxiii)      "***When I told them I could not afford the hundreds of dollars to advertise***

19      ***with them*** since I am a one person business.  After that ***yelp removed all of***

20      ***my positive reviews (14 of them) and left up only the one nasty review***."

21      (FTC 50646092, 11/25/13, Farmingville, NY)

22      (xxiv)      "Yelp is blackmailing me into advertising with them.  Since I have declined

23      our good reviews have been filtered and a handful of bad reviews remain. . . .

24      We had a 3.5 star average until I was contacted by a gentleman named Chris

25      that worked for Yelp.  Chris called almost every day for a few weeks.  He

26      explained to me about the benefits of advertising with Yelp!  ***I declined to***

27      ***buy advertising and since then all of our good and great reviews have been***

28      ***filtered out of their website and only the small number of bad reviews***

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                  - 30 -

1      *remain. . . .  We have over 45 reviews of our restaurant on Yelp! and only 5*

2      *are visible*. . . .  *Chris from Yelp explained to me that by giving his*

3      *seemingly transparent company money (about $399) every month we could*

4      *hide any bad reviews of our restaurant and bolster any good reviews*."

5      (FTC 47501265, 7/29/13, Dacula, GA)

6    (xxv)    "I opened up a restaurant recently and getting good reviews little by little, but

7      *Yelp is filtering all the good reviews while leaving all the bad reviews*.  My

8      customers come back to our restaurant saying their reviews are gone.  Yelp

9      does that to make us pay $350 per month for advertising.  *My sister has a*

10      *restaurant and she was a bit afraid of bad reviews so she paid $350 per*

11      *month and she has only 4 filtered reviews out of 500 and I have 9 out*

12      *of 20*."  (FTC 38427479, 4/30/12, New York, NY)

13    (xxvi)    "Within 1 or 2 days of that bad review going up, Yelp called me for the 1st

14      time from their sales office to try & sell me advertising.  When I told them I

15      could not afford it, they said '*We can make your rating increase & take*

16      *away that one star review for you, if you advertise with us*' . . . .  I've also

17      had many clients write a 5 star review for my business & Yelp insists on

18      keeping them 'Filtered' so that viewers can only see the 1 star review."  (FTC

19      48130435, 8/26/13, Phoenix, AZ)

20    (xxvii)    "In late December [2010], a Yelp advertising representative called me and

21      asked me to pay a monthly marketing fee.  When I declined to pay, *the very*

22      *next day 100% of my 4 and 5 star Yelp reviews were filtered*.  What started

23      happening after that, is that *3 fake 1 star reviews got posted to my*

24      *business*. . . . *I have 18 4 & 5 star reviews, mostly 5 star, and 100% of my 5*

25      *star reviews are filtered*."  (FTC 31092586, 5/12/11, San Francisco, CA)

26    (xxviii)    "Yelp filters out legitimate 5 star reviews while simultaneously leaving less

27      favorable reviews posted on our page.  We continually receive emails and

28      calls from yelp asking us to advertise on their site and the natural implication

1    is that if we advertise with them our reviews will stop being filtered." (FTC
2    42398213, 9/11/12, Brooklyn, NY)

3    (xxix)   "Yelp has been trying to extort money from me for 2 years now to advertise
4    on their site.  When I said no, and refused to pay for advertising on their site,
5    all of our 20+ positive reviews were filtered (with the exception of the Elite
6    Yelpers reviews, which Yelp cannot filter), leaving only the few 1,2,3 star
7    reviews.  *I tested them*. A sales person called me and asked if I would
8    advertise with them. I answered that all my positive reviews were filtered,
9    and I can't advertise if I only have 2.5 / 5 stars. I would need to wait to see
10   that my rating is 4 or 5 stars.  ***Within a couple of days, they started releasing***
11   ***our positive reviews and filtering the negative ones to give us 4 stars***.  A few
12   days after that the sales person called back and said 'see, you are at 4 stars
13   now, can we sign you up'.  I absolutely refused, and ***I told her about the test***
14   ***we did to show the extortion***.  She hung up the phone.  ***Within a week, all of***
15   ***our positive reviews were filtered again, leaving only any negative or low***
16   ***rating reviews***." (FTC 51673743, 2/21/14, Toronto, ON, Canada)

17   (xxx)   "I am a professional photographer and have been one since 2000. . . .  My
18   personal business earns about $10000. a year. During the recession things
19   have been very bad. In 2012 was a terrible year. I noticed a bad review on
20   Yelp along with 12 filtered positive reviews. I emailed and recieved a call
21   from ***Tamara Crabdree*** wherein she ***told me that if I would pay $200 to***
22   ***$3000 a month they would allow the good reviews***. I have lost two pieces of
23   business this year. Please help."  (FTC 43391354, 2/3/13, Folsom, CA)

24   (xxxi)   "I was contacted by Yelp to advertise.  I asked if I advertise will my positive
25   reviews show back up.  ***Adam said they would, but it would cost me $300 to***
26   ***start***."  (FTC 43707146, 2/18/13, Las Vegas, NV)

27   (xxxii)   "yelp wanted me to advertise my business, . . . I told them no [. Later 2 Elite
28   Yelpers gave bad reviews], and [Yelp] blocked out all my good reviews from

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 32 -

searchers. When i contacted them ***they told me i could fix it with advertising, all the bad would go away and the good float to the top***."  (FTC 43714881, 2/25/13, Sturgeon Bay, WI)

(xxxiii)   "This ridiculous company asked that we pay $500 for advertising on their website, and ***in exchange they would remove negative reviews from my page***. I refused to pay because it is a scam, and ***within 2 days all of my positive reviews were removed***." (FTC 43990187, 3/5/13, Oakbrook Terrace, IL)

(xxxiv)   "***Consumer did call Yelp and was told that in order for the good reviews to show up she needs to purchase their advertisment in the annual amount of $4,650***. Consumer states that she has lost alot of customers due to Yelps bad reviews.  [As transcribed or summarized by MALEJANDRA at FTC call center]." (FTC 50891439, 1/17/14, Belleview, WA)

(xxxv)   "Over 6 months ago we had one incident that gained us a negative review. Since then we have seen 8 positive reviews pop up on the site. yet Shortly afterwards these reviews disappeared only leaving the negative one. I inquired about this to Yelp and they said they have specific parameters that keep some thing up and just so happened that the negative one stayed. ***But they did say if I wished to purchase a package through them then the other reviews would come back on***. . . .  This conversation with their representative happened today. . . ." (FTC 51478120, 12/4/13, Jacksonville, FL)

50.    On November 19, 2013, *NBC News Los Angeles* published an article titled "Yelp Under Fire for Alleged Pandering to Advertisers."  The article discussed a lawsuit and specific small businesses that accused Yelp of manipulating customer reviews if those small business owners refused to spend money advertising on Yelp.  In this instance, Yelp reportedly promised to remove negative reviews in exchange for advertising dollars and fulfilled the promise.  When the dentist decided to cancel advertising, the negative reviews returned.

1          NBC4 spoke with a SoCal dentist, Gary Hollander, who said he could
attest to such practices.

2          "This is a forum for anybody to write in," said Hollander, who says
getting people into his dental practice got much tougher in the midst of the
recession when he started getting several negative reviews on Yelp.

3

4          "I wrote to Yelp figuring that they could knock it off," he said.
"Instead, I got an email back stating (that) they can't interfere with factual
disputes."

5

6          The tone quickly changed, according to Hollander and his wife Mary,
when a month later, Yelp called him back asking him if he wanted to buy an
advertisement.

7

8          "*My husband said 'I don't like the negative reviews, what will
happen with those if I pay the $350?' and they said 'no problem we can
remove these negative reviews,' and they did," said Mary Hollander.*

9

10         Gary Hollander claims he called Yelp back a few weeks later to
inform the company he decided not to advertise.

11

12         "My husband said to me 'the negative reviews are back,'" said Mary
Hollander.  "Since he didn't pay the $350.  That's extortion!"

13

14    51.   The same November 19, 2013, article described the account of a former Elite Yelper
(defined at ¶34) who corroborated complaints made by local business owners that Yelp would in fact
filter positive reviews of businesses that were on a list of those which the Company was seeking
advertising revenue.

15

16

17         "*If you wrote a positive review for a business that was on the list of business
they were trying to get to advertise they would filter the review*," explained [Lily]
Jeung] formerly an "elite" Yelper].  "If you were to write a negative review about a
business that was giving them a lot of money -- they would delete your account as
well."

18

19

20    52.   Throughout December 2013, Yelp's stock price continued to trade at artificially
inflated levels.

21

22    Virginia Court of Appeals Orders Yelp to Disclose the Identity of Yelpers Who Wrote Negative and
Potentially False Reviews

23

24    53.   On January 7, 2014, the Virginia Court of Appeals issued a ruling requiring Yelp to
disclose the identities of anonymous Yelp reviewers who had written negative reviews about Hadeed

25

26

27

28

Carpet Cleaning.[18]  On January 8, 2014, *The Washington Times* published an article titled "YELP critics must be identified, court rules in online landscape altering decision."  The article discussed the January 7, 2014, ruling from the Virginia Court of Appeals:

> In a decision that could reshape the rules for online consumer reviews, a Virginia court has ruled that the popular website Yelp must turn over the names of seven reviewers who anonymously criticized a prominent local carpet cleaning business.

> The case revolves around negative feedback against Virginia-based Hadeed Carpet Cleaning.  The owner, Joe Hadeed, said the users leaving bad reviews were not real customers of the cleaning service . . . .

> \*       \*       \*

> If "*the reviewer was never a customer of the business, then the review is not an opinion; instead, the review is based on a false statement*" . . . .

54.     On January 10, 2014, *The Atlantic* published another article about the Virginia appellate court decision titled "Court Rules That Yelp Must Unmask the Identities of Seven Anonymous Reviewers" and focused on the fact that the negative reviews appeared to be totally fabricated.

55.     After news of the Virginia appellate court ruling, the potential disclosure of the anonymous sources began to be more widely discussed, including speculation that the Company might be covertly engaged in the creation of negative reviews.  Following these revelations, the Company's stock price suffered significant volatility and material declines, falling from a close of $82.21 per share on Friday, January 10, 2014 to a close of $75.84 per share on Monday, January 13, 2014.[19]

56.     <u>False and Misleading Statement</u>: On February 5, 2014, the Company issued a press release announcing its fourth quarter and fiscal year 2013 financial results.  The Company announced fourth quarter and fiscal year 2013 revenue and earnings that materially beat Wall Street

---

[18]  *See Yelp, Inc. v. Hadeed Carpet Cleaning, Inc.*, 62 Va. App. 678 (2014), *rev'd and remanded*, *Yelp, Inc. v. Hadeed Carpet Cleaning, Inc.*, 770 S.E. 2d 440 (2015) (determining Virginia courts do not have subpoena jurisdiction over non-resident non-parties).

