UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH CURRY, et al.,

               Plaintiffs,

     v.

YELP INC., et al.,

               Defendants.

Case No.  14-cv-03547-JST

**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**

Re: ECF No. 59

This is a securities class action brought against Yelp Inc. ("Yelp"), its co-founder and Chief Executive Officer Jeremy Stoppelman, its Chief Financial Officer Robert Krolik, and its Chief Operating Officer Geoffrey Donaker (collectively, "Defendants").  Plaintiffs allege that Defendants made material misrepresentations about, among other things, the authenticity of reviews hosted on Yelp's website and whether Yelp manipulated reviews in favor of businesses that advertised on Yelp.  Defendants have moved to dismiss the First Amended Complaint ("FAC"), ECF No. 55, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). This matter came for a hearing on November 10, 2015.

Because the FAC fails to satisfy the requirements for a securities fraud claim, and because further leave to amend would be futile, the Court will grant the motion to dismiss without leave to amend.

I.      **Background**

       A.      **Allegations in the First Amended Complaint**

Yelp is a company founded in 2004 that "describes itself generally as an online networking platform that connects people with great local businesses" by hosting user-generated reviews. FAC ¶ 3.  Yelp generates revenue by selling advertising on its website and mobile application.  Id.

United States District Court
Northern District of California

1    ¶ 4.  Yelp held its Initial Public Offering in March 2012, and its shares are traded on the New

2    York Stock Exchange under ticker symbol "YELP."  Id. ¶ 3.

3            This putative class action is brought on behalf of "all persons who purchased or otherwise

4    acquired the common stock of Yelp from October 29, 2013, through April 3, 2014, inclusive," the

5    "Class Period."  Id. ¶ 1.  Plaintiffs allege that Defendants made false and misleading statements

6    regarding Yelp's advertising practices and financial condition, causing Yelp's stock to trade at

7    "artificially-inflated prices during the Class Period."  Id. ¶ 7.

8            Plaintiffs allege that the misrepresentations began with Yelp's October 29, 2013 press

9    release announcing the company's financial results for the Third Quarter of 2013, as well as the

10   accompanying Prospectus and Registration Statement released on the same day.  Id. ¶ 8.  These

11   materials stated that Yelp "saw another quarter of strong momentum thanks to the high-quality,

12   authentic content contributed by Yelpers around the world" and that Yelp "contributors provide

13   rich, firsthand information about local businesses, such as reviews, ratings and photos."  Id.  The

14   Registration Statement acknowledged that "[t]he media has previously reported allegations that we

15   manipulate our reviews, rankings and rating in favor of our advertisers and against non-

16   advertisers.  These allegations, though untrue, could adversely affect our reputation and brand."

17   Id. ¶ 9.

18           Although Defendants disclosed both before and during the Class Period that Yelp actively

19   curated and controlled the presentation of reviews on its website, Defendants consistently denied

20   manipulating businesses' reviews in exchange for payment.  Id. ¶¶ 12, 45.  For instance, Yelp

21   touted its use of recommendation software to curate reviews in order to ensure the authenticity,

22   quality, and integrity of the reviews hosted on its website.  Id. ¶ 33(a), (e).  Vince Sollitto, Yelp's

23   Vice President of Communications and Public Affairs, stated that Yelp employed algorithms as a

24   "very aggressive means of filtering out attempts to game the system, fakes and shills."  Id.  Yelp

25   also admitted that it controlled reviews and content through the assistance of "community

26   managers" and "scouts" (paid Yelp employees who write reviews of local businesses).  Id. ¶ 33(c),

27   (d).  In addition to its use of automated filtering algorithms, Yelp also employed agents who

28

United States District Court
Northern District of California

1    actively "police[d] the site" and manually removed or filtered reviews violating Yelp's policies.

2    Id. ¶ 33(b).

3         Plaintiffs allege that Defendants' statements regarding the "authentic" and "firsthand"

4    nature of its reviews were false and misleading because Defendants "knew, or recklessly

5    disregarded and failed to disclose" that "[r]eviews, including anonymous reviews, appearing on

6    the Company's website were not all 'authentic' or 'firsthand.'"  Id. ¶ 49(a).  Plaintiffs allege that

7    Yelp "hosted a substantial amount of fraudulent reviews from reviewers Yelp knew did not have

8    firsthand experience with the business being reviewed and/or for which Yelp had credible

9    evidence that the reviews were false."  Id.  Despite Yelp's claims that it used filtering software to

10   ensure review authenticity, Plaintiffs allege that fake reviews of non-advertising businesses were

11   frequently not screened or removed, in some cases even after businesses contacted Yelp with

12   evidence that those reviews were false.  Id.

13        Plaintiffs further allege that Yelp's inclusion of unreliable and inauthentic reviews was in

14   some cases not the result of mere oversight, but was Yelp's calculated business strategy designed

15   to shakedown non-advertising businesses for payment.  Id. ¶¶ 49(b), (c).  Thus, Plaintiffs claim

16   that Yelp's statements denying previous allegations that Yelp manipulated its reviews in favor of

17   advertisers and against non-advertisers were knowingly false.  Id. ¶ 49(c).  Plaintiffs allege that

18   Yelp employees attempted to coerce businesses into buying advertising in exchange for offers to

19   remove fake negative reviews and manipulated businesses' reviews as retribution for refusing to

20   buy advertisements.  Id.  Although Yelp maintained that businesses buying advertising were

21   merely paying to promote themselves, Plaintiffs allege "that in many instances unless local

22   businesses purchased advertising, Yelp would often filter those businesses' legitimate, authentic,

23   first-hand reviews."  Id. ¶ 49(b).

24        Plaintiffs further allege that Defendants made false statements in their October 29, 2013

25   press release by asserting that Yelp's raised financial outlook was "due to and a result of the high

26   quality and authentic content contributed by Yelpers."  Id. ¶ 41.  Plaintiffs allege such statements

27   were false because Defendants concealed the fact that their growth was in fact due to the

28   manipulative advertising tactics alleged in the FAC.  Id. ¶ 49, 61.

3

United States District Court
Northern District of California

1    According to Plaintiffs, on April 2, 2014, *The Wall Street Journal* ("WSJ") published an

2    article which revealed the truth about Yelp's manipulation of reviews in favor of advertisers and

3    against non-advertisers.  Id. ¶¶ 71–72, 74.  This article disclosed the results of a Freedom of

4    Information Act ("FOIA") request WSJ served on the Federal Trade Commission ("FTC")

5    regarding Yelp's customer complaints.  Id. ¶ 71.  In response to WSJ's inquiry, the FTC released

6    2,046 consumer complaints filed with the FTC against Yelp between 2008 and March 4, 2014.  Id.

7    Of the 2,046 consumer complaints, at least 1,344 had not previously been released.  Id. ¶ 74.

8    Plaintiffs allege that, as a result of the WSJ article, the market became aware of "new facts

9    concerning the volume and the apparent corroborative nature of business owner complaints of

10   Yelp's extortion-like tactics and thus Yelp's operations and financial condition."  Id. ¶ 102.

11   Plaintiffs claim that the article's publication caused a decline in Yelp's stock, which, after closing

12   at $80.18 on April 1, 2014, fell to $75.63 by the close of April 2, 2014.  Id. ¶ 103.  On April 3,

13   2014, Yelp's stock price fell further to $70.61, before closing at $65.76 on April 4, 2014.  Id. ¶

14   109.