[19]  On January 14, 2014, the Company's stock price rebounded to close at $81.40.

1   analysts' expectations.  In addition, the Company increased the Company's fiscal 2014 financial

2   guidance:

### Revenue Growth in the Fourth Quarter Accelerates to 72%

4   . . . Yelp Inc., (NYSE: YELP), the company that connects consumers with
great local businesses, today announced financial results for the fourth quarter ended
5   December 31, 2013.

6   •   Net revenue was $70.7 million in the fourth quarter of 2013, reflecting
72% growth from the fourth quarter of 2012
7
*       *       *
8
•   Active local business accounts grew 69% year over year to
9   approximately 67 thousand

10   *       *       *

11   **Business Outlook**

12   As of today, Yelp is providing its outlook for the first quarter of 2014 and full
year 2014.
13
•   For the first quarter of 2014, net revenue is expected to be in the range
14   of $73.5 million to $74.5 million, representing growth of approximately 60%
compared to the first quarter of 2013. . . .
15
•   For the full year of 2014, net revenue is expected to be in the range of
16   $353 million to $358 million, representing growth of approximately 53% compared
to the full year of 2013.  Adjusted EBITDA is expected to be in the range of $54
17   million to $58 million.

18   57.   <u>False and Misleading Statement</u>:   On February 5, 2014, the Company held a

19   conference call for analysts and investors to discuss Yelp's 4Q13 and FY13 financial results.  The

20   call was hosted by Stoppelman, Krolik and Donaker.  During the call, after stating that "over time

21   our goal is to be the first place new local businesses turn for advertising," defendants repeated the

22   4Q13 and FY13 financial results and 2014 financial outlook reported earlier that day and stated the

23   following:

24   [Krolik]: With that thought fresh in our minds, let's turn to the guidance for
the first-quarter and full-year 2014.  For the first quarter we expect revenues in the
25   range of $73.5 million to $74.5 million.

26   We expect adjusted EBITDA for the first quarter to range between $8 million
and $9 million.
27
*       *       *
28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                      - 36 -

We expect full-year 2014 revenue to be in the range of $353 million to $358 million, or approximately 53% revenue growth over 2013. **For the full year, we expect adjusted EBITDA to range between $54 million and $58 million, a 90% increase over 2013**.

58.     Analysts and investors reacted positively to 4Q13 and FY13 financial results and continued to credit Yelp efforts to "Close the Loop" with local businesses to drive advertising revenue.  Barclays, for example, in a February 6, 2014, report "Yelp, Inc.: Five Star Growth for Paying Accounts," stated that increases in Yelp's active advertising accounts must be evidence that Yelp's "closing the loop" services were attracting local businesses to advertise:

> We continue to believe that YELP has the most compelling addressable market in our coverage and is well positioned to penetrate that market by showing merchants a more demonstrable ROI [return on investment] on their ad spend through its "closing the loop" products. . . .

> Paying account growth reflects progress from closing the loop: Yelp added 10,200 paying accounts in 4Q–an organic increase of 8,000 . . . .  Also encouraging, the growth rate for the oldest cohort of Yelp markets accelerated for the 2nd consecutive quarter to 62% from 57%, **evidence we believe of how products that "close the loop" between consumers and merchants are helping to convert customers to paying accounts at an accelerating pace**.

59.     And RBC Capital Markets, in a February 6, 2014 report "Roundup of Yelp Q4:13 EPS Results," agreed that Yelp's Local Advertising revenue was the most important part of the Company's business and key to the Company's financial future:

> Local Advertising revenue, Yelp's most important segment, grew 71% Y/Y to $58.1MM in Q4 (representing 82% of total revenue) . . . . **We continue to believe that Yelp's Local Ad revenue growth is a testament to their ability to continue to offer a compelling value for both consumers and advertisers**.[20]

> *        *        *

> Active Local Business Accounts, the main driver of Yelp's Local Ad Revenue, grew 69% Y/Y to 67,300 in Q4, accelerating from 61% growth in Q3.  We would note that Local Business Account growth benefitted from approximately 2,200 net adds . . . . (emphasis in original)

60.     After the Company's February 5, 2014, financial results and increased financial guidance, Yelp's share price continued to trade at artificially inflated prices including an increase to $89.46 per share on February 6, 2014, and $97.39 by February 27, 2014.

---

[20]   RBC would completely abandon its confidence in Yelp's local and revenue growth.  *See* ¶97.

1    61.   <u>Reasons Why Statements in ¶¶56-57 Were Knowingly False and Misleading</u>.  The

2  statements in ¶¶56-57 to the effect that the Company was increasing its first quarter 2014 and fiscal

3  2014 financial outlook were materially false and misleading and without reasonable basis to the

4  extent that defendants knew but failed to disclose such increase was based upon the Company's

5  knowing business practice of manipulating ("curating") local business reviews in order to compel

6  local businesses into buying advertising.  In light of the above facts, the representations concerning

7  the Company's current and future financial condition and future revenue and earnings prospects, and

8  the extent to which they were reliant upon undisclosed business practices, were materially false and

9  misleading, and did not have a reasonable basis.  In truth, defendants knew or deliberately

10  disregarded that Yelp's ability to generate revenue from advertisers was dependent upon the

11  undisclosed business practice of leveraging inauthentic reviews to compel businesses to purchase

12  Yelp's services as the price to suppress those inauthentic reviews.  *See* ¶¶49-51.

13    62.   <u>False and Misleading Statements</u>: On March 3, 2014, the Company filed its Form

14  10-K for the fiscal year ended December 31, 2013.  The Form 10-K was signed by defendants

15  Stoppelman, Krolik and Donaker and all of the Company's then directors.[21]   The Form 10-K

16  reiterated the fourth quarter and fiscal year 2013 financial results announced on February 5, 2014,

17  and repeated certain of the materially false statements alleged above at ¶43.  With respect to the

18  Company's business practices and online business reviews, the Company repeated the false

19  statements that (a) its contributors posted "firsthand" reviews of local business, (b) businesses could

20  also pay to promote themselves through targeted search advertising, and (c) boasted of the quality of

21  its reviews and the robust nature of the Company's recommendation software, which, according to

22  Yelp, was among the key contributors to the quality and authenticity of the reviews.

23    Yelp connects people with great local businesses.  Our users have contributed
   a total of approximately 52.8 million cumulative reviews of almost every type of
24   local business . . . .

25    *Contributors*. . . .  These contributors provide **rich, firsthand information
   about local businesses, such as reviews, tips, ratings and photos**.

26

27  _____
   [21]   Max Levchin (Chairman of the Board of Directors), Fred Anderson, Peter Fenton, Robert Gibbs,

28  Diane Irvine, Jeremy Levine and Mariam Naficy.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 38 -

1

\*     \*     \*

2

*Local Businesses. . . .* **Businesses can also pay for premium services to promote themselves through targeted search advertising, discounted offers and further enhancements to their business page**. . . .

3

4

\*     \*     \*

5

*Our Recommendation Software.* **In order to maintain and enhance the quality, authenticity and integrity of the reviews on our platform, we employ our proprietary automated recommendation software to analyze and screen all of our reviews**. Our recommendation software looks at a wide range of data associated with each review and reviewer in order **to determine the review's relevance and reliability**. Our recommendation software operates continually, and the results of its determinations with respect to particular reviews may change **over time as it factors in new information**. This can result in reviews that were previously recommended becoming not recommended and reviews that were previously not recommended being restored to recommended status. . . .   We believe **our recommendation technology is one of the key contributors to the quality, authenticity and integrity of the reviews on our platform and the success of our service**.

6

7

8

9

10

11

12

63.   <u>False and Misleading Statement</u>: As alleged in ¶46, throughout the Class Period, defendants also falsely stated and maintained that there was absolutely "no relationship" between the filtering of reviews published on the Yelp site and whether businesses purchased advertising from the Company.  Defendants also falsely claimed that there was zero relationship between the timing of recommendations and when a business decides to or declines advertising.  Yelp's website, for example, under Common Questions, stated (and continues to state):

13

14

15

16

17

**Do Yelp advertisers get preferential treatment?**

18

19

*No*. **Our recommendation software treats advertisers and non-advertisers exactly the same**. . . .

20

21

**Furthermore, there is zero relationship between the timing of when a review gets recommended and when a business decides to – or declines to – advertise** . . . .

22

23

**In short, there is no relationship between reviews and anything having to do with Yelp Ads or the Yelp Ads sales process.  Period**.

24

64.   <u>Reasons Why the Statements in ¶¶62-63 Were Knowingly False and Misleading</u>.  Each of the defendants' Class Period statements set forth above concerning the Company's current business and financial condition, specifically statements concerning: (i) the statement that "[t]hese contributors provide rich, firsthand information about local businesses" (¶62); (ii) businesses can pay to promote themselves through targeted advertising (¶62); (iii) our recommendation technology is

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                   - 39 -

1    one of the key contributors to the quality, authenticity and integrity of the reviews on our platform

2    and the success of our service (¶62); and (iv) the statement in (¶63) that there is zero relationship

3    between the timing of when a review gets recommended and when a business decides to – or

4    declines to – advertise, were each materially and knowingly false and misleading when made for all

5    of the reasons set forth in ¶¶49-51 and caused the Company's stock price to trade at artificially

6    inflated prices.

7        65.    In addition to the numerous complaints filed with the FTC demonstrating the falsity

8    of the representations alleged herein, additional reports from local business owners who brought

9    their complaints to Yelp's attention demonstrate the knowing falsity of the representations alleged

10   herein:

11       (a)    <u>Russel Kassman – R. Kassman Purveyor of Fine Pianos in Berkeley, CA</u>.

12   Russel Kassman is the owner of R. Kassman Purveyor of Fine Pianos in Berkeley, California.

13   Kassman reported he brought to Yelp's attention reviews posted by non-customers which Yelp

14   refused to address (in particular, a number of non-customers who left negative reviews claiming their

15   cars had been towed after parking in a space reserved for Kassman's customers).  Kassman also

16   reported that Yelp has been filtering authentic good reviews of his business.  According to Kassman,

17   Yelp has filtered most of the positive reviews of R. Kassman Purveyor of Fine Pianos since he

18   declined advertising and the remaining unfiltered reviews are currently mostly not positive.