15   Plaintiffs allege that the WSJ article and the underlying FTC complaints were particularly

16   damaging to Yelp's revenue prospects because these materials cast doubt on the veracity of Yelp's

17   denials of its alleged advertising tactics.  Id. ¶ 87(d).  Plaintiffs point to several news reports from

18   this period linking the decline in Yelp stock to the WSJ article, including an April 3, 2014

19   SunTrust Robinson Humphrey report titled "Yelp Shares Drop On FTC Complaints Disclosure."

20   Id. ¶ 18.  In the FAC, Plaintiffs also include the results from an "Event Study" analysis, which

21   they assert "establish[es] that the April 2, 2014 stock price decline was statistically significant at

22   the 95% confidence level, in turn proving that the decline was caused by the disclosure of the

23   April 2, 2014 information and not by chance."  Id. ¶ 2(b), 88–89.  Finally, Plaintiffs assert that the

24   FTC complaints were further damaging because Yelp's local advertising revenue was "the most

25   important part of the company's business," representing approximately 82% of Yelp's annual

26   revenue.  Id. ¶ 59.

27   To support an inference of scienter, Plaintiffs plead that "[b]etween November 4, 2013,

28   and March 10, 2014, many of [Yelp's] executive officers and directors," including Defendants

4

1   Stoppelman, Krolik, and Donaker, "sold more than 1.1 million shares of their Yelp Class A

2   common stock at artificially inflated prices as high as $98.18 per share for insider trading proceeds

3   in excess of $81.5 million." Id. ¶ 66. Plaintiffs suggest that these sales show that Defendants and

4   other insiders knew that Yelp's stock was overvalued as a result of the alleged misrepresentations.

5   Id. ¶¶ 67–68. Plaintiffs further allege that the Court should infer scienter against Stoppelman,

6   Krolik, and Donaker because of their "positions of control and authority" at Yelp. Id. ¶¶ 29–31.

7       **B.    Procedural History**

8       On August 6, 2014, Plaintiff Joseph Curry filed a Complaint for Violations of the Federal

9   Securities Laws against Defendants. ECF No. 1. Later that month, Plaintiff Mary Adams filed a

10  similar complaint against Yelp in a separate action, No. 14-cv-03832, which complaint also

11  alleged violations of the federal securities laws and concerned the same class period as the Curry

12  action. On September 22, 2014, the Court ordered the Adams and Curry actions be related. ECF

13  No. 17.

14      After the cases were related, two potential lead plaintiffs—an individual named Dru L. Pio

15  and the City of Miami Fire Fighters' and Police Officers' Retirement Trust ("the Trust")—filed

16  motions asking the Court to consolidate the two cases pursuant to Federal Rule of Civil Procedure

17  42(a). ECF Nos. 19, 21. Both motions requested that the Court appoint the party who filed the

18  respective motion as lead counsel under 15 U.S.C. §78u-4(a)(3)(B)(v). Id.

19      The Court ordered the actions be consolidated. ECF No. 30. The Court appointed the

20  Trust as the lead plaintiff because the Trust had alleged the greatest financial stake in the outcome

21  of the case, pleading approximately $372,000 in losses due to the decline in Yelp stock, and

22  because the Trust had otherwise satisfied the requirements of Federal Rule of Civil Procedure 23.

23  ECF Nos. 21 at 5–7. The Trust subsequently filed a Consolidated Class Action Complaint for

24  Violations of the Federal Securities Laws ("the initial Complaint"). ECF No. 33.

25      Defendants filed a Motion to Dismiss the Complaint, contending that Plaintiffs failed to

26  adequately plead materially false statements, loss causation, and scienter. ECF No. 34 at 1–2. On

27  April 21, 2015, the Court granted Defendants' Motion to Dismiss on all three grounds and

28  permitted Plaintiffs leave to amend. ECF No. 48 ("the April 2015 Order") at 24. Plaintiffs

United States District Court
Northern District of California

1 | subsequently filed a Motion for Leave to File a Motion for Reconsideration, which motion the

2 | Court denied.  ECF Nos. 52, 54.

3 |      On May 21, 2015, Plaintiffs filed the FAC.  ECF No. 55.  On June 26, 2015, Defendants

4 | filed a Motion to Dismiss the FAC, ECF No. 59, which motion the Court now considers.

5 |      **C.**     **Jurisdiction**

6 |      Because this action arises under the Securities Exchange Act of 1934, the Court has

7 | jurisdiction pursuant to 28 U.S.C. § 1331.

8 | **II.**     **Legal Standard**

9 |      On a motion to dismiss, courts accept the material facts alleged in the complaint, together

10 | with reasonable inferences to be drawn from those facts, as true.  Navarro v. Block, 250 F.3d 729,

11 | 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true

12 | is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory

13 | statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To be entitled to the presumption of

14 | truth, a complaint's claims "must contain sufficient allegations of underlying facts to give fair

15 | notice and to enable the opposing party to defend itself effectively."  Starr v. Baca, 652 F.3d 1202,

16 | 1216 (9th Cir. 2011).

17 |      While a plaintiff generally need only plead "enough facts to state a claim to relief that is

18 | plausible on its face" to survive a motion to dismiss, Bell Atlantic Corp. v. Twombly, 550 U.S.

19 | 544, 570 (2007), "[s]ecurities fraud class actions must meet the higher, exacting pleading

20 | standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

21 | ('PSLRA')."  Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 604 (9th Cir.

22 | 2014).  Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong

23 | inference that the defendant acted with the required state of mind" with respect to each alleged

24 | false statement or omission.  15 U.S.C. § 78u–4(b)(2)(A).  The PSLRA also provides that "the

25 | complaint shall specify each statement alleged to have been misleading, the reason or reasons why

26 | the statement is misleading, and, if an allegation regarding the statement or omission is made on

27 | information and belief, the complaint shall state with particularity all facts on which that belief is

28 | formed."  15 U.S.C. § 78u–4(b)(1)(B).

United States District Court
Northern District of California

1    The Ninth Circuit has held that under the PSLRA, securities fraud plaintiffs must plead all

2    the elements of a securities fraud action with particularity.  Oregon Pub. Employees Ret. Fund,

3    774 F.3d at 605.  "These requirements present no small hurdle for the securities fraud plaintiff."

4    In re VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 701 (9th Cir. 2012).

5    **III.    Motion to Dismiss**

6        Section 10(b) of the Securities Exchange Act of 1934 ("the Securities Exchange Act")

7    prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of

8    any security.  To state a claim for violation of section 10(b), a plaintiff must plead with

9    particularity: "(1) a material misrepresentation or omission made by the defendant; (2) scienter;

10   (3) a connection between the misrepresentation or omission and the purchase or sale of a security;

11   (4) reliance upon the misrepresentation or omissions; (5) economic loss; and (6) loss

12   causation."  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011) (quoting

13   Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008)).

14       Defendants move to dismiss the FAC with prejudice on the grounds that, like the initial

15   Complaint that preceded it, the FAC fails to properly plead the elements of material falsity, loss

16   causation, and scienter.

17       **A.    Materially False Statements**

18       For a statement or omission to be actionable under section 10(b) of the Securities

19   Exchange Act, it must be both (1) false or misleading *and* (2) material.  A statement or omission is

20   false or misleading "if it would give a reasonable investor the impression of a state of affairs that

21   differs in a material way from the one that actually exists."  Berson v. Applied Signal Tech.,

22   Inc., 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation marks and citation omitted); In re

23   Cutera Sec. Litig., 610 F.3d 1103, 1109 (9th Cir. 2010).  A false or misleading statement or

24   omission is material if there is a "substantial likelihood that the disclosure of the omitted fact

25   would have been viewed by the reasonable investor as having significantly altered the 'total mix'

26   of information made available."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976);

27   Matrixx, 131 S. Ct. at 1318.  "Although determining materiality in securities fraud cases should

28   ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are

United States District Court
Northern District of California

7

insufficient to defeat a motion to dismiss for failure to state a claim." In re Cutera Sec. Litig., 610

F.3d at 1108 (internal and quotation marks and citation omitted).

Here, Plaintiffs allege that Defendants made three types of materially false statements.

FAC ¶ 49.