19   Kassman reported that he has provided Yelp with numerous contracts of sale to prove that filtered

20   reviews were left by actual customers, but Yelp has refused to consider this evidence and make the

21   appropriate adjustments.  Instead, according to Kassman, the Yelp page for R. Kassman Purveyor of

22   Fine Pianos displays ads for his direct competitors.

23       (b)    Kassman also reported that one customer, Debbie Schwarzer, an attorney and

24   former partner at Wilson Sonsini Goodman & Rosati, posted a review of his business that was

25   filtered.  Subsequently, Ms. Schwarzer reported that she specifically contacted Yelp and provided a

26   bill of sale to prove she was real customer who had left a legitimate and truthful review based upon

27   her personal experience.  Yelp nevertheless filtered her review.  Ms. Schwarzer described her

28   experience having reviews filtered and attempting to contact Yelp, and later the Better Business

1  Bureau, in a letter she sent to the *San Francisco Chronicle*.  Ms. Schwarzer's letter outlined her

2  experience including the fact that she is a member of Yelp and her good review had been filtered

3  while other of her reviews (all for companies that had paid for advertising) were not filtered.

> Several years ago, Mr. Kassman assisted me in choosing a piano.  I was exceptionally pleased with the service and the instrument that I bought, and wrote a factually accurate review, which I posted to Yelp. Mr. Kassman told me that I should expect my review to be filtered quickly.  Since I am a member of Yelp, and Yelp has no reason to think that I am other than a bona fide reviewer (all of my previous sincere and factually accurate reviews of other businesses had been posted promptly and can still be found), I was puzzled why that would be.  He explained that *Yelp had approached him and "suggested" that he purchase advertising.  He said he had declined, and ever since, any positive reviews had been filtered within a day. True enough, mine disappeared quickly*. While truly hateful and vitriolic reviews are prominently displayed on the page relating to Mr. Kassman's business – reviews so bad that I have to wonder who was paid to write them, having my own personal experience with Mr. Kassman and his business – you can only see mine by going through all of the effort to look at filtered reviews.  There, you will find my review as well as a sizeable number of other positive reviews.  Some of the foul reviews encourage shoppers to go to competing businesses. *Not coincidentally, these shops do purchase advertising from Yelp*. . . .

13  　　　　　　　*　　*　　*

> Mr. Kassman and I have stayed in contact since that incident, and he has told me of a number of subsequent incidents of customers posting favorable reviews following genuine and positive experience with his business and then having the reviews disappear within 24 hours. *I'm not talking about some reviews, I'm talking about every single positive review written by local people with actual knowledge and no motive other than wishing to support a business that has provided good service. I can't imagine how this would happen unless there is a setting on Yelp's systems that directs the site to take all reviews over 1 or 2 stars and filter them.*

> I was astonished that this could happen to me. I'm an honest person, and what I wrote was sincerely felt. I opened a case with the BBB and asked, as a resolution of the matter, that my positive review and all other positive reviews be restored to the business's main page; they forwarded Yelp's response that "there was nothing they could do."  When I objected and insisted that they were perfectly capable of reviewing their filtering algorithm, and insisted that my original request be honored, I received the same reply back, and BBB closed the case.  I have worked with software programmers all of my professional life, and I frankly found it a little difficult to believe that Yelp could not find a way to adjust their review filter. As I stated above, I have to think in fact that they have deliberately adjusted their filter in Mr. Kassman's case. I would love to be able to do discovery on Yelp and see if my suspicions are true.

25  　　　　　　　*　　*　　*

> My only interest in this matter is fairness.  I have no financial arrangement of any kind with Mr. Kassman, no ongoing relationship other than continuing enjoyment of the beautiful piano he helped me choose. *But I hate it when the big*

*guy, in this case Yelp, can get away with behavior that by any measure is unethical and is clearly damaging, just because that person declined to pay money*.[22]

During the Class Period and Prior to Disclosure of Thousands of Business Complaints of Extortion-like Business Tactics, Insiders Unload More than One Million Shares of Yelp Stock for Proceeds of $81.5 Million

66.   Between November 4, 2013, and March 10, 2014, many of the Company's executive officers and directors, including the Company's CEO Stoppelman, CFO Krolik and COO Donaker, at the same time defendants issued false and misleading statements sold more than 1.1 million shares of their Yelp Class A common stock at artificially inflated prices as high as $98.18 per share for insider trading proceeds in excess of $8l.5 million.[23]   These Class A shares were the shares available to insiders for sale without substantially diluting their voting power.

| Name | Shares | Proceeds | Class A | Class A + B |
|------|--------|----------|---------|-------------|
| Geoffrey Donaker | 125,000 | $9,877,471 | 59.7% | 9.1% |
| Peter H. Fenton | 64,012 | $4,002,692 | 31.26% | 31.26% |
| Robert J. Krolik | 35,000 | $2,556,917 | 67.96% | 22.76% |
| Max R. Levchin | 281,584 | $18,187,095 | 100% | 5.6% |
| Jeremy S. Levine | 381,244 | $24,673,766 | 79.4% | 79.4% |
| Joseph R. Nachman | 122,830 | $11,775,649 | 80.2% | 63% |
| Jeremy Stoppelman | 132,350 | $8,493,479 | 50% | 2.1% |
| Laurence Wilson | 26,250 | $1,968,638 | 34.7% | 12.9% |
| TOTAL | 1,168,170 | $81,535,707 | | |

67.   The volume of shares sold by Yelp insiders including the Individual Defendants was not lost on the investing public.  On March 10, 2014, Seeking Alpha published a report titled "If Yelp's CEO Refuses to Own Any Shares, Why Should You?" noting that insiders had unloaded 41%

---

[22]   Plaintiffs spoke with Ms. Schwarzer and confirmed the report and the letter.

[23]   "***Class A common stock***. . . .  We have two classes of common stock outstanding: Class A common stock and Class B common stock.  The rights of the holders of Class A and Class B common stock are identical, except with respect to voting and conversion.  Except as otherwise expressly provided in our amended and restated certificate of incorporation or required by applicable law, the holders of Class A common stock and Class B common stock vote together as a single class on all matters submitted to a vote of stockholders.  However, the holders of Class A common stock are entitled to one vote per share while the holders of Class B common stock are entitled to 10 votes per share.  Each share of Class B common stock may be converted into one share of Class A common stock at any time at the election of the holder thereof, and will be automatically converted into one share of Class A common stock upon (i) the date specified by the affirmative vote of the holders of at least 66-2/3% of the outstanding shares of Class B common stock, or (ii) any transfer, subject to certain exceptions provided in our amended and restated certificate of incorporation."

of their shares in the prior four months and suggesting that management believed that the Company's stock price was overvalued:

> **Massive insider selling:**
>
> To the tune of *41% of insider shares in the last 4 months alone*.  The CEO, Jeremy Stoppleman, has exercised $15.25 million of stock options in the last year and *seems to own almost no shares*.  Instead, Mr. Stoppleman on a weekly basis seems to convert free stock options to the tune of about 15,000 shares and then sell them that day.
>
> The *rampant insider selling over the last 4 months* began at a stock price of $65.63.  This indicates that *management (who knows the workings of the company and its long term growth prospects the best) believes that* at a price 50% below today's price *the stock was blatantly overvalued*.

68.     Later, after the Class Period on June 6, 2014, another Seeking Alpha analyst published a report discussing the massive insider sales at Yelp in an article titled "Yelp, Inc.,: In A State Of Cognitive Dissonance."  Ex. 17.  The analyst was even more incredulous, highlighting that insiders had sold more than three times the revenue earned by the Company:

> Yelp insiders have sold $928 million worth of stock.  *This is unreal as only in America can you have an enterprise value of $4.3 billion and insiders have sold more absolute dollar value of stock than FY2013 revenue by a factor of three, yet retail investors are chasing this name*.

*Id.*

<u>The True Facts Begin to Be More Widely Disclosed, Including New Reports from Business Owners that the Company Buried Reviews After They Declined to Pay for Advertising – Causes Stock Price Decline</u>

69.     On March 31, 2014, the *Los Angeles Times* published an article titled "Yelp's practices sound to some like extortion."  Ex. 4.  The article discussed the Company's practice of offering customers a service to suppress negative reviews for a fee and compared the practice to extortion and detailed the experience of a jeweler who refused to advertise.  In addition, the article reported that Sollito acknowledged that though a Yelp representative may have indeed promised to make competitors ads disappear, the rep only meant that they could buy out the ad space.

> *A merchant is told by Yelp that for a fee, troubling ads on the site can be made to go away.  A Yelp spokesman says what was meant is that the merchant "could buy out the ad space on your own page*."
>
> Yelp just can't stop living the thug life.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                             - 43

Five years ago, I asked whether the popular review site was a shakedown racket for merchants.  I quoted a number of small-business owners who said Yelp had threatened to run negative reviews more prominently if they didn't pay for advertising.

Jeremy Stoppelman, Yelp's chief executive, told me at the time that the San Francisco company doesn't strong-arm merchants.  ***He blamed talk of shakedowns on disgruntled business owners spreading "false rumors*.**"

I guess this is another one of those.

Rick Fonger, 62, decided a few years ago to end a career in journalism and move from Canada to Alhambra, where he opened a jewelry store.

*            *            *

To give his shop, called 58 Facets Jewelry, a little social-media boost, Fonger spent about $300 a month advertising on Yelp.  "It worked OK, not great," he said.

After six months, he decided to shift his limited marketing budget to direct mail.  He canceled his Yelp ad in February.  ***The very next day, Fonger said, a Yelp employee called to say she wanted to help***.  She pointed out that competitors' ads were now appearing above the reviews for his store.  "***She said that for $75 a month, she could make those ads go away," Fonger recalled***.  ***He responded that this sounded a lot like extortion***.  "***She said she could understand why I'd think that," Fonger said***.  ***"But she said they do it to everyone***."

As if that makes it OK.  "***It certainly sounds like extortion***," said Kevin Dean, president of WSI Net Advantage, a Fremont, Calif., Internet marketing firm.

"If Yelp just sold the ad space to someone else, fine," he said.  "But to then call up and offer to make the ad go away for a price, that seems like an unscrupulous business practice."

*            *            *

***Yelp is a for-profit business itself, and it makes the bulk of its money from neighborhood merchants.  About 83% of the company's nearly $71 million in revenue in the most recent quarter came from local ads***.

This gives Yelp a powerful incentive to turn the screws on small businesses as much as it can.

Vince Sollitto, a Yelp spokesman, said that when the company's rep told Fonger that she could make competitors' ads go away for $75 a month, what she meant was that "you could buy out the ad space on your own page."