> i. **Statements Touting the "Authentic" and "Firsthand" Nature of Reviews Hosted by Yelp**

First, Plaintiffs assert that Defendants "falsely stated that the reviews on [Yelp's] website

were authentic and that the contributors to the website provided high-quality, firsthand

information about local businesses." Id. ¶ 8.  For example, Defendant Stoppelman allegedly

stated: "We saw another quarter of strong momentum thanks to the high-quality, authentic content

contributed by Yelpers around the world." Id. ¶ 41.  Plaintiffs claim that, in fact, "a substantial

amount of false" and non-firsthand reviews were hosted on Yelp's website, as demonstrated by

consumer complaints submitted to the FTC.  Id. ¶¶ 10, 44, 49(a).

In its April 2015 Order, the Court rejected this theory.  ECF No. 48 at 10–11.  The Court

held that Defendants' statements were not false or misleading because a reasonable investor would

not believe that all reviews hosted on Yelp's website were authentic, especially in light of

Defendants' previous acknowledgements that Yelp's screening technology was imperfect.  Id.; see

SEC Form S-1 Registration Statement, ECF No. 35-1 at 16 (recognizing that Yelp could not

"guarantee the effectiveness or adequacy" of its screening mechanisms).  Yelp also implicitly

acknowledged that at least some inauthentic reviews existed by openly using screening technology

designed to filter inauthentic reviews.  See FAC ¶¶ 33(a), 62 ("Our recommendation software

operates continually, and the results of its determinations with respect to particular reviews may

change over time as it factors in new information.").  Moreover, because Yelp's Registration

Statement acknowledged that Yelp's screening algorithms were fallible, the Court previously held

that the fact that Yelp hosted some inauthentic or non-firsthand reviews did not significantly alter

the "total mix" of information available to the market.  ECF No. 48 at 11.  Thus, the allegedly

false statements were not material.

In the FAC, Plaintiffs attempt to cure these defects by (1) including the text of several

additional FTC complaints, which were not cited in the initial Complaint, FAC ¶ 49(a)(xv)–(xix);
and (2) adding allegations regarding four additional non-FTC complaints which raised similar
contentions as the FTC complaints previously highlighted by Plaintiffs, FAC ¶ 40.  Plaintiffs
contend that they do not allege Defendants guaranteed that *all* reviews were authentic or firsthand,
but rather that, because "*many* of the reviews were not authentic and firsthand," Defendants'
statements were false.  ECF No. 62 at 5 (emphasis added).  Defendants counter that the FAC still
relies "on the release of the complaints identified in the [initial] Complaint without adding a single
new fact or source.  Nothing shows that those complaints were anything but second-hand and of
the very type and nature disclosed by Yelp and others long before April 2014."  ECF No. 59 at 2.

The Court agrees that the FAC fails to sufficiently allege that these statements were
materially false.  Adding a handful of additional examples of complaints concerning the allegedly
inauthentic nature of a small subset of Yelp reviews does not affect the veracity of Defendants'
previous statements that Yelp reviews, by and large, are "authentic" and "firsthand," especially in
light of Defendants' previous acknowledgements that Yelp's screening technology was imperfect.
See id. at 5 ("the FAC remains based on complaints about a *tiny fraction* of the tens of millions of
reviews on Yelp's sites by a *tiny fraction* of the tens of millions of businesses listed on the sites");
ECF No. 35-1 at 16.  The same logic applies to the four additional non-FTC complaints identified
in the FAC.  FAC ¶ 40.

The Court continues to find persuasive Judge Forrest's reasoning in In re Lululemon
Securities Litigation, 14 F. Supp. 3d 553 (S.D.N.Y. 2014).  In In re Lululemon, Judge Forrest held
that Lululemon's statements regarding the "high quality" of its products compared to others in the
industry were not rendered actionably false by the company's subsequent recall of products that
were found to have quality issues.[1]  14 F. Supp. 3d at 557.  Judge Forrest reasoned that, even prior

---

[1] Plaintiffs assert that the reasoning in In re Lululemon is inapposite because (1) In re Lululemon
involved "non-actionable puffing" and (2) customer complaints, which are "qualitatively
different" than the FTC complaints at issue here.  ECF No. 62 at 5–6.  The first contention is flatly
incorrect.  Without mentioning "puffing," the In re Lululemon court determined that plaintiffs'
interpretation of several allegedly false statements was "unreasonable" given defendant's "clear
acknowledgements that product defects do occur."  14 F. Supp. 3d at 577; see also id. at 577 n.15
("Though the Court need not reach the issue of materiality in light of the other grounds for

United States District Court
Northern District of California

to the recall, Lululemon's website when read in context "implie[d] that such defects occur and with enough regularity to have an established policy as to how they are handled . . . ." Id.  The Second Circuit recently affirmed this decision, relying on the fact that "Lululemon disclosed the possibility of product quality deficiencies and the potential adverse financial impact of these deficiencies, should they arise."  In re Lululemon Sec. Litig., 604 Fed. App'x 62, 63 n.1 (2d Cir. 2015).

Similarly, here, Defendants both explicitly and implicitly acknowledged that some Yelp reviews were inauthentic.  Those acknowledgements, along with a common-sense understanding of what it means for a website to host user-generated content, demonstrates that no reasonable investor could have understood Defendants' statements to mean that all Yelp reviews were authentic.  See, e.g., ECF No. 55-3, Exhibit 15 (stock analyst noting that "there are going to be some illegitimate reviews that make it through the safeguards onto [Yelp's] platform and cause problems.  To successfully police 100% of the reviews is likely impossible and we find it very difficult to argue that Yelp's quality controls are somehow deficient.").  Because a reasonable investor would have known that some of the reviews on Yelp's website were inauthentic, the handful of additional complaints that Plaintiffs have added to the FAC claiming that certain Yelp reviews are inauthentic does not alter the Court's previous conclusion that these complaints did not significantly alter the "total mix" of information available to the market.  TSC Indus., 426 U.S. at 449; Matrixx, 131 S. Ct. at 1318.  Thus, these statements were not materially false.

### ii.   Statements Denying Manipulation of Reviews in Favor of Advertisers and Against Non-Advertisers

Second, Plaintiffs allege that Defendants' statements denying that Yelp manipulated

---

dismissal of the CAC described herein, it notes that many of the alleged misstatements, in context, are likely also not actionable because they are mere puffery or expressions of corporate optimism.").  Thus, the defendant's statements were not false or misleading as reasonable investors would interpret them.  Id. at 581.  As to the second contention, Plaintiffs have not offered any reason why the distinction between the "customer complaints" in In re Lululemon and the FTC complaints at issue here should affect the Court's analysis.  See ECF No. 62 at 6.

United States District Court
Northern District of California

reviews in favor of advertising businesses and against non-advertising businesses were materially false. Id. ¶ 49(c). Plaintiffs rely, in part, on a statement made on Yelp's website that "there is zero relationship between the timing of when a review gets recommended and when a business decides to—or declines to—advertise." Id. ¶¶ 12, 46. Yelp also stated that "[o]ur recommendation software treats advertisers and non-advertisers exactly the same." Id. ¶ 46. According to Plaintiffs, the April 2, 2014 WSJ article and the underlying FTC complaints revealed these statements to be false, Id. ¶¶ 49(a)–(c), 90, because, in reality, "when local businesses declined [Yelp's] overtures to purchase advertising, [Yelp] would often retaliate by removing or filtering their good review and displaying only negative and sometimes fake reviews to encourage non-advertising local businesses to purchase ads." Id. ¶ 44. Plaintiffs also allege that Yelp would "often offer to suppress negative reviews for a fee." Id.