He said Yelp is doing the same thing that phone books do: selling ads that accompany related business listings.

***The difference, of course, is that the Yellow Pages never told businesses they could pay extra to get rid of someone else's ad***.

*            *            *

And maybe he believes that.  ***The reality, however, is that Yelp has created an online venue at which a merchant's competitors can post negative reviews and run their own ads***.

***Yelp then makes money by charging to downplay others' negative reviews and to keep rivals' ads away***.

*Id.*

70.     On March 31, 2014, Wells Fargo published a report that, while optimistic on Yelp because of various "digital trends" (*i.e.*, increased mobile use), noted that an increasing number of Yelp's potential customers were voicing their displeasure with Yelp.  Ex. 5.  Wells Fargo warned that although Yelp had consistently denied giving preferential treatment to advertisers, or perhaps because they had, Yelp's revenue growth would be "compromised" if local businesses concluded otherwise:

> •       **Veracity of user reviews remains a question**.  Yelp's review filtering algorithm remains a controversial topic among a portion of small business owners, who frequently take to the local press to vent claims that Yelp extends preferential treatment to small businesses that pay for advertising services.  ***Though the company consistently denies that sales considerations play any role whatsoever in the review recommendation and filtering process, if a growing number of SMBs come to this conclusion, we believe Yelp's advertising revenue growth could be compromised*.**[24]

71.     On April 2, 2014, *The Wall Street Journal* published an article titled "Yelp Regularly Gets Subpoenas About Users: FTC Says It Has Received 2,046 Complaints Since 2008."  Ex. 7.  The facts disclosed by *The Wall Street Journal*, *i.e.* the individual accounts recorded within the complaints, were overwhelmingly new and material.  The article disclosed that *The Wall Street Journal* had made a FOIA request to the FTC seeking records of complaints against Yelp.  The article noted that the FTC posted their response to the FTC website[25] and that Yelp's stock was down as a result:

---

[24]    The Wells Fargo report appropriately acknowledged that the "veracity of user reviews" remained a question.  However, Yelp has sought to reverse the narrative to question whether the corroborative nature of the complaints should be tested for veracity instead.

[25]    Letter from Dione J. Stearns to Angus Loten, dated March 18, 2014, *available at* http://www.ftc.gov/system/files/attachments/frequently-requested-records/yelp-foia-2014-00610.pdf (Note that although the letter responding to *The Wall Street Journal* FOIA request posted to the FTC's website is stamped March 18, 2014 it is unclear when the letter was actually posted.).

1

2

3

> On Wednesday, the Federal Trade Commission disclosed on its website that it received 2,046 complaints about Yelp from 2008 through March 4 of this year, noting that its disclosure was part of a Freedom of Information Act request from The Wall Street Journal.  *Yelp was down 6%, or $4.82, to $75.36 in Wednesday afternoon trading in the wake of the disclosure*.

4      72.     The 2,046 complaints disclosed by the FTC to *The Wall Street Journal* consisted of

5   substantially new information.  *1,344* of the complaints had not been previously disclosed. Ex. 6.

6   Further, the new complaints made evident both that the rate of complaints filed with the federal

7   agency had significantly accelerated and that the more complaints that were disclosed the more they

8   corroborated each other.  The growth and corroborative nature of the complaints demonstrated that

9   local businesses, the Company's primary source of revenue and future revenue growth, were

10  increasingly dissatisfied with Yelp and Yelp's apparent business model, including the repeatedly and

11  falsely denied manipulation of reviews and its relationship to the Company's advertising sales

12  processes.  This in turn threatened Yelp's business prospects and growth potential in precisely the

13  fashion warned of by Wells Fargo.  *See* ¶70.

14     73.     While Wells Fargo's March 31, 2014 report noted that these challenges and

15  complaints were not new to the Company, it emphasized that Yelp had repeatedly denied the

16  veracity of any such reports by local business owners.  *See* ¶¶45-46.[26] These (more than 1,000) new

17  complaints, recounting the personal experiences of thousands of business owners who directly

18  interacted with Yelp, gave truth to the misrepresentation that Yelp had been perpetuating and

19  continues to perpetuate that there is "zero relationship" between local businesses' decisions to

20  advertise and Yelp's filtering or unfiltering of their reviews. *See, e.g.*, ¶¶46-63.

21     74.     Further, the April 2, 2014 disclosure by *The Wall Street Journal* revealed not only the

22  numerous complaints but also the contents of the FTC complaints and the dramatic increase in the

23  rate at which such complaints were filed.[27] On or around September 11, 2012 the FTC reportedly

24

25  [26]   As late as March 31, 2014, defendants called them false rumors by disgruntled business owners.
¶69.

26  [27]   The letter from the FTC to *The Wall Street Journal* is stamped March 18, 2014, but the FTC
complaints were not actually released to *The Wall Street Journal* until sometime April 1, 2014, and

27  *The Wall Street Journal* did not disclose their availability on the FTC website to the public until
April 2, 2014.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                          - 46 -

1   disclosed 600-700 local business owner complaints from the previous five years which, if accurate,

2   averages at most 140 complaints about Yelp per year. The 2014 FTC letter to *The Wall Street*

3   *Journal* states that the search pursuant to that FOIA request covered the five year period ending

4   March 4, 2014. In the 578 days between August 3, 2012 and March 4, 2014, therefore, 1,344

5   complaints against Yelp were filed with the FTC, an increase of more than 600% in the rate of

6   complaints filed before August 3, 2012.[28]

7         75.    The complaints were clearly corroborative. The complainants, for example, did not

8   just generally identify a temporal proximity between their decision to advertise and Yelp's filtering

9   of reviews. In fact, many stated that the filtering happened ***immediately***. Business owners from

10   Tucson, AZ, New York, NY, Farmingville, NY, and Ontario, Canada, for example, all claimed that

11   after they declined advertising, the very "next day" or "as soon as" they declined advertising Yelp

12   filtered their positive reviews.

13/14
- "Yelp representative called me and asked if I wanted to advertise for $350 per month. ***I declined and the next day all our positive reviews were removed***." (FTC 45635762, 5/3/13, Tucson, AZ)

15/16
- ***"i was asked to advertise on yelp- when i declined-the next day all my good reviews were filtered and all that was left was the one bad review."*** (FTC 47776722, 7/1/13, New York, NY)

17/18
- "***When I told them I could not afford the hundreds of dollars to advertise with them*** since I am a one person business. After that ***yelp removed all of my positive reviews (14 of them) and left up only the one nasty review***."(FTC 50646092, 11/25/13, Farmingville, NY)

19/20/21/22
- "All of our real reviews from our customers have been filtered and only fake, negative reviews are under our account. ***As soon as I agreed to advertise with Yelp, they released 3 positive reviews and filtered out the bad reviews. [But] When I [later] said I would no longer advertise with Yelp, the positive reviews were filtered out and the negative reviews were back online***." (FTC 51567318, 2/10/14, East York, ON, Canada)

23   *See also* ¶49.

24         76.    After *The Wall Street Journal* disclosed the FTC complaints on April 2, 2104, a

25   number of analysts and investors reported that investors considered the disclosures – because they

26   implicated the authenticity and firsthand nature of reviews and Yelp's alleged practice of

---

[28]  Even when there were prior accusations disclosed in September, 2012 Yelp specifically denied and continues to deny that it manipulated reviews in exchange for advertising.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST         - 47 -

1   manipulating reviews to the detriment of non-advertisers – material and significant to investors.  The

2   investing public recognized not only the dramatic increase in complaints, but the undeniable

3   consistency and corroborative nature of the individual allegations recounted therein, strongly

4   suggesting that the accounts were true.

5         77.   Also on April 2, 2014, *TheStreet* published an article titled "Why Yelp (YELP) Stock

6   Is Falling Today," which discussed the impact the new information had on the Company's stock

7   price: "***Yelp (YELP) shares are down*** 6.6% to $74.93 on Wednesday ***after*** the Federal Trade

8   Commission reported that it received 2,046 complaints about the business review website dating

9   from 2008 to March 2014."  Ex. 8.

10         78.   On April 3, 2014, SunTrust Robinson Humphrey published a report titled "Yelp

11   Shares Drop On FTC Complaints Disclosure," describing the impact of the disclosure of the April 2,

12   2014, FTC complaints on Yelp's stock price: "Yelp shares were down nearly 6% yesterday (vs.

13   Nasdaq up 0.2%) on 1.5x normal volume. ***We attribute the underperformance to an FTC***

14   ***disclosure that it received 2,046 consumer complaints targeting Yelp over a 5-year period ending***

15   ***March 4, 2014***."  Ex. 9.

16         79.   Also on April 3, 2014, *MTNewswires* published an article titled "Yelp Falls to 2-

17   Month Low as FTC Complaints, Business Subpoenas Scrutinized," stating that: "Yelp Inc. (YELP)

18   ***sinks for a second session*** on Thursday ***as investors scrutinize a Federal Trade Commission***

19   ***disclosure this week that revealed 2,046 complaints*** about the review site from 2008 through March

20   of this year."  Ex. 11.

21         80.   On April 3, 2014, Nicole Petallides, a Fox Business Network correspondent,

22   explained during an edition of a Fox television show called "Money" (transcript appearing in 2014

23   CQ Roll Call, Finance Wire) that Yelp's stock was getting "hammered" because the revelations in

24   the FTC complaints were material to investors, even if only "some" of Yelp's reviews are fraudulent.

25           [Yelp] stock is getting hammered. It is down about seven percent right now.
But ***the problem is the big picture problem which is that you have small business***

26   ***owners now complaining month after month, year after year, since back to 2008,***
***saying that some of these complaints that people put on to yelp are fraudulent. And***

27   ***so this is problematic***. And this is a whole debate over free speech versus what's fair.
. . . So, ***this is not a problem that is ending today***, but certainly seems like something

28   that is plaguing some of the people who sign up with Yelp and use Yelp.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST            - 48 -

Ex. 12.

81.    On April 3, 2014, Yelp stock price declined from a close of $75.63 on April 2, 2014, to $70.61 on April 3, 2014, on more than 8 million shares trading volume as compared to only 5.4 million shares traded on April 2, 2014.