### a.    Falsity

In its April 2015 Order, the Court held that the contents of the FTC complaints did not establish that Defendants' statements denying manipulation of Yelp reviews were false. ECF No. 48 at 14. The Court determined that even if consumer complaints could sufficiently prove a statement false to overcome a motion to dismiss, the FTC complaints highlighted by the initial Complaint did not do so because they were insufficiently numerous and corroborative. ECF No. 48 at 14–16; see In re Netflix, Inc. Sec. Litig., C04-2978 FMS, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005) (finding that a small number of customer complaints, on their own, do not establish that a company's contrary statements are false because "every large company can expect to have some customer complaints"). Moreover, many of the customer complaints relied on by Plaintiffs hinged on the customers' inferences of misconduct, rather than concrete examples of Yelp's behavior. ECF No. 48 at 15. The Court concluded that these complaints failed to establish any significant pattern of misconduct tending to prove that Yelp's denials of manipulation were false.

In the FAC, Plaintiffs have added nine additional examples of FTC complaints and four additional examples of non-FTC complaints, which allegedly support their claim that Yelp's denial of manipulation was false. FAC ¶ 40; ¶ 49(c)(xviii)–(xx), (xxx)–(xxxv). Plaintiffs allege

11

1    that these complaints are corroborative of each other because "many stated that the filtering

2    happened *immediately*" after the complainant's decision whether or not to pay for advertising with

3    Yelp. Id. ¶ 75 (emphasis in original).  Plaintiffs also assert that the FTC complaints tend to prove

4    Defendants' denials of manipulation false because the number of FTC complaints accelerated by

5    "more than 600%" between August 3, 2012 and March 4, 2014. Id. ¶ 72, 74.  Finally, Plaintiffs

6    intimate that because Yelp employees, including community managers, had the technological

7    capability to manually filter Yelp reviews, Defendants plausibly had the ability to effectuate the

8    alleged advertising scheme, thereby making Defendants' denials more likely to be false.  Id. ¶ 33.

9         Defendants counter that the FAC merely repackages the same information the Court

10   previously rejected as being insufficient to demonstrate falsity.  ECF No. 59 at 8.  Defendants

11   assert that changes in the particular reviews that surface on Yelp are not probative of manipulation

12   because Yelp has admitted that "whether a review is filtered may change from day to day."  Id.

13   (citing ECF No. 35-7 at 34 ("Our recommendation software operates continually, and the results

14   of its determinations with respect to particular reviews may change over time as it factors in new

15   information.")).  Further, Defendants counter Plaintiffs' assertions regarding the acceleration of

16   FTC complaints by noting that the total number of Yelp reviews was correspondingly increasing

17   over the same time frame.  Id. at 7.

18        The Court finds Defendants' arguments more persuasive.  The FAC includes nine new

19   examples of FTC complaints alleging manipulation of Yelp reviews, compared to the 25 such FTC

20   complaints which the Court previously found "did not establish that Yelp engaged in large-scale

21   manipulation of customer reviews."  ECF No. 48 at 15. The inclusion of these nine new FTC

22   complaints does not affect the Court's previous analysis.  Id. at 15–16.  Once again, some of the

23   newly highlighted FTC complaints do not allege that Yelp told the business owner in question that

24   purchasing advertising would influence the filtering of reviews.  Instead, these business owners

25   drew their own inferences about Yelp's manipulation of reviews based on what they regarded as

26   suspiciously-timed changes in their reviews.  See FAC ¶ 49(c)(xviii) (Yelp "asked if I wanted to

27   advertise on their website.  I respectfully declined.  They then immediately started filtering out all

28   the positive reviews . . . ."); ¶ 49(c)(xix) ("After making it clear that I don't want to pay to

United States District Court
Northern District of California

1    advertise with [Yelp], they have 'filtered' a majority of my reviews."); ¶49(c)(xx) (After refusing

2    to advertise with Yelp, "we started seeing all of our positive reviews . . . disappear and left only 2

3    negative reviews . . . just because we refused to pay for [Yelp's] enhancing ad.").  While six of the

4    nine new FTC complaints do contain allegations that a Yelp representative directly told the

5    complainant that Yelp would manipulate reviews in exchange for a fee, see FAC ¶ 49(c)(xxx),

6    (xxi), (xxxii), (xxxiii), (xxxiv), (xxxv), the FAC now identifies only eleven such FTC complaints

7    out of the 2,046 released by the FTC covering a five year period.  See FAC ¶ 49(a)(ii), ¶49(c)(ii),

8    (xvi), (xxiv), (xxvi), (xxx), (xxxi), (xxxii), (xxxiii), (xxxiv), (xxxv).[2]

9           As the Court observed its previous order of dismissal, "every large company can expect to

10   have some customer complaints."  Curry v. Yelp Inc., No. 14-CV-03547-JST, 2015 WL 1849037,

11   at *8 (N.D. Cal. Apr. 21, 2015).  Thus, Plaintiffs must show more than the mere existence of a few

12   customer complaints per year to adequately plead that Defendants' denials of manipulation were

13   false or misleading.  See In re Netflix, 2005 WL 1562858, at *7; ECF No. 48 at 13–16.  Especially

14   when compared to the tens of millions of reviews hosted by Yelp, a dozen relevant but

15   unsubstantiated and divergent consumer complaints over at least five years does not establish a

16   pattern of conduct sufficient to indicate that Defendants' statements were false.  And Plaintiffs

17   have again failed to direct the Court to any case holding that customer complaints alleging

18   circumstances that are contrary to defendant's representations independently suffice to establish

19   the falsity of those representations.  Because a small number of customer complaints does not

20   sufficiently establish the veracity of the allegations contained therein, see In re Netflix, 2005 WL

21   1562858, at *7, the Court holds that Plaintiffs have failed to plead falsity with particularity.[3]

22   _____

23   [2] Out of the six non-FTC complaints, only one complaint alleged that a Yelp representative
     directly told the complainant that Yelp would manipulate reviews in exchange for a fee.  See FAC
24   ¶ 40 (complaint of Gary Hollander).  The other five non-FTC complaints reveal the same
     unsubstantiated inferences that plague most of the FTC complaints cited by Plaintiffs.  See, e.g.,
25   FAC ¶ 40 ("[A]fter he declined to purchase advertising, Yelp filtered most of his positive reviews,
     but not his negative ones.").
26   [3] For the same reasons, the Court finds that Defendants' statement that "businesses could pay to
     promote themselves" was not false.  FAC ¶ 49(b).  Plaintiffs assert that Defendants' statement that
27   "businesses could pay to promote themselves" through targeted advertising was materially false
     because Yelp would filter authentic reviews "unless local businesses purchased advertising."  FAC
28   ¶ 49(b).  Plaintiffs appear to argue that Defendants' statement was misleading because it impliedly
     "create[d] an impression of a state of affairs that differs in a material way from the one that

1

### b.    Materiality

2      In its April 2015 Order, the Court noted that prior to April 2, 2014, Yelp's Registration

3  Statement acknowledged that "[n]egative publicity could adversely affect our reputation and

4  brand," specifically noting previous media reports of allegations that Yelp "manipulates []

5  reviews, rankings and ratings in favor of our advertisers and against non-advertisers."  ECF No. 48

6  at 12 (quoting ECF No. 35-1 at 16).  Yelp's Registration Statement also disclosed that "various

7  businesses have sued us alleging that we manipulate Yelp reviews in order to coerce them and

8  other businesses to pay for Yelp advertising."  ECF No. 35-1 at 22.[4]  The Court relied, in part, on

9  these statements to conclude that the disclosure of the FTC complaints alleging manipulation was

10 not material because it did not alter the "total mix" of information available to the market.  ECF

11 No. 48 at 12–13 (citing <u>S.E.C. v. Todd</u>, 642 F.3d 1207, 1215 (9th Cir. 2011)).  Plaintiffs advance

12 several arguments why the FAC alleges materiality with respect to Yelp's denials of manipulation

13 of reviews, which arguments the Court now addresses in turn.