82.    Also on April 3, 2014, the *Los Angeles Times* published an article titled "Yelp's tactics feel 'nefarious' and 'fishy,' even if they're legal," (apparently written before FTC complaints were disclosed) laying bare the reality that Yelp's ability to generate revenue is predicated not on "connecting" businesses with customers, but on leveraging Yelp-created threats to sell advertising:

> Among the frequently asked questions on Yelp's website, there's this: "Will Yelp remove or reorder bad reviews if a business pays for sponsorship?"
>
> And the answer: "No.  You can't pay us to remove or reorder your bad reviews — it's just that simple."
>
> It's not that simple, at least if you listen to the many **small-business owners who say Yelp routinely uses bad reviews and competitors' ads as leverage to get merchants to cough up some cash**.
>
> "They continually harass you and strong-arm you to get you to pay for their service," said Randy Boelsems, 64, who runs a boating supply company in Fountain Valley.
>
> And **if you don't play ball, he said, it's likely that negative reviews about your company will be featured more prominently than positive ones**.
>
>         *      *      *
>
> A Yelp spokesman, Vince Sollitto, defended this practice by saying merchants are being offered the chance to buy out the ad space accompanying their reviews.
>
> **Looked at another way, though, it could be said that Yelp creates a problem for businesses and then offers to fix it – for a price**.
>
>         *      *      *
>
> I spoke with a number of small-business owners who related stories about **Yelp demanding payment to remove malicious reviews or being uncooperative in addressing false claims**.
>
> Chris Monks, 32, said he used to pay Yelp $300 a month to advertise his New Haven, Conn., moving company.  Then he switched to the $75-a-month plan, which at least kept competitors' ads off his listing.
>
> After he canceled that in January, Monks said, "**suddenly past negative reviews reappeared and all the good reviews disappeared**."

1
2
3

   I checked out the Yelp listing for his company, 2 Young Studs Moving. There were four recommended reviews – a five-star review from February, a one-star review from 2012, a two-star review from 2011 and a five-star review from 2009.  A mixed bag.

4
5

   However, if you click on Yelp's link to "reviews that are not currently recommended," you'll find some more negative reviews and then page after page of five-star reviews from recent years.  ***It's as if all the good reviews had been deliberately buried beneath the bad ones***.

6
7

   Yelp says it has no control over how reviews are played on the site.  It says automated software chooses which reviews to recommend and which ones to downplay, and "treats advertisers and non-advertisers exactly the same."

8
9

   I asked to speak once again with Sollitto, Yelp's vice president of corporate communications.  A senior PR manager, Kristen Whisenand, asked what I wanted to discuss and then emailed me a statement.

10
11

   "Not sure what's left to explore here," she said of allegations that Yelp is trying to extract money by running competitors' ads on businesses' listings. "Yelp disagrees and thinks it's a perfectly standard advertising practice."

12   Ex. 10.

13    83.  The stock continued its decline.  On April 4, 2014, *TheStreet* published an article

14 titled "Why Yelp (YELP) Stock Is Lower Today," reporting that Yelp's stock price was continuing

15 to plummet because of the disclosure of the FTC complaints that Yelp posted negative reviews after

16 the local businesses did not purchase advertising:

17
18

   Yelp Inc. is down -7.31% to $65.45 Friday, ***continuing a two day fall beginning on April 2***, when the Wall Street Journal reported that the Federal Trade Commission disclosed over 2,000 complaints against the business review website in response to a Freedom of Information Act request made by the Journal.

19
20

   ***The company is now facing a scandal*** alleging they posted only negative reviews for businesses that did not purchase advertisements on their site.

21   Ex. 14.

22    84.  On April 4, 2014, Zacks published a report titled "Yelp Drops on FTC Complaints,

23 Lawsuit" regarding the disclosure and its impact on the Company's stock price and specifically

24 attributing the decline to the disclosure of the volume of FTC complaints:

25
26

   Shares of Yelp Inc. (YELP) fell $5.02 (6.6%) to close at $70.61 on Apr 3, 2014, after the Federal Trade Commission said that it received an overwhelming number of complaints about the company's business review practices over the last five years.

27
28

   The FTC recently announced that it received more than 2,046 complaints against Yelp. ***According to The Wall Street Journal, most of the complaints were***

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST         - 50 -

> *lodged by small business owners alleging that Yelp posts fraudulent reviews that defame their reputation.*
>
> *Most of these business owners said that the negative reviews posted on the website appeared after they declined to pay Yelp for sponsorship.*

Ex. 13.

85.     On April 4, 2014, the Company's stock price declined from a close of $70.61 on April 3, 2014, to $65.76 on April 4, 2014 on more than 12 million shares shared as compared to 8.1 million shares traded on April 3.

86.     In sum, the widespread disclosures of official complaints, including the bases of the complaints with the FTC, caused the Company's stock price to suffer sharp declines, as between April 1, 2014, and April 4, 2014, Yelp's stock price dropped from a close of $80.18 per share on April 1, 2014, to a close of $65.76 per share on April 4, 2014.

<u>Defendants' False and Misleading Statements Alleged Herein and Facts Disclosed on April 2, 2014 Were Material to Investors</u>

87.     Defendants' false and misleading statements alleged herein at ¶¶41, 43, 45-46, 56-57, 62-63 were in fact material and admittedly important to the Company, its prospects for financial growth and thus investors considering whether to buy or sell Yelp stock. *Mattrix Initiatives, Inc. v. Siracusano*, _U.S._, 131 S. Ct. 1309, 1318 (2011).  The materiality of the alleged misrepresentations is evidenced by, among other things: (i) the fact that Yelp is a one-product company wherein largely anonymous reviews are its content, but advertising sales are its only product/service; (ii) the vast majority of its revenue, including over 83% of the Company's 4Q13 reported revenue, was driven by local business advertising; (iii) defendants' emphasis on the importance of the integrity, credibility and authenticity of Yelp's reviews and assurances that there was "no relationship" between reviews and advertising practices; (iv) the growing number of local business complaints of extortion-like business practices; (v) investors' and analysts' identification of the importance of the question of whether there was a relationship between review manipulation; (v) the sharp decline of Yelp's stock price following the April 2, 2014 disclosure of the FTC complaints and securities analysts' identification of the reason for the decline; and (vi) defendants' statements were factual statements intended to induce reliance.

1    (a)    <u>Yelp is a One-Product Company</u>.  During the Class period, the Company

2    monetized the content (reviews) on its site one way, by selling advertising services, primarily to

3    local (*i.e.* small- and medium-sized) businesses.  According to Yelp, "substantially all of [its]

4    revenue was generated by the ***sale of advertising products***" and "we rely heavily on advertising

5    spend by small and medium-sized local businesses."[29]  Yelp generated $192,983,000 in revenue

6    from local advertising in 2013, almost 83% of Yelp's total revenue for the year.  For example, one

7    analyst, Trefis, in a February 7, 2014 report stated that: "Local Advertising constitutes 77% of the

8    Trefis price estimate for Yelp's stock."  Or, as Jeff Reeves, editor of InvesoterPlace.com, put it in a

9    May 5, 2015 article an titled, "Yelp Stock Is Losing the War with Google and Facebook (YELP)":

10        [I]t's worth pointing out explicitly that Yelp is decidedly not a review company… ***it
         is a local advertising company***.

11
         Consider that in Q1 [2015], Yelp reported a total of $118.5 million in
12       revenue. Of that, $98.5 million or 83% came from local advertising accounts.
         (alteration and some emphasis in original)

13   Ex. 23.

14        (b)    <u>Yelp Emphasized Authenticity and Firsthand Nature of Reviews in Its SEC</u>

15   <u>Filings</u>.  Yelp's SEC filings and website falsely denied the truth of reports that they manipulated

16   reviews to the detriment of non-advertisers, but simultaneously admitted that the Company's

17   credibility surrounding this issue was material to investors whether or not they engaged in this

18   practice, saying:

19
         (i)    "The media has previously reported allegations that we manipulate our
20   reviews, rankings and ratings in favor of our advertisers and against non-advertisers.  ***These***

21   ***allegations, though untrue, could adversely affect our reputation and brand. . .***"[30]

22        (ii)    The Company emphasized that the credibility of the reviews was critical

23   to Yelp's business, and therefore investors:

24        Yelp Reviews. ***Yelp reviews are core to the Yelp experience and a key point***
25       ***of differentiation from competing services.***

26

27   [29]   FY13 Form 10-K at 13.

28   [30]   FY12 Form 10-K at 13.

\*          \*          \*

- **Trusted and Credible.  The credibility of Yelp reviews is a critical component of our value proposition and brand** . . . .[31]

(c)      Yelp Emphasized Credibility and Integrity of its Review Content to Investors at Analyst Conferences.  Defendants acknowledged that the credibility and integrity of the reviews on the Company's website was the entirety of the Company's value proposition:

> [M]aintaining trust and protecting the integrity of our content. And for us, really, that is Job 1, that we have to not just generate quality content, but maintain the integrity of that content.  Because **consumers rely on the content and they trust it.  And the minute they don't, the entire value proposition breaks down**.[32]

(d)      Yelp Website Assurances that There Was No Relationship Between Reviews and Advertising Demonstrates Materiality of the Alleged Misrepresentations.  The prominence with which defendants presented the issue and denial on the Company's website further demonstrates the significance of the issue to investors:

> **Do Yelp advertisers get preferential treatment?**
>
> **No.** Our recommendation software treats advertisers and non-advertisers **exactly the same**. . . .
>
> Furthermore, **there is zero relationship between the timing of when a review gets recommended and when a business decides to – or declines to – advertise** . . . .
>
> In short, **there is no relationship between reviews and anything having to do with Yelp Ads or the Yelp Ads sales process.  Period.**[33]

(e)      Securities Analysts Identify the Importance of the Credibility and Integrity of Reviews to the Company's Financial Condition.  Securities analysts reporting on the Company during the Class Period identified the materiality and significance of the Company's reviews and advertising sales practices, including that the Company was manipulating reviews in favor of advertisers.  *See, e.g.*, ¶¶99-108.  Specifically, on March 31, 2014, Wells Fargo published a report

---

[31]   Yelp's Form S-1 Registration Statement, filed with the SEC on November 17, 2011 and Yelp's Form 424(b)(4) Prospectus, filed with the SEC on March 2, 2012.

[32]   Vince Solitto, a Yelp Vice President, responding directly to a question about reviews from an analyst at the December 11, 2013 Cantor Fitzgerald Internet Conference.

[33]   *See* Common Questions Yelp for Business Owners, Yelp, https://biz.yelp.com/support/common_questions (last visited May 21, 2015).

that cautioned that an increasing number of Yelp's potential customers were voicing their displeasure with Yelp. Wells Fargo stated that "[v]eracity of user reviews remains a question" and cautioned investors that although Yelp had consistently denied that sales considerations played any role whatsoever in review recommendation and filtering reviews, any apparent growth of the number of claims from small business owners would affect revenue growth because they would have concluded otherwise, *i.e.*, that sales considerations did in fact play a role in the filtering of reviews:

- **Veracity of user reviews remains a question**. Yelp's review filtering algorithm remains a controversial topic among a portion of small business owners, who frequently take to the local press to vent claims that Yelp extends preferential treatment to small businesses that pay for advertising services. ***Though the company consistently denies that sales considerations play any role whatsoever in the review recommendation and filtering process, if a growing number of SMBs come to this conclusion, we believe Yelp's advertising revenue growth could be compromised***.