14     First, Plaintiffs argue that the content of the FTC complaints must have been new and

15 material because, otherwise, Yelp's stock would not have dropped so significantly the day the

16 WSJ article revealed the existence of the FTC complaints.  ECF No. 62 at 9–10, 15–16

17 ("Defendants, moreover, fail to explain *why* if the April 2, 2014 disclosure contained no new

18 information, the market reacted the way it did and Yelp's stock price declined nearly 6% . . .

19 following disclosure of the FTC complaints.").  Plaintiffs support this argument by noting that the

20

21 ──────────────────────────────

actually exists," namely that Yelp does not manipulate reviews for advertisers.  <u>Brody v.</u>

22 <u>Transitional Hospitals Corp.</u>, 280 F.3d 997, 1006 (9th Cir. 2002).  The Court doubts whether
   Defendants' statement created the impression that Yelp did not manipulate reviews in favor of

23 advertisers.  Moreover, because a small number of customer complaints alleging that Yelp
   manipulates reviews in favor of advertisers does not establish the veracity of the allegations

24 contained therein, <u>see</u> <u>In re Netflix</u>, 2005 WL 1562858, at *7, the Court holds that Plaintiffs have
   failed to plead falsity of this statement with particularity.

25 [4] In its April 2015 Order, the Court noted that it "need not resolve the question of whether a 'truth-
   on-the-market' defense is properly considered at the motion to dismiss stage.  Yelp disclosed the

26 existence of persistent allegations that Yelp manipulated reviews in favor of advertisers in its
   Registration Statement.  Because this disclosure existed within the four corners of a statement that

27 Plaintiffs allege was false or misleading, the Court need not analyze whether the truth was
   'transmitted to the public with a degree of intensity and credibility sufficient to effectively

28 counterbalance any misleading impression created by insider's one-sided representations.'
   <u>Provenz v. Miller</u>, 102 F.3d 1478, 1493 (9th Cir. 1996)."  ECF No. 48 at 12–13 n.3.

FAC includes the results of an "event study," which allegedly "demonstrates that the sharp decline in [Yelp's] share price was statistically significant and the direct result of the new information contained within *The Wall Street Journal*'s article." Id. at 10 (citing FAC ¶ 89).

Defendants challenge the relevance of Plaintiffs' event study on a number of grounds, including that the event study does not establish materiality under the applicable PSLRA standard.[5] ECF No. 63 at 5–6. In particular, Defendants note that "[t]he WSJ article reports that Yelp's stock price was 'down 6%' *at the time the article was published*. Therefore, that price decline could not possibly have been attributed to the article." ECF No. 63 at 6 (emphasis in original).

The Court agrees with Defendants. Because the WSJ article, which appears to have been published at 4:23 PM ET on April 2, 2014, states that "Yelp *was* down 6% . . . in Wednesday afternoon trading in the wake of the [FTC] disclosure," ECF No. 55-3, Exhibit 7 (emphasis added), the WSJ article itself could not have possibly altered the "total mix" of information available to the market such that Yelp's stock declined on April 2, as Plaintiffs appear to argue. ECF No. 62 at 10 ("[T]he event study demonstrates that the sharp decline in [Yelp's] share price [on April 2, 2014] was statistically significant and the direct result of the new information contained within *The Wall Street Journal*'s article."); id. at 15 ("As the FAC alleges, only the thousands of corroborative complaints by Yelp reviewers and business owners revealed by *The Wall Street Journal* exposed defendants' statements as false."); FAC ¶¶ 90–91 ("[F]ollowing *The Wall Street Journal* article Yelp's stock price declined 5.7% . . . . [T]his statistically significant price decline is uncontroverted evidence that the market viewed the information disclosed in *The Wall Street Journal* article to be new and material."). Even if the WSJ article were published prior to the stock decline, the WSJ article did not discuss the contents of the FTC complaints.[6] Instead,

---

[5] Because the Court rejects Plaintiff's argument regarding the relevance of the event study on other grounds, the Court need not address Defendants' argument that an event study is an opinion, as opposed to a fact, and thus cannot be properly considered on a motion to dismiss. ECF No. 63 at 5.

[6] Plaintiffs incorrectly argue that the WSJ article "opine[d] on the content and subject matter of the FTC complaints." ECF No. 62 at 19 (citing ECF No. 55-3, Exhibit 7). In reality, the WSJ article revealed nothing regarding the contents of the FTC complaints. ECF No. 55-3, Exhibit 7. At the same time, the WSJ article did discuss a Harvard Business School study, which "concluded that

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the WSJ article merely reported that on April 2, 2014, the FTC "disclosed on its website that it

2    received 2,046 complaints about Yelp from 2008 through March 4 of this year, noting that its

3    disclosure was part of a Freedom of Information Act request from the Wall Street Journal."  ECF

4    No. 55-3, Exhibit 7.  Thus, the WSJ article itself did not disclose any information regarding Yelp's

5    manipulation of reviews, which could have been material.[7]

6          Rather, Plaintiffs' only conceivably plausible materiality argument would be that the

7    FTC's disclosure of the underlying FTC complaints, and not the WSJ article reporting on the

8    FTC's disclosure, altered the "total mix" of information available to the market.  However, the

9    FAC fails to allege any information regarding the FTC's disclosure of the underlying complaints

10   from which the Court could assess materiality.  While the WSJ article attached as an exhibit to the

11   FAC states that "[o]n Wednesday, the Federal Trade Commission disclosed on its website that it

12   received 2,046 complaints about Yelp from 2008 through March 4 of this year," it is unclear

13   whether the FTC disclosed the contents of those complaints.[8]  ECF No. 55-3, Exhibit 7.

14   _____

15   there was nothing 'statistically significant' to support claims that Yelp gives preferential treatment
     to businesses that pay for advertising or other services on the site."  Id.

16   [7] For the same reason, the Court rejects Plaintiffs argument that "[m]ultiple reports by analysts . . .
     further demonstrate that reasonable investors found disclosure of the FTC complaints to constitute
17   new information that was important to their investment decisions."  ECF No. 62 at 11.  Just as the
     WSJ article revealed no information about the contents of the FTC complaints, several of the other
18   "analyst reports" cited by Plaintiffs also did not discuss the contents of the FTC complaints.  See,
     e.g., ECF No. 55-3, Exhibit 8 (April 2, 2014 The Street article) ("The exact nature of the
19   complaints are unknown but in the past local businesses have accused Yelp of hurting their ratings
     by posting only negative reviews about their businesses after they refused to buy ads."); ECF No.
20   55-3, Exhibit 9 (April 3, 2014 SunTrust Robinson Humphrey report) ("The complaints have not
     necessarily been verified by the FTC and we do not know that exact nature or detail of the
21   complaints."); ECF No. 55-3, Exhibit 11 (April 3, 2014 MTNewswires article) (Yelp stock "sinks
     for a second session on Thursday as investors scrutinize a Federal Trade Commission disclosure
22   this week that revealed 2,046 complaints about the review site from 2008 through March of this
     year.").  Accordingly, these analyst reports do not support Plaintiffs' claim that reasonable
23   investors in fact relied on the allegations of review manipulation contained in the FTC complaints.
     While one of the analyst reports does discuss the content of some of the 2,046 FTC complaints,
24   ECF No. 55-3, Exhibit 13 (April 4, 2014 Zacks Equity Research article) ("[M]ost of the
     complaints were lodged by small business owners alleging that Yelp posts fraudulent reviews that
25   defame their reputation."), that report was published on April 4, 2014 and discussed Yelp's stock
     drop on April 3, as opposed to the April 2 stock drop which is at issue here.  Id.
26   [8] Based on the FTC letter referenced in the WSJ article, it appears as if the FTC included copies of
     the FTC complaints in its response to the WSJ's FOIA request, but it is unclear whether the FTC
27   made these complaints publicly available at the same time.  FAC ¶ 71 n. 25.