Ex. 5.

(f)    Defendants' Statements Were Not Puffery.  Yelp describes itself as a company that connects people with great local businesses. When defendants said that Yelp reviews were firsthand and authentic, they were not simply saying that Yelp had high quality reviews. Instead, defendants were making factual statements, promising local businesses that Yelp would connect them to real, paying customers.  As a California appeals court held, Yelp's statements that they protected the integrity and credibility of Yelp's content by employing filtering software were statements of fact, not puffery, that induced reliance; in other words, material:

*Yelp's statements are factual because they are intended to induce consumer reliance on Yelp's reviews by making specific and detailed statements intended to induce reliance*, such as: the filter "give[s]" consumers the "most trusted" reviews, and Yelp's engineers (a word inspiring confidence) are working to provide the "most unbiased and accurate" information available.  Although in making these statements, Yelp may use words of emphasis ("remarkable filtering process," "most trustworthy," "most established sources"), Yelp's specific representations about the accuracy of its review filter go beyond mere expressions of opinion or puffery and hyperbole; rather Yelp speaks with the authority of a Web site that intends to attract users with the accuracy of its filter.

*If Yelp intended the statements as puffery or opinion, in the context of Yelp's advertising-driven Web site such statements would have limited utility; thus Yelp would have had no legitimate purpose in making those statements about its review filter.*

*      *      *

1
2

[Local] businesses would not be advertising on Yelp without the potential benefit they could obtain from users' reviews and *without assurances that potential patrons of their business establishments would be reading only reliable reviews*.

3

*Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294, 311-12 (2014).

4

88.    <u>Sharp Decline in Yelp Stock Price upon April 2, 2014 Disclosures and Event Study

5

Establishes Materiality of the New Information</u>. As alleged herein, during the Class Period,

6

defendants issued false statements and falsely denied various accusations that the Company was

7

manipulating reviews, rankings and ratings in favor of its advertisers, to the detriment of non-

8

advertisers.  These misrepresentations and false denials were generally believed by investors, and, as

9

a result, caused Yelp's common stock to trade at artificially inflated prices during the Class Period.

10

89.    The April 2, 2014 *The Wall Street Journal* article focusing on the numerous FTC

11

complaints against Yelp exposed defendants' manipulation.  It was the only negative Yelp specific

12

news reported on April 2.  Consequently, whether this new information was material, *i.e.*, whether it

13

materially changed the public mix of information, can be objectively determined using an event

14

study.  An event study is a regression analysis measuring the effect of a specified event on a

15

company's stock price, and is commonly used to assess claims of materiality and loss causation in

16

securities class actions.  *See* Madge S. Thorsen, Richard A. Kaplan & Scott Hakala, *Rediscovering

17

the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 99 (2006).  Ex. 1.  The event study first

18

determines the historical relationship between Yelp's stock price and: (a) the market index (NYSE

19

Composite); and (b) the industry index (equally weighted peer group: HomeAway, Inc., Angie's

20

List, Inc., Groupon, Inc., OpenTable, Inc., Trulia, Inc., and Zillow Group, Inc.) during the one year

21

period prior to the event (April 3, 2013-April 1, 2014).[34]  Second, the event study compares Yelp's

22

actual stock price decline on April 2, 2014 (-5.67%) to its predicted return based on its historical

23

relationship with the market and industry index (+1.36%), with the difference being the abnormal

24

return (-7.04%, or Yelp's price decline net of market and industry factors).[35]  The statistical

25

probability of a price decline of 7% or greater is then calculated using the t-statistic (-1.96), which in

26
27

[34]    Plaintiffs have engaged a Certified Financial Analyst to employ an event study to evaluate the April 2, 2014 event, *The Wall Street Journal*'s disclosure of the FTC complaints.

28

[35]    The abnormal return is off by 0.01% due to rounding.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                          - 55 -

this case results in a p-value of 2.5%.  In other words, there was only a 2.5% probability of a 7% decline (or greater) occurring randomly.  Because the probability is less than 5%, the stock price decline is said to be statistically significant at the 5% level (the most commonly used benchmark to determine statistical significance).  In other words, Yelp's April 2, 2014 stock price decline was statistically significant and thus most likely caused by the information regarding the FTC complaints in the *The Wall Street Journal* article published on April 2, 2014.[36]

**April 2, 2014 Event Analysis**

| Date | Company | Market Index (1) | Peer Group Index (2) | Predicted Return (3) | Abnormal Return | t-statistic | p-value (4) |
|------|---------|------------------|----------------------|----------------------|-----------------|-------------|-------------|
| 4/2/2014 | -5.67% | 0.33% | 0.81% | 1.36% | -7.04% | (1.96) | 2.5% |

(1) NYSE Composite index used as a proxy for the overall market factors.
(2) Janney Peer Group used as proxy for industry factors (11/14/2013 Janney Analyst Report, p.23).
(3) Based on regression using the one-year period prior to 4/2/2014 as the control period.
(4) One-tailed p-value of 2.5% means that the price decline was statistically significant at the commonly used 5% level.

90.     As detailed in ¶71, on April 2, 2014 the breadth of Yelp's continuing manipulation was exposed by *The Wall Street Journal* in an article reviewing numerous FTC complaints against the Company.  These FTC complaints demonstrated that Yelp was engaged in a systematic manipulation of their reviews, undermining their reliability and pressuring local business owners who were not customers, but instead **non-customers**, to become paying Yelp clients.  *The Wall Street Journal* article revealed to the market the scope and magnitude of the Company's practices, previously denied by the Company, and, as a result, its stock price quickly declined.  In fact, following *The Wall Street Journal* article, Yelp's stock price declined 5.7%, compared to an increase in both the market and industry indices.

91.     Furthermore, as discussed in ¶¶99-108, analysts and market commentators linked the large price decline in Yelp's stock price to the new information contained in *The Wall Street Journal* article.  There is simply no other explanation for Yelp's statistically significant stock price decline on April 2, 2014.  Importantly, this statistically significant price decline is uncontroverted evidence that the market viewed the information disclosed in *The Wall Street Journal* article to be new and material.

---

[36]  *See* Ex. 25 for entire regression output.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 56 -

Post Class Period Publications Corroborate the Negative Impact of the April Disclosures on the
Company's Stock Price – Financial Condition and Outlook.

92.     On April 8, 2014, SunTrust Robinson Humphrey published a report titled "Upgrading

to Buy, $85 Target Investors Getting Another Shot At Quality Growth Story." Ex. 15.  The report

characterized the weakness in Yelp's share price, specifically attributing the price decline to the

April 2, 2014 disclosure of the FTC complaints and noting that many of the complaints were that

negative reviews appeared more prominently after local businesses declined to buy advertising:

> ***Investors Getting Another Shot At Quality Growth Story***.  Yelp stock is
> down 33% in the past month, the worst performer in our basket of 20 mid and large
> cap internet peers.  Most of the weakness is explained by the broader market
> correction, punishing high growth, high multiple, top performers like Yelp.  ***We
> believe there are also two company specific issues contributing (at the margin) to
> relative underperformance in the past month: 1) recent negative headlines,
> regarding FTC complaints and a somewhat related VA Supreme Court case***; and
> 2) weak international traffic data.  On the first item, we see little if any impact to the
> business/financials and offer a thorough walk-through in this report. . . .

> \*          \*          \*

> ***The issue of the FTC complaints***.  As we discussed in our note on Thursday
> (LINK), ***it was recently brought to light, by way of the WSJ, that the FTC received
> 2,046 complaints targeted at Yelp for the five years ended March 2014***. . . .  Where
> it gets more interesting is that the ***FTC records, according to the WSJ, show that a
> significant number of the complaints indicated that the negative reviews picked up
> after the local business had declined to advertise with Yelp.  Essentially the
> insinuation here is that Yelp attempted to strong arm these local businesses
> (through negative reviews) that had opted not to advertise with Yelp***.

> \*          \*          \*

> As it relates to strong-arming tactics, our best sense is that 1) ***there could be
> some isolated cases where this may have happened, i.e. a young Yelp salesperson
> acting out of line***; 2) there is likely some coincident cases; and 3) there are probably
> many of these cases where local businesses are complaining over what are negative
> but probably fair and legitimate based on the reviewers experience.  We are very
> suspect of any notion that this issue goes any deeper or Yelp's businesses practices
> are somehow corrupt.  We are of course watchful and mindful.

*Id.*

93.     On April 16, 2014, the *Star Tribune* published an article titled "Yelp fosters suspicion

among small businesses," documenting the experience of Lymarie Jimenez, who opened her own

business, Sugar Love Bakery of Woodbury, MN, in January 2014.  Ex. 16.  As the *Star Tribune*

explained, Jimenez experienced the same problems with Yelp that other business owners have

1    described in complaints to the FTC and elsewhere, including the suspicious timing of when and

2    which reviews were filtered:

3         Lymarie Jimenez opened Sugar Love Bakery in Woodbury in January, and so
         far she's doing well. . . .

4

5         She even caught a break by having the space next door leased by a bridal
         shop, a great neighbor for someone in the wedding cake business.

6         Now, if she could only keep Yelp from ruining her life.

7         What, isn't Yelp a harmless and helpful crowd sourced consumer review site?
         Not to Jimenez, who believes that nearly 20 positive reviews of her business were
8         suppressed by Yelp, while two negative reviews are prominently displayed as
         "recommended."

9         ***To her the only logical explanation is retribution for her declining to
10        advertise with Yelp***.

11        ***Her experience is far from an isolated case***. ***Yelp denies that it does this
         sort of thing, but it has been the subject of frequent complaints to regulators and a
12        number of lawsuits***.

13                    *        *        *

14        Within weeks of opening she got a call from Yelp, an advertising pitch from a
         call center in Arizona.

15                    *        *        *

16        ***Jimenez turned Yelp down***.

17        ***Within a couple of days a one-star review showed up, she said, the first
         review by that poster***.  ***That means he opened a Yelp account just to write
18        something bad about her bakery***.

19        She didn't think much of it, as some great reviews were showing up, too.
20        ***Over the next few days, however, all of the positive reviews left the site***.  ***The
         negative review stayed***.