28

                                                    16

1    Moreover, it is unclear when the FTC made the disclosure.  As Defendant's note, "Plaintiffs

2    concede that the FOIA response by the FTC was dated March 18—two weeks earlier than reported

3    in the Wall Street Journal—and they have no facts to show when the underlying data was actually

4    available on the FTC website."  ECF No. 63 at 6 n.4.  As a result, the Court has no way of

5    assessing the materiality of the FTC's disclosure.  Accordingly, the Court rejects Plaintiffs'

6    materiality argument based on the timing of the stock decline and the event study.

7            Second, Plaintiffs argue that under the Supreme Court's decision in Matrixx, plaintiffs

8    need not meet "some undefined threshold" of consumer complaints in order to sufficiently allege

9    materiality.  ECF No. 62 at 8.  The Court previously rejected this argument in its Order denying

10   Plaintiffs' Motion for Leave to File Motion for Reconsideration.  ECF No. 54.  The Court

11   continues to find that the holding in Matrixx is inapplicable here and therefore rejects Plaintiffs'

12   argument on the same grounds.

13           In Matrixx, the defendants had withheld, or failed to disclose, complaints by physicians

14   and users claiming that defendants' over-the-counter cold remedy caused anosmia.  131 S. Ct. at

15   1324.  Although defendants were aware of these claims, they did not disclose the existence of the

16   claims or the related litigation to investors.  Id. at 1315.  Defendants argued that this failure to

17   disclose the existence of the complaints was not material because the volume of the complaints

18   was not "statistically significant" and thus did not prove causation.  Id. at 1315.  The Supreme

19   Court disagreed, noting "that medical professionals and regulators act on the basis of evidence of

20   causation that is not statistically significant," and therefore "it stands to reason that in certain cases

21   reasonable investors would as well."  Id. at 1321.  Accordingly, the Supreme Court held that while

22   "the mere existence of reports of adverse events . . . will not satisfy" the "total mix" materiality

23   standard, the reports need not be statistically significant to support a finding of materiality.  Id.

24   Rather, "the source, content, and context of the reports . . . may reveal in some cases that

25   reasonable investors would have viewed reports of adverse events as material . . . ."  Id. (internal

26   quotation marks omitted).

27           Here, by contrast, Defendants did not conceal the existence of the FTC complaints.  Yelp

28   acknowledged in its Registration Statement that "[n]egative publicity could adversely affect our

United States District Court
Northern District of California

1    reputation and brand," specifically noting previous media reports of allegations that Yelp

2    "manipulates [] reviews, rankings and ratings in favor of our advertisers and against non-

3    advertisers," ECF No. 35-1 at 16, and that "various businesses have sued us alleging that we

4    manipulate Yelp reviews in order to coerce them and other businesses to pay for Yelp advertising .

5    . . ." Id. at 12.  As a result, the disclosure of the existence of the FTC complaints did not

6    significantly alter the total mix of information available to reasonable investors.  Unlike the

7    Matrixx defendants, Defendants here had already informed investors of the existence of such

8    complaints and even of the pending litigation concerning the complaints. Because Matrixx

9    involved a failure to disclose complaints altogether, 563 U.S. at 31, 34, not a defendant's

10   acknowledgement of the existence of customer complaints coupled with a denial of the

11   complaints' veracity, that case is inapposite.

12          Third, Plaintiffs argue that Yelp's denial of manipulation was material because allegations

13   of review manipulation threatened "Yelp's entire business model."  ECF No. 62 at 9 (citing FAC ¶

14   87).  Plaintiffs allege that "Yelp is a one-product company" with substantially all of its revenue

15   generated by the sale of its advertising products.  FAC ¶ 87(a).  Plaintiffs further allege that the

16   credibility and integrity of reviews hosted by Yelp "was the entirety of the Company's value

17   proposition."  Id. ¶ 87(c).  Thus, Plaintiffs argue that the Yelp's denial of manipulation was

18   material because "if a growing number of local businesses came to believe there was some

19   relationship between reviews and advertising, Yelp's advertising revenue and growth could be

20   compromised."  ECF No. 62 at 9.  These allegations do suggest that new information regarding

21   Yelp's alleged manipulation could have a significant impact on Yelp's profitability and thus

22   Yelp's stock price.  However, these allegations do nothing to address a flaw that the Court

23   previously relied on in rejecting Plaintiffs' materiality argument:  the fact that some businesses

24   made allegations that Yelp manipulated reviews was disclosed by Yelp before the beginning of the

25   class period in Yelp's Registration Statement.  ECF No. 48 at 16.  For that reason, the Court

26   continues to find that the FTC complaints regarding manipulation did not alter the "total mix" of

27   information available to the marketplace on the issue of whether Yelp manipulates reviews of

28   businesses in connection with advertising.

United States District Court
Northern District of California

###### iii.    Forecasted Growth

Third, Plaintiffs allege that Yelp's statements regarding future business prospects were false or misleading because "strong performance and raised financial guidance" was not "driven by . . . authentic, firsthand content," as Yelp claimed.  FAC ¶ 49.  Plaintiffs suggest that Defendants failed to disclose that Yelp's future revenue in fact relied upon the alleged advertising practices.

As the Court previously noted, ECF No. 48 at 17, optimistic statements about a company's prospects can be actionable "if not genuinely and reasonably believed, or if the speaker is aware of undisclosed facts that tend seriously to undermine the statement's accuracy."  Cooper v. Pickett, 137 F.3d 616, 629 (9th Cir. 1997).  Short of such awareness, these statements generally are not actionable, as "[t]he statement, 'the storm is passing and it will be sunny tomorrow,' when it in fact continues to snow the next day, may be bad forecasting, but it is not necessarily a lie."  Ronconi v. Larkin, 253 F.3d 423, 433 (9th Cir. 2001).  Because the FAC, like the initial Complaint, does not establish that Defendants made false statements related to the manipulation of reviews in favor of advertisers and against non-advertisers, Plaintiffs have not pleaded with particularity that Defendants' optimistic statements about the company's prospects was undermined by undisclosed facts that Defendants' knew.

Accordingly, the Court continues to hold that Plaintiffs have failed to sufficiently allege that any of Defendants' statements were materially false.

### B.    Loss Causation

Plaintiffs assert that Defendants' allegedly false statements caused Yelp's stock to rise artificially.  FAC ¶ 88.  Plaintiffs further allege that on April 2, 2014, "*The Wall Street Journal* article revealed to the market the scope and magnitude of [Yelp's] practices, previously denied by [Yelp], and, as a result, its stock price quickly declined.  In fact, following *The Wall Street* Journal article, Yelp's stock price declined 5.7%, compared to an increase in both the market and industry indices."  FAC ¶ 90.

"To prove loss causation, the Plaintiffs must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the

Plaintiffs."  Oregon Pub. Employees Ret. Fund, 774 F.3d at 608 (internal quotation marks omitted).  Securities plaintiffs need not prove that a defendant's representations were fraudulent to sufficiently plead loss causation.  See Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1064 (9th Cir. 2008).  However, "that does not allow a plaintiff to plead loss causation through 'euphemism' and thereby avoid alleging the necessary connection between defendant's fraud and the actual loss."  Id.  Indeed, information that reveals a mere "risk" or "potential" for fraud is insufficient to establish loss causation.  Loos v. Immersion Corp., 762 F.3d 880, 889 (9th Cir. 2014).

In its April 2015 Order, the Court found that because "the FTC complaints [referenced in the WSJ article] do not establish the falsity of Defendants' representations, . . . the release of the FTC complaints did not reveal any fraudulent practices to the market."  ECF No. 48 at 17.  The Court went on to hold that the decline in Yelp's stock on April 2, 2014 could only be attributed to "market speculation about whether fraud had occurred," which "simply cannot form the basis of a viable loss causation theory."  ECF No. 48 at 19 (quoting Loos, 762 F.3d at 890).