21        As Jimenez was telling her story this week, there were four recommended
22        reviews on the Sugar Love page.  Two were from so-called "elites," a kind of Yelp
         super reviewer.  One was for three stars and the other was for five stars, the highest
23        rating.

24        There were also two one-star reviews.  One called the staff "extremely rude
         and immature," and the other didn't have anything specific to say other than that he
25        was disappointed.  ***Both were the only such reviews either one had ever posted***.

26        For a more complete view of what customers really think, here's a tip: Click
         on the link at the bottom of the page for reviews that aren't "recommended" by Yelp.
27        ***There one finds just one one-star review of the bakery – and 18 four- or five-star
         reviews***.

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                   - 58 -

**How are reviews filtered?**

These reviews had been "filtered" by Yelp.  The filter is a black box, an algorithm, created by Yelp to block reviews that seem fake.  Part of the reason business owners don't trust Yelp is that it's never said much about what happens inside its black box.

*Some of the 19 blocked reviews on Sugar Love were by people who had made no other reviews.  Jimenez said she can understand the algorithm deciding these were not real.  But why continue to recommend the two one-star reviews, also by first-time contributors?  What made them seem more real*?

There's no phone number to call, she said, so she said she just dialed extensions in the call center until someone picked up his phone.  She got that person to agree that her review history seemed odd.  *But he wasn't going to do anything about it*.

"They kept saying, 'It's not us, it's the software,'" she said.  "If it's their software, then fix it."

Her aggravation with Yelp isn't confined to the curious placement of reviews.  She didn't really appreciate feeling pressure to advertise on the Yelp page featuring her business in order to keep her competition from advertising there.

She didn't create this page for her business or ask for it, but she needed to spend $300 a month to keep a competitor from advertising there?

That sounded kind of thuggish.

On the other hand, it's more or less how publishers of the Yellow Pages made their money for years.

The ads now there are for a row of businesses at the bottom under the heading "Best of Yelp Woodbury – Bakeries."  *The only thing notable here is that none is actually in Woodbury.*

*Id*.

94.     On June 6, 2014, Seeking Alpha published a report titled "Yelp, Inc.: In A State Of Cognitive Dissonance."   The report examined the gulf between Yelp's stated ability to grow revenues by "closing the loop" and the Company's actual, hostile, relationship with its customer base, in particular in light of the disclosure of the FTC complaints:

Yelp's steadfast protection of its users' anonymity has led to a ground swell of negative business sentiments towards Yelp from some business owners. *In fact, a small group of business owners have become so incensed with Yelp they leveled allegations that positive user reviews suddenly disappeared soon after they refused to embark on a Yelp advertising campaign.  Perhaps more alarmingly, some vocal business owners claim that strong negative reviews appeared on Yelp and with no way of verifying them.*  This explains why Yelp only has 73,600 paying business customers, despite its 132 million unique monthly users and its 57 million cumulative reviews posted to its sites since inception. *Moreover, the Federal Trade*

1
2
3
4

*Commission (FTC) is actively investigating the 2,045 complaints leveled against Yelp from businesses during the time period of 2008 and 2014. I'm at a loss for words as to how any investor can feel comfortable owning this stock at this valuation when FTC is investigating its aggressive business tactics.* Negative findings could permanently impair Yelp reputation and credibility with would be paying local business owners.

5
6

Also, according to the SEC filings, *Yelp insiders have sold $928 million worth of stock. This is unreal as only in America can you have an enterprise value of $4.3 billion and insiders have sold more absolute dollar value of stock than FY2013* revenue by a factor of three, yet retail investors are chasing this name.

7

Ex. 17.

8    95.    On July 21, 2014, Seeking Alpha published a report titled "Yelped Investors Will

9    Soon be Calling for Help." The report discussed certain of the risks to the Company's business

10   model as follows:

11

Businesses Deterred

12
13

The number of businesses that believe the enhanced pages or ads are worth the cost is quite minimal compared to the overall number of businesses registered. On the entire platform, Yelp has 1.6 million businesses, but only 73,600 are active business accounts which represents roughly 4.6% of the total.

14
15
16

Many businesses may be deterred from entering the platform as the policy of saving user anonymity makes user reviews unverifiable. A situation may arise where competing businesses write negative reviews for each other which will not be able to be removed. Maybe this is to blame for the miniscule percentage of paying businesses.

17
18
19

Moreover, Yelp has a 1-9-90 business model in which 1% of users are dedicated reviewers, 9% are occasional reviewers and 90% only read the reviews. With such a high dependence on a concentrated segment of reviewers, a policy change removing anonymity could significantly reduce the number of reviews. Yelp is certainly in a catch-22.

20
21
22

Further, *the Federal Trade Commission (FTC) is actively investigating 2,045 complaints leveled against Yelp from 2008 to 2014. The integrity of the platform is certainly in question and if continued negative sentiment mounts, Yelp will face an incredibly difficult situation where businesses will flock from it.*

23

Ex. 18.

24   96.    By the time Yelp announced it 1Q15 earnings and 2Q15 guidance on April 30, 2015,

25   it was clear to investors that weaknesses in Yelp's local advertising revenue were not temporary or

26   one-time problems, but disappointing trends that had persisted since the disclosure of the FTC

27   complaints on April 2, 2014.

28

97.     RBC Capital Market, for example, in an April 30, 2015 report titled "Y(H)elp! Downgrading To Sector Perform On Very Negative Q1 Results" explained that "The key Local Ad segment came in light, with Yelp citing a temporary salesforce issue. H[o]w[ever], the Q2 Guide doesn't imply a temporary problem, suggesting competitive challenges or Tough T[otal]A[ddressable]M[arket] factors or both." Ex. 21.  As Mark Mahaney, an analyst at RBC Capital Markets, put it to defendants during the 1Q15 earnings call:

> The guidance in terms of revenue growth for the balance of the year requires revenue growth that kind of stabilized and yet *you've seen pretty consistent deceleration not only in revenue growth but local ad revenue* and some of the key metrics. What makes you think growth will stabilize?… What is it that gives you that confidence?

98.     And the next day, Forbes, in a May 1, 2015 article titled, "What's Yelp's Problem? Its Business Model," explained that Yelp's business model was failing because it relied on a revenue base that it had alienated and raised the credibility of reviews on the Company's site:

> What's the weakness in Yelp's model?
>
> The way the company monetizes its platform—in particular, reliance on companies that are graded rather than on consumers for its revenues.
>
> That raises serious questions about the credibility of [Yelp's reviews], as evidenced by complaints against the Company filed with the San Francisco Better Business Bureau.
>
> "Complaints concern, among other things, business owners who are concerned that their positive reviews are being filtered and negative reviews are remaining, potentially giving consumers a skewed view of their business.  Some complaints also concern business owners alleging that there are false or inaccurate reviews on their Yelp listing that Yelp will not remove, though the business owner has provided proof or substantiation that the review is false or inaccurate."

Ex. 22.

## LOSS CAUSATION/ECONOMIC LOSS

99.     Plaintiffs incorporate ¶¶71-98 above including the event study analysis, and allege that during the Class Period, defendants materially misrepresented Yelp's true financial condition by issuing false statements concerning the quality and authenticity of the reviews appearing on the Company's website, falsely stating that there was zero relationship between the purchase of advertising and when reviews were recommended or filtered, the efficacy of the Company's review filtering software and the Company's reliance on undisclosed business practices to meet financial

1   guidance.  *See* ¶¶41, 43, 45-46, 56-57, 62-63.  In truth, defendants knew and/or deliberately

2   disregarded that the review content on the Company's website was plagued by inauthentic reviews,

3   that the Company often retaliated against businesses who refused to buy advertising and often used

4   those inauthentic reviews as leverage to compel local businesses to purchase advertising packages,

5   and that the Company's financial prospects depended in part on revenue from such practices.  *See*

6   ¶¶49-51, 61, 64.

7       100.    Defendants' false and misleading statements had their intended effect and caused

8   Yelp stock to trade at artificially inflated prices throughout the Class Period and to reach a Class

9   Period high of $101.75 per share on March 5, 2014.

10      101.    On April 2, 2014, the true state of the Company's operations began to be widely

11  reported, including the breadth and apparent corroborative nature of local business owner complaints

12  filed with the FTC.  ¶¶71-77.  This disclosure and follow on disclosures caused Yelp's stock price to

13  decline as the prior artificial inflation came out of Yelp's stock price and investors absorbed the

14  significance of the new information and its relationship to the alleged misrepresentations.

15      102.    More specifically, on April 2, 2014, new facts concerning the volume and the

16  apparent corroborative nature of business owner complaints of Yelp's extortion-like tactics and thus

17  Yelp's operations and financial condition began to be widely reported to the market when *The Wall*

18  *Street Journal* published the results of an FOIA request served on the FTC.  The April 2, 2014 *The*

19  *Wall Street Journal* article revealed not only the fact that over 2,000 complaints had been filed with

20  the FTC concerning Yelp's business practices, but also indicated that the content of the complaints,

21  made available on the FTC's website, provided a broad based view into complaints that Yelp

22  manipulated the appearance and prominence or presentation of reviews to compel local businesses to

23  purchase advertising.  *See* ¶¶71-75, Ex. 7.

24      103.    The April 2, 2014, disclosures consisted of new information which was directly

25  related to and sharply inconsistent with defendants' prior misrepresentations, including false denials

26  of such conduct.  Indeed, the disclosures revealed that the Company's future revenue prospects,

27  which apparently relied in part on such business practices, were at much greater risk than previously

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 62 -

1   indicated.  As a result, the Company's stock price declined from a close of $80.18 on April 1, 2014,

2   to a close of $75.63 on April 2, 2014, on substantially increased volume.  *See* ¶81.

3        104.    Investment analysts indeed attributed the stock price decline on April 2, 2014, and

4   following days' decline to this new information.  For example, on Wednesday April 2, 2014,

5   *TheStreet* published an article titled "Why Yelp (YELP) Stock Is Falling Today," which discussed

6   the impact the new information had on the Company's stock price: "Yelp (YELP) shares are down

7   6.6% to $74.93 on Wednesday after the Federal Trade Commission reported that it received 2,046

8   complaints about the business review website dating from 2008 to March 2014," and speculated that

9   they were related to prior extortion claims: "[I]n the past local businesses have accused Yelp of

10  hurting their ratings by posting only negative reviews about their businesses after they refused to buy

11  ads."  Ex. 8.