In the FAC, Plaintiffs seek to remedy their loss causation theory by proffering the aforementioned event study, which purports to show the statistical significance of Yelp's stock drop on April 2, 2014.  FAC ¶¶ 89–90.  Defendants respond that the event study is inapposite because it does not establish that any of the information revealed in the WSJ article or the FTC disclosures was new—meaning that no "fraud was *revealed* to the market," Loos, 762 F.3d at 887 (emphasis added).  ECF No. 59 at 11.  Defendants' assert that the disclosures instead only revealed the *potential* of fraud, which is insufficient to plead loss causation under Loos.  ECF No. 63 at 9 (citing Loos, 762 F.3d at 890). Finally, Defendants assert that because the WSJ article did not discuss the content of the FTC complaints, Plaintiffs have not pleaded with particularity that the relevant FTC complaints caused Yelp's stock price to drop.  ECF No. 59 at 12 (citing ECF No. 55-3, Exhibit 7 (April 2, 2014 WSJ article) and quoting ECF No. 55-3, Exhibit 8 (April 2, 2014 The Street article) ("The exact nature of the complaints are unknown . . . .") and Exhibit 9 (April 3, 2014 SunTrust Robinson Humphrey report) ("The complaints have not necessarily been verified by the FTC and we do not know the exact nature or detail of the complaints")).

20

1       The Court continues to find that the FTC disclosures did not reveal any fraud to the market

2   because the disclosures did not establish that Defendants' statements were false or misleading.

3   Instead, like the impending investigation in <u>Loos</u>, the market merely became aware of the

4   possibility that further investigations by the FTC could later establish that Defendants' denials

5   were false or misleading.  ECF No. 48 at 19 (citing <u>Loos</u>, 762 F.3d at 890).  Plaintiffs have added

6   no allegations in the FAC that would counsel otherwise.

7       While Defendants' event study suggests that the stock drop on April 2, 2014 was

8   "statistically significant"—i.e., the stock drop was not the "result of random error"[9] or

9   happenstance— it cannot identify to what information the market reacted on April 2, 2014.  As

10  discussed *supra* Part III.A.ii.b, the April 2, 2014 stock drop could not have been caused by the

11  WSJ article itself because that article was published after Yelp's stock had already dropped.

12  Instead, the April 2, 2014 stock drop may have been caused by the FTC disclosure of the

13  complaints reported on in the WSJ article.  However, the FAC does not plead any facts regarding

14  the FTC's disclosure of these complaints.  In particular, the FAC does not allege when the FTC

15  disclosure occurred.  Moreover, the FAC does not allege whether the FTC disclosure included the

16  contents of the complaints or whether the FTC disclosure merely indicated the number of

17  complaints.  Indeed, the market may have reacted to the sheer number of complaints reported by

18  the FTC, which would not support Plaintiffs' loss causation theory because Plaintiffs must plead a

19  causal connection "between the deceptive acts that form the basis for the claim of securities fraud

20  and the injury suffered by the Plaintiffs." <u>Oregon Pub. Employees Ret. Fund</u>, 774 F.3d at 608

21  (internal quotation marks omitted).

22      Without more information, Plaintiffs' contention that the market reacted to the statements

23  at issue here "is not a fact.  It is an inference [Plaintiffs] believe is warranted from the facts that

24  are alleged." <u>Metzler</u>, 540 F.3d at 1065.  The Court finds this inference unwarranted at this stage

25  because Plaintiffs have not pleaded any facts relating to the FTC disclosure itself.

26  **C.    Scienter**

27

28  ———————————
    [9] <u>Matrixx</u>, 563 U.S. at 1319 n.6 (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 354 (2d ed. 2000)).

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The PSLRA's heightened scienter standard requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). The required state of mind is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12 (1976). "[R]ecklessness may satisfy the element of scienter in a civil action for damages under §10(b) and Rule 10b-5." Hollinger v. Titan Capital Corp, 914 F.2d 1564, 1568–69 (9th Cir. 1990). Reckless conduct, in this context, "may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. at 1569 (internal quotation marks omitted). Because scienter is a subjective inquiry, "the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." Gebhart v. SEC, 595 F.3d 1034, 1042 (9th Cir. 2010).

The "strong inference" of scienter required by the PSLRA "need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the most plausible of competing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007) (internal quotation marks omitted). It must, however, "be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." Id. "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009). Courts, however, cannot conduct this analysis "in a vacuum." Tellabs, Inc., 551 U.S. at 323. To evaluate whether a complaint satisfies the "strong inference" requirement, courts must consider "*all* of the facts alleged, taken collectively," not "scrutinized in isolation." In re VeriFone Holdings, 704 F.3d at 701 (emphasis in original).

### i.    Allegations Regarding Defendants' Role in the Company

First, Plaintiffs allege that Defendants' scienter can be inferred from their "position of control and authority as officers and/or directors" of Yelp and their resulting "access to the

22

adverse undisclosed information about [Yelp]'s financial condition and performance as particularized [in the FAC]."  FAC ¶ 30–31; ECF No. 62 at 21.  Plaintiffs argue that "[l]ocal advertising services (*i.e.* the monetization of reviews) were 'core' to Yelp's success, adding circumstantial evidence of defendants' scienter.  ECF No. 62 at 22.  Defendants characterize these claims as the same conclusory statements about Defendants' role in Yelp that the Court previously rejected.  ECF No. 59 at 14.

"As a general matter, corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter."  S. Ferry, 542 F.3d at 784–85 (9th Cir. 2008) (internal quotation marks omitted).  Under the "core operations inference," however, "allegations regarding management's role in a company . . . may conceivably satisfy the PSLRA standard . . . without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter."  Id. at 786.

In its April 2015 Order, the Court rejected Plaintiffs' scienter argument based on management's general awareness of the day-to-day workings of Yelp because "Defendants never indicated that they were personally involved in ensuring the authenticity of Yelp's reviews" and therefore it was not "absurd to suggest" that Defendants did not have knowledge of Yelp's representatives' alleged advertising tactics.  ECF No. 48 at 21–22.

Plaintiffs do little to cure this defect in the FAC.  Plaintiffs suggest that because Yelp had the ability to manually filter reviews and employed community managers, scouts, and ambassadors to curate, write, and edit reviews, Yelp executives necessarily had "knowledge and control over Yelp's content and had access to information contradicting their public statements." ECF No. 62 at 21.  Defendants counter that statements referring to Yelp's curating, filtering, and creating reviews is irrelevant because nothing "in the FAC and nothing in the Opposition comes remotely close to showing" that Defendants knew about the alleged manipulation of reviews and made "a conscious decision to lie about it."  ECF No. 63 at 12.

United States District Court
Northern District of California

The Court agrees that the FAC does not include any "allegation[s] of specific information conveyed to management that is related to the fraud." S. Ferry, 542 F.3d at 785. Defendants' statements that "we employ proprietary filtering technology to analyze and screen all of our reviews" does not imply, by any measure, that Yelp's directors and officers personally screened reviews or knew about the alleged illicit advertising scheme. FAC ¶ 43. If anything, this statement indicates that the majority of Yelp's monitoring is done automatically and without human intervention. The fact that Yelp employed community managers, scouts, and ambassadors to write and curate posts also does not indicate that Yelp's directors and officers knew that any significant number of reviews were not authentic or firsthand, beyond what Defendants represented to the public. As the Court stated in the April 2015 Order, it is not "self-evident that Yelp's chief executives necessarily knew of the veracity of complaints made by individual local business owners who contacted Yelp and offered evidence that reviews or their business were not credible or were being manipulated by Yelp employees because they had declined to advertise." ECF No. 48 at 21. Nor is it "absurd" to suggest that Defendants were unaware of the truth of the allegations that Yelp employees were manipulating reviews. ECF No. 48 at 22.