12       105.    On Thursday, April 3, 2014, more analysts and other market watchers continued to

13  digest and report on the April 2, 2014, disclosure and discuss potential implications of the over 2,000

14  FTC complaints.  On April 3, 2014, SunTrust Robinson Humphrey published a report titled "Yelp

15  Shares Drop On FTC Complaints Disclosure," stating that "Yelp shares were down nearly 6%

16  yesterday (vs. Nasdaq up 0.2%) on 1.5x normal volume.  We attribute the underperformance to an

17  FTC disclosure that it received 2,046 consumer complaints targeting Yelp over a 5-year period

18  ending March 4, 2014."  Ex. 9.  On the same day, *MTNewswires* published an article titled "Yelp

19  Falls to 2-Month Low as FTC Complaints, Business Subpoenas Scrutinized," stating that: "Yelp Inc.

20  (YELP) *sinks for a second session* on Thursday *as investors scrutinize* a Federal Trade Commission

21  disclosure this week that revealed 2,046 complaints about the review site from 2008 through March

22  of this year."  Ex. 11.

23       106.    Similarly, Nicole Petallides, a Fox Business Network correspondent, explained during

24  an April 3, 2014, edition of a Fox television show called "Money" (transcript appearing in 2014 CQ

25  Roll Call, Finance Wire) that investors were concerned about these new disclosures of complaints

26  going back to 2008 and the effect the conduct was having on people signing up with Yelp.  She

27  noted that the stock was getting "hammered" because of this news:

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 63 -

[Yelp] stock is getting hammered. It is down about seven percent right now. But *the problem is the big picture problem which is that you have small business owners now complaining month after month, year after year, since back to 2008, saying that some of these complaints that people put on to yelp are fraudulent. And so this is problematic*. And this is a whole debate over free speech versus what's fair. . . . So, *this is not a problem that is ending today*, but certainly seems like something that is plaguing some of the people who sign up with Yelp and use Yelp.

Ex. 12.

107.   On April 3, 2014, the stock price declined more than $5.00 per share to $70.61 per share on trading volume of over 8.1 million shares.  ¶81.

108.   On Friday, April 4, 2014, *TheStreet* published an article titled "Why Yelp (YELP) Stock Is Lower Today," reporting that Yelp's stock price was *continuing* to plummet because disclosure of the FTC complaints had created a continuing "scandal":

Yelp Inc. is down -7.31% to $65.45 Friday, *continuing a two day fall beginning on April 2*, when the Wall Street Journal reported that the Federal Trade Commission disclosed over 2,000 complaints against the business review website in response to a Freedom of Information Act request made by the Journal.

*The company is now facing a scandal* alleging they posted only negative reviews for businesses that did not purchase advertisements on their site.

Ex. 14.

109.   On April 4, 2014, the Company's stock price declined from a close of $70.61 on April 3, 2014, to $65.76 on April 4, 2014 on more than 12 million shares shared as compared to 8.1 million shares traded on April 3.

110.   Like other members of the class of purchasers of Yelp stock who purchased at artificially inflated prices during the Class Period, plaintiffs suffered an economic loss, *i.e.*, damages, when Yelp's stock prices declined upon the disclosures correcting the alleged misrepresentations.

111.   The timing and magnitude of Yelp's stock price decline negates any inference that the loss suffered by plaintiffs and other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the class,

1  was a direct result of defendants' fraudulent scheme and misrepresentations to artificially inflate

2  Yelp's stock price and the subsequent significant decline in the value of Yelp stock when the true

3  state of the Company's operations was revealed to the market correcting the misrepresentations.

**NO SAFE HARBOR**

4

5  112.    Yelp's verbal "Safe Harbor" warnings accompanying its oral forward-looking

6  statements ("FLS") issued during the Class Period were ineffective to shield those statements from

7  liability.

8  113.    The defendants are also liable for any false or misleading FLS pleaded because, at the

9  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

10 authorized and/or approved by an executive officer of Yelp who knew that the FLS was false.  None

11 of the historic or present tense statements made by defendants were assumptions underlying or

12 relating to any plan, projection or statement of future economic performance, as they were not stated

13 to be such assumptions underlying or relating to any projection or statement of future economic

14 performance when made, nor were any of the projections or forecasts made by defendants expressly

15 related to or stated to be dependent on those historic or present tense statements when made.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

16

17

18 114.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-

19 market doctrine in that, among other things:

20         (a)    Defendants made public misrepresentations or failed to disclose material facts

21 during the Class Period;

22         (b)    The omissions and misrepresentations were material;

23         (c)    The Company's stock traded in an efficient market;

24         (d)    The misrepresentations alleged would tend to induce a reasonable investor to

25 misjudge the value of the Company's stock; and

26         (e)    Plaintiffs and other members of the Class purchased Yelp common stock

27 between the time defendants misrepresented or failed to disclose material facts and the time the true

28 facts were disclosed, without knowledge of the misrepresented or omitted facts.

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 65 -

1   115.   At all relevant times, the market for Yelp's common stock was efficient for the

2   following reasons, among others:

3          (a)   As a regulated issuer, Yelp filed periodic public reports with the SEC; and

4          (b)   Yelp regularly communicated with public investors via established market

5   communication mechanisms, including through regular dissemination of press releases on the major

6   news wire services and through other wide-ranging public disclosures, such as communications with

7   the financial press, securities analysts and other similar reporting services.

8                          **CLASS ACTION ALLEGATIONS**

9   116.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

10  of Civil Procedure on behalf of all persons who purchased Yelp common stock during the Class

11  Period (the "Class").  Excluded from the Class are defendants and their families, and directors and

12  officers of Yelp and their families and affiliates.

13  117.   The members of the Class are so numerous that joinder of all members is

14  impracticable.  The disposition of their claims in a class action will provide substantial benefits to

15  the parties and the Court.  Yelp has more than 59 million shares of stock outstanding, owned by

16  hundreds if not thousands of persons.

17  118.   There is a well-defined community of interest in the questions of law and fact

18  involved in this case.  Questions of law and fact common to the members of the Class that

19  predominate over questions that may affect individual Class members include:

20          (a)   Whether the 1934 Act was violated by defendants;

21          (b)   Whether defendants omitted and/or misrepresented material facts;

22          (c)   Whether defendants' statements omitted material facts necessary in order to

23  make the statements made, in light of the circumstances under which they were made, not

24  misleading;

25          (d)   Whether defendants knew or recklessly disregarded that their statements were

26  false and misleading;

27          (e)   Whether the price of Yelp common stock was artificially inflated; and

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                              - 66 -

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

119.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

120.    Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

121.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

122.    Plaintiffs incorporate ¶¶1-121 by reference.

123.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

124.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Yelp common stock during the Class Period.

125.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Yelp common stock.  Plaintiffs and the Class would not have purchased Yelp common stock at the prices they paid, or at all, if they had been

1  aware that the market prices had been artificially and falsely inflated by defendants' misleading

2  statements.

3     126.   As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the

4  other members of the Class suffered damages in connection with their purchases of Yelp common

5  stock during the Class Period.

6                                **COUNT II**

7                      **For Violation of §20(a) of the 1934 Act**
                            **Against All Defendants**
8

9     127.   Plaintiffs incorporate ¶¶1-126 by reference.

      128.   The Individual Defendants acted as controlling persons of Yelp within the meaning of
10

11 §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about

12 Yelp, the Individual Defendants had the power and ability to control the actions of Yelp and its

13 employees.  Yelp controlled the Individual Defendants and its other officers and employees.  By

   reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.
14

15                            **PRAYER FOR RELIEF**

16    WHEREFORE, plaintiffs pray for judgment as follows:

17    A.    Determining that this action is a proper class action and certifying Lead Plaintiff as

18 class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as

   Lead Counsel;
19

20    B.    Awarding plaintiffs and the members of the Class damages and interest;

21    C.    Awarding plaintiffs' reasonable costs, including attorneys' fees; and

22    D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

   proper.
23

24

25

26

27

28

1030970_1

FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:14-cv-03547-JST                                    - 68 -

1

**JURY DEMAND**

2

     Plaintiffs demand a trial by jury.

3

DATED:  May 21, 2015

ROBBINS GELLER RUDMAN
  & DOWD LLP

4

SHAWN A. WILLIAMS
AMANDA M. FRAME

5

KENNETH J. BLACK

6

7

s/ Shawn A. Williams
SHAWN A. WILLIAMS

8

9

Post Montgomery Center
One Montgomery Street, Suite 1800

10

San Francisco, CA  94104
Telephone:  415/288-4545

11

415/288-4534 (fax)

12

Lead Counsel for Lead Plaintiff

13

CYPEN & CYPEN
STEPHEN H. CYPEN

14

777 Arthur Godfrey Road, Suite 320
Miami Beach, FL  33140

15

Telephone 305/532-3200
305/535-0050 (fax)

16

Additional Counsel for Plaintiff

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on May 21, 2015, I authorized the electronic filing of the foregoing with

3 the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4 e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5 caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6 CM/ECF participants indicated on the attached Manual Notice List.

7        I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on May 21, 2015.

9                                s/ Shawn A. Williams

10                                SHAWN A. WILLIAMS

11                                ROBBINS GELLER RUDMAN
                                  & DOWD LLP

12                                Post Montgomery Center
                               One Montgomery Street, Suite 1800

13                                San Francisco, CA  94104
                               Telephone:  415/288-4545

14                                415/288-4534 (fax)
                               E-mail: shawnw@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Mailing Information for a Case 3:14-cv-03547-JST Curry v. Yelp Inc. et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **David E. Azar**
  dazar@milberg.com,pwedgworth@milberg.com,maoffice@milberg.com,cchaffins@milberg.com,jconte@milberg.com,dgjonaj@milberg.com

- **Kenneth Joseph Black**
  KennyB@rgrdlaw.com

- **Marjory Anne Gentry**
  Marjory.Gentry@aporter.com,marie.zambrano@aporter.com

- **Lionel Z. Glancy**
  info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Nathan R. Hamler**
  nathanh@johnsonandweaver.com,paralegal@johnsonandweaver.com,michaelf@johnsonandweaver.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,nathanh@johnsonandweaver.com,shawnf@johnsonandweaver.com,michaelf@johnsonandweaver.com,ceciliar@johnsonandweaver.c

- **Ryan M. Keats**
  Ryan.Keats@aporter.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,lpvega@pomlaw.com

- **Francis P McConville**
  fmcconville@labaton.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Charles J. Piven**
  piven@browerpiven.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Gilbert Ross Serota**
  gilbert.serota@aporter.com,marie.zambrano@aporter.com,SFCalendar@aporter.com

- **David Conrad Walton**
  davew@rgrdlaw.com,ldeem@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,smorris@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)