### ii.    Allegations Regarding Unusual Insider Sales

Second, Plaintiffs rely on Defendants' stock sales during the class period as circumstantial evidence that Defendants knew Yelp's stock price was artificially inflated. FAC ¶¶ 66–68. To establish a sufficiently "strong inference" of scienter based on circumstantial evidence of insider trading, the Ninth Circuit requires plaintiffs to allege "unusual" or "suspicious" stock sales "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." Ronconi, 253 F.3d at 435 (emphasis and internal quotations marks omitted). To assess whether insider sales qualify as unusual or suspicious, courts consider "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." Id. Plaintiffs "must allege sufficient context of insider trading for [courts] to determine whether the level of trading is dramatically out of line with prior trading practices." Id. (internal quotation marks omitted).

24

United States District Court
Northern District of California

1    In its April 2015 Order, the Court rejected Plaintiffs' argument based on insider sales

2 because Plaintiffs had not "provided any context for the sales described in the Complaint and the

3 Court thus [could not] conclude that the sales were suspicious."  ECF No. 48 at 22.  In particular,

4 the Court noted that it had "no basis on which to conclude that there exists a strong inference that

5 these sales were out of line with prior trading practices because the Complaint does not allege any

6 information regarding the insider's prior trading practices."  Id. at 23

7    In the FAC, Plaintiffs have added the percentages of overall Class A and Class A+B[10]

8 shares sold by eight Yelp insiders during the Class Period.  FAC ¶ 66.  Plaintiffs have also

9 included stock market journalists' impressions of these insider sales, including characterizations

10 that insider selling at Yelp was "rampant" during the Class Period.  FAC ¶ 67.

11    Defendants respond that "the FAC again fails to provide any prior context for the sales

12 made during the class period."  ECF No. 59 at 13.  Defendants note that the only difference

13 between the initial Complaint and the FAC is that the FAC adds "the percentage of Class A

14 common stock allegedly sold by certain insiders."  Id. at 14.  Lastly, Defendants contend that the

15 sales "were consistent with prior patterns and, in most of the material cases, the result of 10b5-1

16 stock sales plans."  Id. at 13.

17    The Court cannot discern the relevance of the percentage of Class A common stock sales

18 during the Class Period because those shares comprise a minority of Defendants' overall Yelp

19 stock holdings.[11]  FAC ¶ 66.  Plaintiffs have provided no authority—and the Court is aware of

20 none—that supports the claim that a high percentage of sales of one class of stock supports a

21 finding of scienter where those shares represent a small overall percentage of the seller's total

22 stock holdings.[12]  Indeed, Plaintiffs appear to agree that "sales of all holdings should be taken into

23

---

24 [10] The primary difference between "Class A" and "Class B" common stock is that "the holders of
   Class A common stock are entitled to one vote per share while the holders of Class B common
25 stock are entitled to 10 votes per share."  FAC ¶ 66 n. 23.
   [11] For example, between November 4, 2013 and March 10, 2014, Plaintiffs allege Defendant
26 Stoppelman sold 50% of his Class A shares—a figure that merely comprises 2.1% of his overall
   Class A+B holdings.  FAC ¶ 66.
27 [12] Plaintiffs suggest that sales of Class A shares uniquely show scienter because they "were the
   shares available to insiders for sale without substantially diluting their voting power, making
   defendants more likely to unload them."  ECF No. 62 at 23.  However, the fact that Defendants
28 were incentivized to sell their Class A shares first while maintaining their Class B shares does not

1  account when determining scienter." ECF No. 62 at 23.  However, the overall percentages of

2  Class A+B shares sold by Defendants do not support an inference of scienter.  FAC ¶ 66 (listing

3  insider sales of 9.1%, 22.76%, and 2.1% for the named Defendants); Ronconi, 253 F.3d at 435

4  (finding insider sales of 10% and 17% not "suspicious").

5          More importantly, however, Plaintiffs have once again failed to provide any historical

6  context for the insider sales, leaving the Court unable to determine if the sales were, in fact,

7  suspicious.  FAC ¶ 66; ECF No. 48 at 22–23.  Plaintiffs once again argue that the Court should

8  ignore this deficiency because Yelp's initial public offering occurred in March 2012, and thus,

9  Plaintiffs do not have enough historical data to show that the insides sales are "unusual" or

10 "suspicious."  ECF No. 62 at 24 (citing Chu v. Sabratek Corp., 100 F.Supp.2d 827, 841 (N.D. Ill.

11 2000)).[13]  However, it is Plaintiffs' burden to plead scienter with particularity should they wish to

12 pursue a securities claim against Defendants.  Plaintiffs may allege scienter in any number of

13 ways, and thus the unavailability of historical trading data does not unfairly foreclose Plaintiffs'

14 ability to survive a motion to dismiss.  In the Ninth Circuit, information about trading history

15 remains "necessary to determine whether the sales during the Class Period were out of line with

16 historical practices," Police Ret. System of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051,

17 1064 (9th Cir. 2014) (internal quotation marks omitted).  Because Plaintiffs have submitted no

18 such historical trading data, the Court cannot conclude that the insider sales alleged by Plaintiffs

19 supports a finding of scienter.

20          Considering both of Plaintiffs' scienter theories collectively, the Court concludes that

21 Plaintiffs have failed to carry their burden of alleging scienter under the pleading requirements of

22 Federal Rule of Civil Procedure 9(b) and the PSLRA.[14]

23 _____

24 support a finding of scienter.  Rather, Defendants simply appear to have decided to sell their less
   valuable shares first.

25 [13] Plaintiffs' reliance on the reasoning in Chu is unavailing.  In Chu, the court did not hold that a
   plaintiff's burden of pleading scienter is eased when it lacks historical stock price data.  The court

26 merely noted that when prior trading history is unavailable, plaintiffs cannot use past trading to
   support their scienter theory.  Chu, 100 F. Supp. 2d at 841.  Ultimately, the Chu court examined

27 the "level and timing of sales" and held that the plaintiffs had inadequately alleged scienter against
   the defendants, despite the fact that some defendants had sold a majority of their holdings during

28 the class period.  Id. at 842.
   [14] Because Plaintiffs have done nothing to cure the deficiencies of scienter in their initial

United States District Court
Northern District of California

### D.    Plaintiffs' Derivative Section 20(a) Claim

Section 20(a) of the Securities Exchange Act, which forms the basis of Plaintiffs' second cause of action, extends liability to persons who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a). A claim under section 20(a) can only survive if the underlying predicate Securities Exchange Act violation also survives. See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000). Because the Court dismisses Plaintiffs' predicate Securities Exchange Act claim, Plaintiffs' second cause of action also must be dismissed.

## IV.    Leave to Amend

The Court previously dismissed Plaintiff's initial Complaint without prejudice and directed Plaintiffs to add to any amended complaint additional factual allegations demonstrating material falsity, loss causation, and scienter. ECF No. 48 at 24. The fact that Plaintiffs "failed to correct these deficiencies in [their First] Amended Complaint is a strong indication that the plaintiffs have no additional facts to plead." Zucco Partners, LLC, 552 F.3d at 1007 (internal quotation marks omitted). "A district court's discretion to deny leave to amend is particularly broad where the plaintiff has previously amended." Salameh v. Tarsadia Hotel, 726 F.3d 1124, 1133 (9th Cir. 2013) (internal quotation marks omitted). The Court concludes that further leave to amend would be futile and therefore dismisses Plaintiffs' FAC without leave to amend.

## V.    Conclusion

Plaintiffs have failed to plead with particularity materially false or misleading statements, loss causation, and scienter. Plaintiffs have therefore not stated a claim for relief under either

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Complaint, the Court need not consider Defendants' argument based on the named Defendants' 10b5-1 stock sales plans. ECF No. 59 at 13–14.

27

section 10(b) or 20(a) of the Securities Exchange Act.  Accordingly, the Court hereby dismisses the FAC without leave to amend.

IT IS SO ORDERED.

Dated:  November 24, 2015



                      JON S. TIGAR
             United States District Judge

United States District Court
Northern District of California

28